IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOLAE, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | C.A. No. 07-140-JJF |
| vs. | ) | |
| | ) | |
| HERSHEY CANADA INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPENDIUM OF UNREPORTED CASES CITED IN ANSWERING BRIEF OF SOLAE, LLC IN OPPOSITION TO HERSHEY CANADA INC.'S MOTION TO DISMISS**

MORRIS JAMES LLP

P. Clarkson Collins (I.D. No. 739)
Katherine J. Neikirk (I.D. No. 4129)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware 19899
(302) 888-6800
pcollins@morrisjames.com
kneikirk@morrisjames.com

OF COUNSEL:
CROWELL & MORING LLP
Scott L. Winkelman
Monica M. Welt
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2500

Dated: May 11, 2007

**UNREPORTED CASES**

Cases Tab

*Brown v. Williams,*
No. 03-426-SLR, 1989 WL 51674 (D. Del. April 25, 2007)....................................1

*Hadley v. Shaffer*,
No. 99-144-JJF, 2003 WL 21960406 (D. Del. August 12, 2003)............................2

*Health Trio v. Margules.*,
No. 06C-04-196, 2007 WL 544156 (Del. Super. Ct. January 16, 2007)..................3

*L & L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*,
No. 98-315-SLR, 2006 WL 1102814 (D. D. C. March 31, 2006)............................4

*Little Switz., Inc. v. Destination Retail Holdings Corp.*,
No. 98-315-SLR, 1999 WL 223496 (D. Del. March 31, 1999)................................5

*McNeil Nutritionals, LLC v. Sugar Ass'n*,
No. C. A. 05-69 (GNS), 2005 WL 1000242 (D. Del. April 29, 2005)......................6

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
No. 06-1181, 2007 WL 942201 (Fed. Cir. March 30, 2007)...................................7

*Triegiant Loyalty Solutions, Inc. v. Maritz*,
No. 04-360-JJF, 2005 WL 441077 (D. Del. February 15, 2005)..............................8

# TAB 1

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

**Albert James BROWN, Plaintiff,**
**v.**
**Dave WILLIAMS, Raphael Williams, et al., Defendants.**

**Civil No. 03-426-SLR.**

April 25, 2007.

Albert James Brown, Howard R. Young Correctional Institution, Wilmington, DE, Pro se Plaintiff.

Dana Spring Monzo, Esquire, McCullough & McKenty, P.A., Wilmington, DE, for Defendant Tammy Y. Kastre.

MEMORANDUM OPINION

ROBINSON, Chief Judge.

I. INTRODUCTION

***1** On April 24, 2003, Albert James Brown, a pro se plaintiff proceeding in forma pauperis ("plaintiff"), filed the present action pursuant to 42 U.S.C. § 1983 [FN1] against Dave Williams, Courtney Porstman, and Warden Raphael Williams (collectively, the "State defendants"). [FN2] (D.I.2) On May 24, 2006, plaintiff amended his complaint to add Tammy Y. Kastre ("Kastre") as a defendant. (D.I.60) Plaintiff asserts four claims, all of which arise under the Eighth and Fourteenth Amendments. Plaintiff requests declaratory judgment, injunctive relief, and compensatory and punitive damages. (D.I. 8 at 16) The court has jurisdiction over the present suit pursuant to 28 U.S.C. § 1331. Before the court is Kastre's motion to dismiss. (D.I.71) For the reasons that follow, the court grants defendant's motion.

FN1. The statute provides, in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in the action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

FN2. Plaintiff has also alleged Eighth Amendment violations by Courtney A., Diana Hernandez, Doctor Alvin Kingcade, Doctor Ali, Doctor N. Shah, and PA Ina (collectively, the "medical defendants"), claiming inadequate medical care. (D.I. 8 at 13)

II. BACKGROUND

The court recited many of the pertinent facts in its memorandum opinion granting State defendants' motion for summary judgment (D.I.46), thus, only the most pertinent facts related to the present motion to dismiss are summarized below. On May 23, 2002, plaintiff was arrested and subsequently admitted to the Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware, where he has remained at all times relevant to this litigation. [FN3] (D.I. 2 at 3) Plaintiff filed this § 1983 lawsuit on April 24, 2003, alleging, in part, that the medical care he received during his incarceration at HRYCI violated his Eighth and Fourteenth Amendment rights under the U.S. Constitution. (D.I.2) Plaintiff initially brought suit against the State defendants on April 24, 2003, and amended his complaint to include the medical defendants on December 1, 2003. [FN4] (D.I.2, 8) On April 19, 2006, plaintiff again amended his complaint and added Kastre as a defendant. (D.I.51, 59) Kastre was made a party to this action by virtue of her capacity as owner of First Correctional Medical, the prison's health care provider during the period in question. (D.I.59) Plaintiff states that he "learned [Kastre] is the owner of First Correctional Medical," and asserts that she is at fault for the actions of the medical personnel at the prison. [FN5] (D.I.51) On September 18, 2006, Kastre moved to dismiss plaintiff's complaint. (D.I.71)

FN3. Plaintiff alleges that on the night of his arrest, he was the victim of police brutality, assault, and battery. (D.I. 8 at 1) Plaintiff has filed a separate complaint regarding that incident in Civ. No. 03-404-SLR.

FN4. State defendants moved for summary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



judgment, which the court granted noting that liability in a civil rights action cannot be predicated solely on the operation of respondeat superior. (D.I. 46 at 9) Plaintiff's claims against the medical defendants are still pending.

FN5. Specifically, plaintiff alleges that Kastre "is [at] fault [for] the responsibilities of Dr. Shah, supervisor Courtney Portsman, Alvin A. Kingcade, Dr. Ali, PA Ina, [and] Diana Hernandez." (D.I.51)

III. STANDARD OF REVIEW

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993). In analyzing a motion to dismiss, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Gibbs v. Roman, 116 F.3d 83, 86 n. 6 (3d Cir.1997): Urrutia v. Harrisburg County Police Dep't, 91 F.3d 451, 456 (3d Cir.1996). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).

IV. DISCUSSION

***2** The Third Circuit has concluded that a person in a supervisory position cannot be the moving force behind a constitutional violation of a subordinate unless the supervisor has exhibited deliberate indifference to the plight of the person deprived. See Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989); Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 (1st Cir.1988)). In addition, "a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n. 3 (1981); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir.1976)). Personal involvement can be established through allegations of either personal direction or actual knowledge and acquiesence (deliberate indifference); however, such allegations must be made with particularity. See Rode, 845 F.2d at 1207. Finally, the Supreme Court has held that supervising officials do not violate the constitutional rights of victims of misconduct unless they have had an affirmative part in the misconduct. See Rizzo v. Goode, 423 U.S. 362, 377 (1976); Commonwealth of Pa. v. Porter, 659 F.2d 306, 336 (3d. Cir.1981) (requiring that supervising officials play an affirmative role in violating the plaintiff's rights and that an official's misconduct "cannot be merely a failure to act").

Viewing the facts in the light most favorable to plaintiff, the court finds that plaintiff has failed to sufficiently allege personal involvement on behalf of Kastre in order to subject her to liability. Plaintiffs allegations have not been made with the requisite particularity. In both his motion to amend the complaint and his answering brief to Kastre's motion to dismiss, plaintiff failed to state any affirmative actions on the part of Kastre. (D.I.51, 59, 73) Plaintiff only related that Kastre is the owner of First Correctional Medical and that she, therefore, is responsible for the actions of the medical personnel. (D.I.51) Without specific instances in which Kastre affirmatively knew of or participated in the withholding of constitutionally adequate medical care to plaintiff, it can be inferred that plaintiff intends to hold her liable by virtue of her position. Because § 1983 prohibits the imposition of liability on the sole basis of the doctrine of respondeat superior, the court concludes that plaintiff has failed to state a claim upon which relief can be granted. See Durmer v. O'Carroll, 991 F.2d 64, 69 n. 14 (3d Cir.1993).

V. CONCLUSION

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



For the reasons stated above, defendant's motion to dismiss is granted. An appropriate order shall issue.

ORDER

At Wilmington this 25th day of April, 2007, consistent with the memorandum opinion issued this same date;

***3** IT IS ORDERED that defendant Kastre's motion to dismiss (D.I.71) is granted.

2007 WL 1219624 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# TAB 2

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21960406 (D.Del.))

Page 27

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

**Thomas J. HADLEY, in his capacity as the Former Shareholders Representative of the shareholders of Kiamichi Railroad Company, Inc ., Plaintiff**
**v.**
**James S. SHAFFER, individually, Kiamichi Railroad Company, L.L.C., and Statesrail, L.L.C., Defendants/Third-Party Plaintiffs/Counterclaim Plaintiffs**
**v.**
**Jack L. HADLEY and Thomas J. Hadley, individually. Third-Party Defendants.**

**No. Civ.A. 99-144-JJF.**

Aug. 12, 2003.

Jesse E. Finkelstein, Frederick K. Cottrell, III, Anne Shea Gaza, of Richards, Layton & Finger, Wilmington, Delaware, for Defendants/Third Party Plaintiffs/Counterclaim Plaintiffs, Michael E. Schonberg, and James Berglund, of Thompson & Knight, P.C., Dallas, Texas, of counsel.

Robert Jacobs, Vincent J.X. Hedrick, of Jacobs & Crumplar, P.A., Wilmington, Delaware, for Third Party Defendants, Weldon Stout, of Wright, Stout, Fite & Wilburn, Muskogee, Oklahoma, of counsel.

OPINION

FARNAN, J.

***1** Presently before the Court is Third Party Defendants' Motion to Dismiss for Lack of Jurisdiction. (D.I.92). For the reasons discussed below, the motion to dismiss (D.I.92) will be denied.

I. Introduction

In June, 1995, StatesRail L.L.C. ("StatesRail"), a Delaware limited liability company, and Kiamichi Railroad Company ("Kiamichi"), a Delaware corporation, (collectively referred to as "Third Party Plaintiffs") entered into an Agreement and Plan of Merger (the "Merger Agreement"). (D.I.95, Exh. A). The merger was completed effective June 30, 1995. (D.I. 95, Exh. A at 1). Before the merger, Kiamichi was a closely-held corporation with approximately 16 shareholders. (D.I.95, Exh. C). Jack Hadley and his wife were the majority shareholders of Kiamichi. (D.I.95, Exh. C). Under the Merger Agreement, Kiamichi created a subsidiary under the laws of Delaware, Kiamichi Acquisition, L.L.C. ("KRR Acquisition"). (D.I. 95, Exh. A at 1). Pursuant to the terms of the Merger Agreement, KRR Acquisition acquired Kiamichi's stock and Kiamichi ceased to exist.

At the time of closing, $1.4 million of the total purchase price was placed into an escrow account by the parties for indemnification purposes (the "Indemnity Escrow Account"). (D.I. 33 at 7, ¶ 4). Pursuant to the Merger Agreement, funds in the Indemnity Escrow Account not returned to StatesRail as indemnity payments are to be disbursed to the former shareholders of Kiamichi according to a schedule in the Merger Agreement. (D.I. 95, Exh. A at §§ 2.3(b), 2.6(e)). A Former Shareholder Representative ("Representative") was appointed to administer the indemnity claims asserted by Third Party Plaintiffs. (D.I. 95, Exh. A at 25, 48). Initially, Jack Hadley served as the Representative, but Thomas J. Hadley later assumed the position. (D.I. 95, Exh. B at ¶ 6).

Following the merger, StatesRail filed a lawsuit in Texas against Thomas J. Hadley, in his capacity as Representative, alleging that Hadley had failed to release indemnity payments to States Rail in accordance with the terms of the Merger Agreement. (D.I.95, Exh. E). Thomas J. Hadley filed a Motion to Dismiss, claiming that the mandatory forum selection clause in § 11.11 of the Merger Agreement provided that the Delaware courts had exclusive jurisdiction. (D.I. 95, Exh. F at 6). As a result of Section 11.11's mandatory forum selection clause, Hadley argued that the Texas court lacked jurisdiction. (D.I. 95, Exh. F at 6). Hadley's Motion to Dismiss was granted on June 29, 1998. (D.I.95, Exh. H).

On July 10, 1998, Thomas J. Hadley, in his capacity as Representative, filed a lawsuit in an Oklahoma state court alleging various breaches of the Merger Agreement. (D.I. 95 at 5). Third Party Plaintiffs removed the suit to federal court and subsequently requested and obtained a change of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.



venue to this Court, based on Section 11.11's forum selection clause. (D.I. 92 at 1-2). Third Party Plaintiffs then filed a Counterclaim and Third Party Complaint against Thomas J. Hadley and Jack Hadley, individually, disputing the ownership of certain life insurance policies related to the Merger Agreement. (D.I. 98 at 2-3).

***2** The parties do not dispute that the instant claims are based upon the Merger Agreement. However, Jack Hadley and Thomas J. Hadley, individually, (the "Hadleys") have moved to dismiss the claims against them for lack of in personam jurisdiction. (D.I.92).

II. Standard of Review

Third Party Defendants Jack Hadley and Thomas J. Hadley contend that the Third Party Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) because the Court lacks personal jurisdiction over them in their individual capacities. Rule 4(e) of the Federal Rules of Civil Procedure provides that a federal court may exercise personal jurisdiction over a nonresident "to the extent permissible under the law of the state where the district court sits." Mesalic v. Fiberloat Corp., 897 F.2d 696, 698 (3d Cir.1990); Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc., 833 F.Supp. 437, 440 (D.Del.1993).

Once a defendant has properly raised the jurisdictional defense, the plaintiff has the burden of establishing by a preponderance of the evidence that the defendant has had minimum contacts with the forum state. Patterson v. F.B.I., 893 F.2d 595, 604 (3d Cir.1990), cert. denied, 498 U.S. 812 (1990). If the plaintiff is able to make a prima facie case supporting the exercise of personal jurisdiction, the burden shifts to the defendant to "present a compelling case that the presence of some other consideration would render jurisdiction unreasonable." Grand Entm't Group v. Star Media Sales, 988 F.2d 476, 483 (3d Cir.1993). In the context of a motion to dismiss, the record must be viewed in the light most favorable to the non-moving party. See Joint Stock Soc'y v. Heublein, Inc., 936 F.Supp. 177, 192 (D.Del.1996) (holding that the court must accept as true all well-pled facts).

III. Parties' Contentions

The Hadleys contend that the Court lacks in personam jurisdiction over them for the purposes of this litigation. (D.I.92). The Hadleys rely on three assertions: (i) that they are not bound by the Merger Agreement's forum selection clause; (ii) that they have taken no acts within the state of Delaware that would subject them to statutory jurisdiction; and (iii) that to subject them to jurisdiction would be inconsistent with Due Process.

First, the Hadleys contend that, as non-signatories to the 1995 Merger Agreement, they are not bound by the Merger Agreement's mandatory forum selection clause. (D.I. 98 at 8). Because they are not bound by the forum selection clause, they argue that they have not consented to the exercise of personal jurisdiction over them by the Court. (D.I. 98 at 8-9). Further, the Hadleys contend that the forum selection clause cannot be enforced against them in their individual capacities as third-party beneficiaries. (D.I. 98 at 12-13). The Hadleys contend that third-party beneficiary status can only be conferred upon the party bringing the suit. (D.I. 98 at 13). Because they are not Plaintiffs in the Third Party Complaint, the Hadleys contend that they are not third-party beneficiaries to the Merger Agreement such that they should be deemed to have consented to this Court's jurisdiction.

***3** The Hadleys further contend that they have not committed any acts in their individual capacities that would subject them to personal jurisdiction in this Court under Delaware's long-arm statute, 10 Del. C. § 3104(c)(1-6). (D.I. 92 at 6). Finally, the Hadleys contend that because they have not had the requisite minimum contacts with the State of Delaware, the constitutional Due Process requirement has not been met. (D.I. 92 at 7). In support of this assertion, the Hadleys submit affidavits which state that they have not been in the State of Delaware regarding the subject matter of this action. (D.I. 92 at 7). For all these reasons, the Hadleys contend that they are not subject to the jurisdiction of this Court. (D.I.92).

In response, Third Party Plaintiffs contend that the Hadleys have expressly consented to and waived any objections to the exercise of personal jurisdiction by this Court pursuant to the Merger Agreement's forum selection clause. (D.I. 95 at 10). Third Party Plaintiffs argue that, as intended third-party beneficiaries of the Merger Agreement, the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Hadleys are bound by the forum selection clause. (D.I. 95 at 12-13). In support of this contention, Third Party Plaintiffs point out that Thomas J. Hadley had previously attempted to enforce the terms of the Merger Agreement in an Oklahoma court, by asserting his standing as the Former Shareholders Representative. (D.I. 95 at 4, 15). Further, Thomas J. Hadley successfully argued to the Texas state court that all causes of action arising out of the Merger Agreement must be brought in Delaware. (D.I. 95 at 16). By having previously used the forum selection clause to his benefit, Third Party Plaintiffs argue that Thomas J. Hadley is now bound by the terms of that clause. (D.I. 95 at 15).

Alternatively, Third Party Plaintiffs contend that this Court has specific jurisdiction over the Hadleys. Plaintiffs assert that under a properly expansive reading of the Delaware long-arm statute, the Hadleys have, in fact, transacted business in Delaware sufficient to satisfy § 3104(c)(1). (D.I. 95 at 17-18).

Further, Third Party Plaintiffs assert that the exercise of jurisdiction by this Court over the Hadleys comports with Due Process. (D.I. 95 at 21). In support of this contention, Third Party Plaintiffs argue that the Hadleys: (i) purposely availed themselves of Delaware state laws; (ii) could have reasonably anticipated being called into the courts of Delaware; and (iii) would bear a minimal burden if made to defend this action in this jurisdiction. (D.I. 95 at 21). In sum, Plaintiffs contend that the Hadleys are subject to the exercise of personal jurisdiction by this Court. (D.I.95).

IV. Discussion

A. Whether the Hadleys Have Expressly Consented to Jurisdiction in Delaware Pursuant to the Forum Selection Clause?

The first question in an evaluation of whether the Hadleys can be properly subjected to the jurisdiction of this Court, is whether they have consented to jurisdiction as a result of the Merger Agreement's forum selection clause. When a party is bound by a forum selection clause, the party is considered to have expressly consented to personal jurisdiction. Res. Ventures, Inc. v. Res. Mgmt Int'l, Inc., 42 F.Supp.2d 423, 431 (D.Del.1999). An express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process. Sternberg v. O'Neil, 550 A.2d 1105, 1116 (Del.1987). Such consent is deemed to be a waiver of any objection on Due Process grounds and an analysis of minimum contacts becomes unnecessary. See Hornberger Mgmt. Co. v. Haws & Tingle General Contractors, Inc., 685 A.2d 724, 727 (Del.Super.Ct.2000) (stating "[a] party may expressly consent to jurisdiction by agreeing to a forum selection clause ... If a party consents to jurisdiction, a minimum contacts analysis is not required."); USH Ventures v. Global Telesystems, Inc. C.A. No. 97C-08-086, 1998 Del. Super Lexis 167, at *22 (Del.Super.Ct. May 21, 1998) (same). Thus, if the Court determines that the Hadleys are bound by the forum selection clause, the Court can exercise in personam jurisdiction over them.

***4** In order to determine whether the Hadleys are bound by the forum selection clause, three questions must be resolved. These questions are: (1) whether the forum selection clause is valid; (2) whether the Hadleys are either parties, third-party beneficiaries, or closely related to the Merger Agreement; and (3) whether the present claim arises from their standing relating to the Merger Agreement. Only where all three questions are answered in the affirmative, can the Hadleys be bound by the forum selection clause and found to have consented to the Court's jurisdiction.

1. Is the Forum Selection Clause Valid?

Both Delaware and federal decisional law acknowledge that, as a general principle, private parties may agree to conduct all potential litigation arising out of a contract in a single jurisdiction. Process and Storage Vessels, Inc. v. Tank Servs., Inc., 541 F.Supp. 725, 733 (D.Del.1982). Such Merger Agreements are presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes: (i) it is a result of fraud or overreaching; (ii) enforcement would violate a strong public policy of the forum; or (iii) enforcement would, in the particular circumstances of the case, result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable. Coastal Steel Corp. v. Tilghman Wheelabrator, LTD., 709 F.2d 190, 202 (3d Cir.1983), overruled on other grounds by, Lauro Lines v. Chasser, 490 U.S. 495 (1989). Generally put, forum selection clauses are enforced so long as enforcement at the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



time of litigation would not place any of the parties at a substantial and unfair disadvantage or otherwise deny a litigant his day in court. See Process, 541 F.Supp. at 733 (citing The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)). Because the Hadleys have made no assertion regarding the validity of the clause, they have not overcome the presumption in favor of validity. Accordingly, the Court concludes that the forum selection clause is valid.

2. Are the Hadleys Subject to the Forum Selection Clause As Third-Party Beneficiaries?

The Court must next determine whether the Hadleys are subject to the terms of the forum selection clause. If the Hadleys are found to be either parties, third-party beneficiaries, or closely related to the Merger Agreement, they will necessarily be bound by the forum selection clause. The Court will first turn to whether the Hadleys can be considered parties to the Merger Agreement.

The Hadleys correctly assert that they are not parties to the original 1995 Merger Agreement. (D.I. 98 at 8). They are not listed as parties on the Merger Agreement's cover page. Further, neither Thomas nor Jack Hadley signed the Merger Agreement in any capacity. (D.I. 95 at Exh. A). The Hadleys, however, stop short of a full analysis. The parties executed an amendment to the Merger Agreement (the "Amendment") on October 3, 1995. Jack Hadley, in his capacity as Chairman of the Board of Directors of Kiamichi, was a signatory to the Amendment. As such, Jack Hadley would be bound by the forum selection clause in his capacity as chairman. See Resource Ventures, Inc., 42 F.Supp.2d at 432 (finding that a signatory to an amendment of a contract is bound by the forum selection clause in the original contract). However, Jack Hadley is not bound by the clause in his individual capacity. See, e.g., Packer v. TDI Systems, 959 F.Supp. 192, 195 n. 2 (S.D.N.Y.1997) (stating "[t]he forum selection clause, of course, applies to the parties to the contracts, the corporate entities, and not to the individual signatories."). Accordingly, the Court concludes that the Hadleys, in their individual capacities, are not parties to the Merger Agreement.

*5 The next inquiry is to determine whether the Hadleys can be considered third-party beneficiaries to the Merger Agreement. To qualify as a third-party beneficiary, it must be shown that the contract was "made for the benefit of that third party within the intent and contemplation of the contracting parties." Grand St. Artists v. Gen'l Electric. Co., 19 F.Supp.2d 242, 253 (D.N.J.1998) (citing Grant v. Coca-Cola Bottling Co., 780 F.Supp. 246 (D.N.J.1991)); Pierce Associates, Inc. v. Nemours Foundation, 865 F.2d 530, 535 (3d Cir.1988) (applying Delaware law); Browne v.. Robb, 583 A.2d 949, 954-955 (Del.1990) (requiring the contracting parties to intend to confer a benefit on the third party). To determine whether the parties intended to make an individual a third-party beneficiary, the Court must look to the terms of the contract and the surrounding circumstances. Grand St. Artists, 19 F.Supp.2d at 253.

Under Delaware law, the intention of the contracting parties is paramount in determining whether others have standing as third-party beneficiaries. See E.I. DuPont & Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, 197 (3d Cir.2001). Thus, if it was not the promisee's intention to confer direct benefits upon a third party, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract. Guardian Constr. Co. v. Tetra Tech Richardson, Inc., 583 A.2d 1378, 1386 (Del.Super.Ct.1990).

The Court concludes that the Hadleys are intended third-party beneficiaries of the Merger Agreement. As consideration for the sale of shares in Kiamichi, the Merger Agreement provided that the shareholders (including the Hadleys) would receive the payments set forth in paragraph 2.3(a). (D.I. 95, Exh. A at 5). Paragraph 8.6 of the Merger Agreement required the approval of the Hadleys and other shareholders before the Merger Agreement became final. (D.I. 95, Exh. A at 36). The Hadleys also consented to the stock purchase and merger. (D.I. 95 at Exh. D, E, K). The Hadleys, as shareholders, were undoubtedly intended to receive a benefit from the sale of their stock through the Merger Agreement. See DuPont, 269 F.3d at 196. In fact, Jack Hadley and his wife were majority shareholders of Kiamichi, owning approximately 60% of the shares. (D .I. 95 at Exh. C. Schedule 3.4 of Stock Purchase Merger Agreement). Further, Jack Hadley was actively involved in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



negotiations that led to the Merger Agreement. See Kleifgen Decl. at ¶¶ 3-4.

Thomas J. Hadley has exhibited his status as a third-party beneficiary in at least two ways. First, when faced with the Texas suit, initiated by StatesRail, Mr. Hadley was granted a 12(b)(2) Motion to Dismiss after he successfully argued that "... by Section 11.11 of the Merger Agreement the parties irrevocably submitted and consented to the jurisdiction and venue of the courts of the State of Delaware and the federal courts located in Delaware." (D.I. 95, Exh. F at ¶ 6). The case was dismissed based on Mr. Hadley's assertion that the forum selection clause was enforceable in "any dispute arising out of or relating to the Merger Agreement." (D.I. 95, Exh. F at ¶ 6). Two weeks after the Texas court granted Mr. Hadley's Motion to Dismiss, Mr. Hadley instituted suit against Third Party Plaintiffs in Oklahoma. There, Mr. Hadley used his third-party beneficiary status to his benefit by seeking compensation for alleged breaches of the Merger Agreement. The Oklahoma court agreed with the Texas court's conclusion that the forum selection clause was binding and transferred the case to this Court.

***6** Delaware law prohibits third-party beneficiaries from reaping the benefits of a contract they seek to enforce, while, at the same time, avoiding the burdens or limitations of the contract, such as a forum selection clause. Process, 541 F.Supp. at 733. For example, in Rumsey Elec. Co. v. Univ. of Del., the Delaware Supreme Court held that:

> When plaintiff seeks to secure benefits under a contract as to which he is a third-party beneficiary, he must take that contract as he finds it .... the third party cannot select the parts favorable to him and reject those unfavorable to him.

358 A.2d 712, 714 (Del.1976) (quoting Sanders v. Amer. Cas. Co., 269 Cal.App.2d 306, 310 (Cal.Ct.App.1969)). See also, Coastal Steel, 709 F.2d at 203 (holding that third-party beneficiary status does not permit the avoidance of contractual provisions otherwise enforceable); Barrett v. Picker Int'l Inc., 589 N.E.2d 1372, 1376 (Ohio Ct.App.1990) ("Therefore, plaintiffs' status as third-party beneficiaries cannot be used as both a sword to reap the benefits of the [contract] and a shield to protect them from enforcement of the forum selection clause."). Thomas J. Hadley cannot use the forum selection clause to his advantage, as he did in the Texas and Oklahoma litigations, and then assert that he is not bound by its terms in this Court. Based on the above cited factors, the Court concludes that the Hadleys are third-party beneficiaries to the Merger Agreement. As third-party beneficiaries, the Hadleys are bound by the terms of the Merger Agreement, including the forum selection clause.

Even if the Hadleys are not third-party beneficiaries to the Merger Agreement, the Court concludes that they are closely related to the Merger Agreement, and therefore, reasonably bound by its forum selection clause. "Forum selection clauses bind nonsignatories that are closely related to the contractual relation or that should have foreseen governance by the clause." Jordan v. SEI Corp., 1996 U.S. Dist. LEXIS 7627, at *18-19 (E.D. Pa. June 4, 1996). See also Hugel v. Corporation of Lloyd's, 999 F.2d 206, 209-210 (7th Cir.1993) (binding corporations owned and controlled by contracting party); Manetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509, 514 n. 5 (9th Cir.1988) (binding parent companies of contracting party and individual directors); Coastal Steel, 709 F.2d at 202 (binding a third-party beneficiary). In the instant case, the Hadleys are closely related to the Merger Agreement for the reasons discussed in the context of the Court's third-party beneficiary analysis. Accordingly, the Court concludes that the Hadleys should have foreseen governance by the forum selection clause.

3. Do the Claims Against the Hadleys Arise from their Status Relating to the Merger Agreement?

In order for the Hadleys to be bound by the terms of the forum selection clause, the claims asserted must arise from the Merger Agreement at issue. See DuPont, 269 F.3d at 197; see also Indus. Elec. Corp. v. Power Distrib. Group, Inc., 215 F.2d 677, 680 (7th Cir.2000) (holding that a third-party beneficiary was not compelled to arbitrate claims because the claims did not arise out of the contract from which it derived its third-party status). Here, the Hadleys concede that the present claim arises out of the Merger Agreement. Because the claim is based on the Merger Agreement to which the Hadleys are bound, the Court concludes that the Hadleys are bound by the terms of the forum

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



selection clause contained within the Merger Agreement.

*7 In sum, the Court concludes that Jack Hadley and Thomas J. Hadley are third-party beneficiaries, or at the very least, closely related to the Merger Agreement, which contains a valid forum selection clause such that the Hadleys are bound by the forum selection clause. Because the Hadleys are bound by the forum selection clause, the Court concludes that they have expressly consented to the jurisdiction of this Court.

B. Whether the Hadleys are Subject to Personal Jurisdiction Under Specific Jurisdiction Principles?

In the alternative, even if the Hadleys were not bound by the forum selection clause such that they cannot be said to have consented to jurisdiction in this Court, the Court would conclude that the Hadleys are subject to the Court's jurisdiction under the principles of specific jurisdiction. In the absence of consent to jurisdiction, the determination of whether personal jurisdiction exists is a two-step process under Delaware law. Jeffreys v. Exten, 784 F.Supp. 146, 150 (D.Del.1992). First, in personam jurisdiction must exist under the applicable state long-arm statute. See 10 Del. C. § 3104 (2003). Second, the exercise of jurisdiction must comport with the Due Process Clause of the Federal Constitution under the standards announced in International Shoe Company v. Washington, 326 U.S. 310 (1945). See Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir.1984); Hercules, Inc. v. Leu Trust and Banking (Bahamas) Ltd., 611 A.2d 476 (Del.1992), cert. dismissed, 507 U.S. 1025 (1993).

In order to determine whether in personam jurisdiction over the Hadleys exists, the Court must determine whether "the alleged conduct of a defendant comes within one of the provisions of the long-arm statute." Blue Ball Props., Inc. v. McClain, 658 F.Supp. 1310, 1315 (D.Del.1987). Third Party Plaintiffs assert that jurisdiction exists under 10 Del. C. § 3104(c)(1). This subsection of Delaware's long-arm statue provides that a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent "transacts any business or performs any character of work or service in the State." 10 Del.C. § 3104(c)(1). When applying the statute, it must be construed liberally, to "confer jurisdiction to the maximum extent possible under the Due Process Clause." Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 863 F.Supp. 186, 188 (D.Del.1993); accord LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del.1986).

Subsection (c)(1) has been interpreted to be a specific jurisdiction provision. Intel Corp. v. Broadcom Corp., 167 F.Supp.2d 692, 700 (D.Del.2001). Specific jurisdiction requires that there be a nexus between the plaintiff's cause of action and the conduct of the defendant. Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 414 n. 8 (1983). Therefore, personal jurisdiction can be asserted over a defendant on the basis of a single act related to the state, if the claim has its basis in the asserted transaction. Blue Ball, 658 F.Supp. at 1316; Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F.Supp. 1458, 1466 (D.Del.1991); Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc., 961 F.Supp. 686, 690 (D.Del.1997). The relatedness requirement only provides that the plaintiff cannot assert personal jurisdiction over a defendant on claims that are unrelated to the defendant's jurisdictional contacts. Intel, 167 F.Supp.2d at 704; Int'l Shoe, 326 U.S. at 317-18. The analysis then rests on two questions: (i) whether the Hadleys "transacted business" in Delaware to satisfy subsection (c)(1); and (ii) if so, whether those contacts in Delaware gave rise to the present controversy.

1. Whether the Hadleys Transacted Business in Delaware?

***8** Because Third Party Plaintiffs assert jurisdiction over the Hadleys in their individual capacities based on actions taken in their capacities as corporate agents, the fiduciary shield doctrine is implicated. The fiduciary shield doctrine is a judicially created doctrine that immunizes acts performed by an individual in the individual's capacity as a corporate employee from serving as the foundation for the exercise of personal jurisdiction over that individual. Res. Ventures, 42 F.Supp.2d at 434. In the past, this Court has concluded that the fiduciary shield doctrine is not an absolute bar to personal jurisdiction over a corporate agent. Mobil Oil, 833 F.Supp. at 443. As such, the mere fact that the defendant has acted through his corporation is insufficient to bar jurisdiction over the defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



individually. Tristrata, 961 F.Supp. at 690. Thus, the Court must read § 3104(c)(1) broadly and consider all forum related contacts of the individual defendants, even those taken in their fiduciary capacities. Res. Ventures, 42 F.Supp.2d at 434; Brady v. Preferred Florist Network, Inc., 791 A.2d 8, 12 (Del. Ch.2001).

In support of their argument that the Hadleys are subject to this Court's jurisdiction, Third Party Plaintiffs point to the Delaware Chancery Court's decision in NRG Barriers, Inc. v. Jelin, C.A. No. 15013, 1996 Del. Ch. LEXIS 81 (Del. Ch. July 1, 1996). This Court finds NRG to be on point factually and is persuaded by the NRG Court's analysis. In NRG, the Chancery Court denied defendant-shareholder's Motion to Dismiss for lack of in personam jurisdiction. 1996 Del. Ch. LEXIS 81, at *6. The court found that the actions of defendant-shareholders constituted the "transact[ion] of business" sufficient to subject them to jurisdiction under Subsection (c)(1) of Delaware's long-arm statute. Id. The court pointed to the following four facts as support for its finding: (i) defendants were shareholders in a closely-held Delaware corporation; (ii) defendants entered into a Stock Purchase Merger Agreement, a contract with a Delaware corporation to sell their stock in the Delaware close corporation; (iii) the parties expressly agreed Delaware law governed the Stock Purchase Merger Agreement; and (iv) Delaware lawyers participated in drafting the Merger Agreement and rendered legal advice with respect to Delaware law. Id. at *7.

The Court finds that three of the four factors cited in NRG are present in this case. As to the first factor, the Hadleys were shareholders in Kiamichi, a closely-held Delaware corporation. Second, the Hadleys, as shareholders, entered into the Merger Agreement, which provided for a stock purchase and merger. Third, as the Court has previously discussed, the parties consented to the Merger Agreement, which contained a Governing Law Clause and provided that the Merger Agreement would be enforced in accordance with the laws of Delaware. (D.I. 95, Exh. A. at § 11.5).

***9** In support of their contention that the statutory requirements of Delaware's long-arm statute have not been met, the Hadleys have provided the Court with affidavits that assert that they have not been in Delaware regarding the subject matter of this action. (D.I. 92 at 7). However, the Hadleys fall short in their effort to avoid jurisdiction by relying too heavily on physical ties to Delaware. As noted in NRG, the court is not limited to a "personal, physical presence ... within the borders of a state" when determining whether personal jurisdiction exists. 1996 Del. Ch. LEXIS 81, at *10.

The Court concludes that the Chancery Court's holding in NRG should be followed, and therefore, concludes that the Hadleys' actions satisfy the minimum contacts required by Subsection (c)(1) of the Delaware long-arm statute. Having concluded that the Hadleys transacted business in Delaware sufficient to satisfy the Delaware long-arm statute, the Court must next determine whether the Hadleys' contacts with Delaware are related to the present controversy. Because neither party disputes that the Merger Agreement and resulting stock purchase and merger gave rise to the present controversy, the Court concludes that the statutory requirement of specific jurisdiction has been met.

2. Due Process Requirements

Having determined that the Hadleys have satisfied the statutory basis for establishing personal jurisdiction, the Court must next consider whether the exercise of personal jurisdiction comports with the constitutional requirements. Due process requires that a defendant have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." ' Int'l Shoe, 326 U.S. at 319. In Hanson v. Denckla, the Supreme Court noted that "it is essential that in each case there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. 235, 253 (1958).

In addition, the defendant's conduct and connection with the forum State must be such that he should reasonably anticipate being haled into court there. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). A Due Process analysis requires the court to examine the relationship between the forum, the litigation, and the defendant to determine whether a defendant can be fairly subjected to the court's personal jurisdiction. Sternberg v. O'Neil, 550 A.2d 1105, 1120 (Del.1988).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



After reviewing the facts in light of the applicable principles, the Court concludes that the exercise of personal jurisdiction in this case comports with due process. The Hadleys purposely availed themselves of Delaware law. As shareholders, they approved the Merger Agreement, which explicitly stated that Delaware law would govern all disputes arising from the Merger Agreement after the merger. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). Further, Jack Hadley was instrumental in the negotiations that led to the Merger Agreement. Both Jack and Thomas J. Hadley voted their shares in favor of the Merger Agreement. By approving the Merger Agreement, the Hadleys could have reasonably anticipated being haled into the Delaware courts. See World-Wide Volkswagen, 555 U.S. at 291-292.

***10** Finally, the burden on the Hadleys to litigate the present claim in Delaware is minimal when weighed against the interests of Third Party Plaintiffs and the State of Delaware. Because this claim arises out of Thomas J. Hadley's breach of contract claims, which are also being litigated in Delaware, he cannot contend that he would be unduly burdened by being made to litigate the instant claims in Delaware, as well. Further, the State of Delaware has a strong interest in adjudicating related claims in the same court. Finally, the Hadleys have failed to present the Court with any factual support for why jurisdiction would violate Due Process or be unduly burdensome. Accordingly, the Court concludes that the Due Process requirements are satisfied.

V. Conclusion

In sum, the Court concludes that the forum selection clause contained within the Merger Agreement is valid and enforceable against the Hadleys in their individual capacities. Additionally, the Court concludes that the exercise of personal jurisdiction over the Hadleys is proper under the Delaware long-arm statute and comports with Due Process. Accordingly, the Third Party Defendants' Motion to Dismiss (D.I.92) will be denied.

An appropriate Order will be entered.

ORDER

NOW THEREFORE, for the reasons stated set forth in the Opinion issued this date, IT IS HEREBY ORDERED this 12 th day of August 2003, that the Third Party Defendants' Motion to Dismiss for Lack of Jurisdiction (D.I.92) is DENIED.

2003 WL 21960406 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# TAB 3

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.

**HEALTHTRIO, INC., Plaintiff,**
**v.**
**David J. MARGULES; Howard Horwitz; Norman Oberstein; Curtis Capeling; Montgomery McCracken and John W. Newcomer, Defendants.**

**C.A. No. 06C-04-196.**

Submitted: Oct. 6, 2006.
Decided: Jan. 16, 2007.

Upon Consideration of Defendants' Motion to Dismiss GRANTED IN PART, DENIED IN PART.

Kevin W. Gibson, Esq., Gibson & Perkins, P.C., Wilmington, Delaware for Plaintiff.

Nicholas E. Skiles, Esq., Swartz, Campbell, Wilmington, Delaware for Defendant Margules.

John A. Elzufon, Esq., Elzufon, Austin, Reardon, Tarlov & Mondell, Wilmington, Delaware for Defendant Horowitz.

Daniel A. Griffith, Esq., Marshall, Dennehey, Wilmington, Delaware for Defendant Capeling.

M. Duncan Grant, Esq., Pepper, Hamilton, LLP, Wilmington, Delaware for Defendant Montgomery.

OPINION AND ORDER

YOUNG, J.

***1** On April 21, 2006, HealthTrio, Inc. ("HealthTrio"), the Plaintiff, filed a four count legal malpractice action against David J. Margules ("Margules") and Joanne P. Pinckney ("Pinckney") and their firm Bouchard, Margules & Friedlander, P.A. ("BMF"); Howard L. Horwitz ("Horwitz") and Norman Oberstein ("Oberstein") and their firm Oberstein, Kibre & Horowtiz, LLP ("OKH"); Curtis Capeling ("Capeling") and his firm Harwell, Howard, Hyne, Gabbert & Manner, P.C. ("HHHGM"); and John H. Newcomer, Jr. ("Newcomer") and his firm Montgomery, McCraken, Walker & Rhoads, LLP ("MMWR"). The four claims raised in the Complaint are: (1) Legal Malpractice against all Defendants, (2) Breach of Fiduciary Duty against all Defendants, (3) Breach of Contract against all Defendants and (4) Respondeat Superior against BMF, OKH, HHHGM and MMWR. While the Plaintiff filed the Praecipe with the Complaint, he also filed a document asking that the Praecipe be held because an Acceptance of Service would be filed by the Defendants. [FN1] An Acceptance of Service was never filed and instead the Plaintiff released the hold placed on the Praecipe on May 12, 2006, when he filed a second Praecipe. On July 27, 2006, the Plaintiff filed his First Amended Complaint, which removed Pinckney as a defendant and modified the second count of the Complaint, the Breach of Fiduciary Duty claim, to allege a breach solely against Margules/BMF. None of the Defendants answered the Complaint or the First Amended Complaint. Rather, each of the four sets of Defendants has submitted the assorted motions to dismiss.

FN1. The Plaintiff's attorney, Kevin W. Gibson, emailed the Defendants on April 21, 2006 and notified them of the fact he was holding sheriff service because it is his custom to offer defendants the option of accepting personal service.

FACTS

While each Defendant is moving to dismiss for different reasons, the basic facts of the case are universal. This legal malpractice action arose out of litigation between Immedient Corp. ("Immedient") and HealthTrio in the Delaware Superior Court. The defendant in that case and the plaintiff in the present action, HealthTrio, is in the business of producing computer systems for managed health care organizations. The plaintiff in the underlying action, Immedient, is a software system producer that entered into a professional services agreement ("PSA") with HealthTrio to create certain software programs for HealthTrio. In March, 2001, a dispute arose between Immedient and HealthTrio. On August 23, 2001, Immedient filed suit to recover monies it claimed were due under the PSA. HealthTrio hired Newcomer, Horwitz, Oberstein



and Capeling and their law firms to defend them in the litigation.

The lawyers consulted, and on October 17, 2001, after being furnished information by HealthTrio, Newcomer filed an Answer and Counterclaim. On January 30, 2002, Margules/BMF agreed to render legal advice to Healthtrio in the Immedient action. On February 11, 2002, HealthTrio filed a Substitution of Counsel in the Immedient action, whereby Newcomer/MMWR withdrew as HealthTrio's local counsel of record and Margules/BMF became HealthTrio's local counsel of record. The applicable scheduling order required that any motions to amend the pleadings be filed by February 8, 2002. Despite new counsel, no such motion was made until Margules/BMF filed a motion to amend HealthTrio's Answer and Counterclaim to assert a counterclaim of breach of contract and an additional counterclaim for fraud and misrepresentation on April 22, 2003. Judge Cooch denied the motion on the first day of trial, April 28, 2003, stating that "[c]utoff dates for amendments and pleadings are important in litigation so we can avoid the very imbroglios that we find ourselves in today." The trial was held April 28 through May 2, 2003, December 1 through December 5, 2003, and March 3 and 4, 2004. On December 12, 2003, Margules/BMF renewed its motion to amend the pleadings. In a February 24, 2004 letter, and in a lengthy March 3, 2004 ruling, Judge Cooch denied HealthTrio's renewed motion to amend the counterclaim. On November 4, 2004, Margules/BMF withdrew as counsel of record and William R. Denny and his firm, Potter Anderson & Corroon, LLP were substituted as counsel for HealthTrio. On November 23, 2004, HealthTrio's new counsel requested leave to amend the counterclaim, which Judge Cooch again denied on December 8, 2004. On January 18, 2005, HealthTrio argued for the inclusion of a claim for negligent misrepresentation against Immedient. Judge Cooch, in a Memorandum Opinion issued on June 22, 2005, ruled that HealthTrio could not make such a claim because it came too late. Judge Cooch ultimately ruled against HealthTrio in the amount of $721,579.

***2** In the case at bar, HealthTrio claims, in the first count of the First Amended Complaint, legal malpractice against all the aforementioned Defendants arising from their failure to "counsel, advise, and recommend" that HealthTrio plead "a breach of contract counterclaim, an additional fraud and misrepresentation counterclaim and a negligent misrepresentation counterclaim." In the second count, Plaintiff claims Breach of Fiduciary Duty against Margules/BMF for Margules' failed to notify HealthTrio that it did not have an affirmative claim against Immedient for breach of contract or negligent misrepresentation. Finally, in the third count, the Plaintiff alleges all the Defendants breached their contractual duty to provide "skillful, diligent, competent and professional legal advice." The Plaintiff seeks damages in excess of $100,000. In addition, the Plaintiff claims it is entitled to recoup attorney fees paid to its counsel in the present action, and to disgorge the attorney fees paid to the Defendants in the underlying action.

DISCUSSION

Currently before the Court are four motions to dismiss filed by the four sets of defendants in this action. While each set of defendants has filed its own motions, two of the motions are repeated by multiple defendants, and so will be addressed together. First, Capeling/HHHGM and Newcomer/MMWR filed motions to dismiss due to the expiration of the statute of limitations. Second, Margules/BMF, Capeling/HHHGM, and Newcomer/MMWR all filed Rule 12(b)(6) motions to dismiss Counts I and III. Each remaining motion is filed singularly. Horwitz and Oberstein/OKH have filed a Rule 12(h)(3) motion to dismiss for lack of jurisdiction based on a forum selection clause. In addition, Capeling/HHHGM have filed a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. The Court will begin by addressing the three motions raising jurisdictional issues, before proceeding to the Rule 12(b)(6) motion.

The Horwitz and Oberstein/OKH Rule 12(h)(3) Motion to Dismiss for Lack of Jurisdiction Based on a Forum Selection Clause

Defendant Horwitz and Oberstein/OKH seeks a Rule 12(h)(3) dismissal based on the Court's lack of jurisdiction due to the existence of an enforceable forum selection clause between it and the Plaintiff. The forum selection clause is contained within the retainer agreement. It mandates that "any and all disputes arising in connection with this agreement or the services provided pursuant to this agreement must and shall be resolved in the courts of the State

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



of California, County of Los Angeles, which shall have sole and exclusive jurisdiction and venue as to the same."

Defendants caption this as a Rule 12(h)(3) motion to dismiss for lack of jurisdiction. The Delaware Court of Chancery has held that the proper procedural rubric for addressing a forum selection clause is under Rule 12(b)(3), improper venue. [FN2] As the Court of Chancery points out, the Superior Court is in conflict, with some judges holding the correct standard is under 12(b)(6) and others holding it is 12(b)(3). [FN3] The approach taken here will follow that adopted by the Court of Chancery and the majority of the federal courts, reviewing the Defendant's motion as if it had a Rule 12(b)(3) filing. Hence, the Court can "grant a dismissal motion before the commencement of discovery on the basis of affidavits and documentary evidence if the plaintiff cannot make out a prima facie case in support of its position." [FN4] However, if the plaintiff "advances a non-frivolous legal argument that would defeat the motion if the facts turn out to be as it alleges, the court usually must allow the plaintiff to take discovery to gather proof of those facts." [FN5]

FN2. Simon v. Navellier Series Fund, 2000 WL 1597890, at *3-*7 (Del. Ch.).

FN3. Id. at *6. See Simm Associates, Inc. v. PNC Nat'l Bank, 1998 WL 961764, at *3 (Del.Super.) (In which Judge Quillen held that Rule 12(b)(6), and not Rule 12(b)(3), should govern motions); but see Double Z Enterprises, Inc. v. General Marketing Corp., 2000 WL 970718, at *2-*3 (Del.Super.) (In which Judge Del Pesco, without discussion, treats a motion based on a forum selection clause that limited plaintiff to a particular venue as one under Rule 12(b)(3)).

FN4. Id.

FN5. Id.

***3** As to the merits of the Motion, in considering the enforceability of forum selection clauses, Delaware courts have followed the approach adopted by the United States Supreme Court in M/S Bremen v. Zapata Off-Shore Company, 407 U.S. 1 (1972). [FN6] Delaware courts have held that, if there is a forum selection clause in a contract, even when venue where the suit is filed is proper, the court should decline to proceed when the parties freely agreed that litigation should be conducted in another forum. [FN7] Furthermore, in M/S Bremen, the U.S. Supreme Court held that, "forum selection clauses are prima facia valid and should be enforced unless the clause is shown by the resisting party to be unreasonable under the circumstances." [FN8] At least two Delaware courts have held that "the circumstances" are to be assessed at the time of trial. [FN9] However, our courts have also held that these clauses do not violate due process, if they are the product of a "freely negotiated" agreement and are not "unreasonable and unjust." [FN10] Furthermore, the Delaware Superior Court has stated:

FN6. See Chaplake Holding v. Chrysler Corporation, et al., 1995 WL 653510, at *6 (Del.Super.).

FN7. Eisenmann Corp. v. General Motors Corp., 2000 WL 140781, at * 7 (Del.Super.).

FN8. Id.

FN9. See Elia Corp. v. Paul N. Howard Co., 391 A.2d 214, 216 (Del.1978) and Brandywine Balloons, Inc. v. Custom Computer Service, Inc., 1989 WL 63968, at *3 (Del.Super.).

FN10. Hornberger Management Company v. Haws & Tingle General Contractors, Inc., 768 A.2d 983, 987 (Del.Super.2000)

"Such an agreement is only unreasonable when its enforcement would seriously impair the Plaintiff's ability to pursue its cause of action. Mere inconvenience or additional expense is not the test of unreasonableness. In light of present day commercial realities, a forum clause should control absent a strong showing that it should be set aside." [FN11]

FN11. Eisenmann Corp., 2000 WL 140781, at *7.

By requiring a showing of unreasonableness, the Delaware courts have placed a heavy burden on the plaintiff. This burden cannot be overcome by pleading mere inconvenience. As M/S Bremen stated, "it should be incumbent on the party seeking to escape his contract to show that trial in the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." [FN12] Thus, a resisting party must clearly demonstrate grave inconvenience. [FN13]

FN12. M/S Bremen, 407 U.S. at 18.

FN13. Chaplake Holding, 1995 WL 653510, at *6-*7.

The Plaintiff argues that the clause does not control due to reasons of judicial economy, Delaware's strong interest in adjudicating the case, and Plaintiff's entitlement to its day in court. First, it is noteworthy that the Defendants argue that OKH became involved in the Delaware litigation only when it secured agreement from HealthTrio that any issues arising out of its representation of HealthTrio in Delaware would be resolved in California. The Defendants support their argument with an affidavit from Dr. Korpman, the CEO and President of HealthTrio at the time the retainer agreement with OKH was negotiated and executed. In that affidavit, Dr. Korpman averred how changes were made by HealthTrio to the initial retainer agreement, an arbitration provision. However, Dr. Korpman stated that he and HealthTrio specifically agreed to the forum selection clause, because he knew OKH would not represent HealthTrio otherwise, and because he and HealthTrio had excessive contacts with California. Thus, it is clear that the clause was freely negotiated.

***4** Turning to Plaintiff's specific efforts aimed at resisting the motion, the first two arguments, that of judicial economy and Delaware's interest in adjudicating the matter, must fall by the wayside. The U.S. Supreme Court, in M/S Bremen, is clear that the resisting party must demonstrate some grave difficulty that accrues to him as a party, not to the courts. While the third argument attempts to capture the language necessary to overcome the forum selection clause, returning to M/S Bremen reveals the Plaintiff still cannot prevail. The Supreme Court stated that when parties to a freely negotiated agreement "contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable." [FN14] Dr. Korpman's affidavit indicates that the inconvenience the Plaintiff now cites as creating a denial of it its day in court, the distance, was contemplated during negotiations of the retainer. Dr. Korpman and HealthTrio freely traded the convenience of bringing an action arising from OKH's representation in Delaware in order to obtain OKH's representation against Immedient. Furthermore, this inconvenience also falls into the category of "mere inconveniences or additional expenses" and, in this day and age, would not seriously impair the Plaintiff's ability to pursue its cause of action. [FN15] As such, the Plaintiff has failed to demonstrate the required grave inconvenience.

FN14. Bremen, 407 U.S. at 16.

FN15. See Eisenmann Corp., 2000 WL 140781, at *7.

Therefore, because the Plaintiff has not made out a prima facie case in support of its position, Defendant Horwitz and Oberstein/OKH's Motion to Dismiss for Lack of Jurisdiction is GRANTED. The proper venue for the Plaintiff's claims against this Defendant is the courts of the State of California, County of Los Angeles.

The Capeling/HHHGM Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Defendant Capeling/HHHGM challenges the personal jurisdiction of this Court, contending that the Delaware Long-Arm Statute does not apply, and that maintaining such jurisdiction would violate due process. When a motion to dismiss challenges personal jurisdiction, the burden is on the plaintiff to show a basis for the court's jurisdiction over the nonresident defendant. [FN16] This burden is met if the plaintiff can make out a prima facie case that personal jurisdiction may be exercised by the Court. [FN17] To determine whether Delaware courts can obtain personal jurisdiction, a two-step analysis is applied. First, the Court must consider whether the Delaware Long-Arm Statute, 10 Del. C. § 3104, applies; and then must evaluate whether subjecting a defendant to jurisdiction in Delaware violates the due process clause of the Fourteenth Amendment. [FN18] In determining whether jurisdiction is appropriate, the Court must view all factual disputes in a light most favorable to the plaintiff. [FN19]

FN16. Galasso v. Continental Bank, 1986 WL 7986, at *1 (Del.1986).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



FN17. Hart Holding v. Drexel Burnham Lambert, 593 A.2d 535, 593 (Del. Ch.1991).

FN18. LaNuova D & B, S.p.A. v. Bowe Co. Inc., 513 A.2d 764, 768 (Del.1986).

FN19. Boone v. Oy Partek Ab, 724 A.2d 1150, 1155 (Del.Super.1997), aff'd, 707 A.2d 765 (Del.1998).

In pertinent part, Delaware's Long-Arm Statute provides that a court may exercise personal jurisdiction over a nonresident defendant if the person:

*5 "(1) transacts any business or performs any character of work or service in the State; (2) contracts to supply services or things in this State; (3) causes tortious injury in the State by an act or omission in this State; (4) causes tortious injury in the State or outside of the State by any act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenues from services, or things used or consumed in the State." [FN20]

FN20. 10 Del. C. § 3104(c). The statute is to be construed liberally in favor of exercising jurisdiction. [FN21] In addition, it has been held to be a "single act" statute, which means that jurisdiction over nonresidents may be predicated on a single act or transaction engaged in by a nonresident within the State. [FN22] Federal and State courts have held that a reviewing court must undertake "an expansive interpretation to the long arm statute, ruling that § 3104 must be construed as conferring jurisdiction to the maximum perimeters of the due process clause." [FN23]

FN21. Waters v. Deutz Corp., 460 A.2d 1332, 1334 (Del.Super.1983).

FN22. Eudaily v. Harmon, 420 A.2d 1175, 1180 (Del.1980).

FN23. Transportes Aereos de Angola v. Ronair, Inc., 544 F.Supp. 858, 864 (D.Del.1982).

In the present case, the litigants chiefly rely on two Delaware Superior Court decisions in their arguments on the applicability of the long-arm statute.    While the Defendant argues that

International Controls Corp. v. Bondi [FN24] prevents the exercise of personal jurisdiction under the statute, the Plaintiff has cited Lester v. Katzen [FN25] to support its claim of personal jurisdiction. A review of the facts of International Controls reveals that the case is inapposite. In that case, the plaintiff, International Controls Corp. ("ICC"), sued its general counsel, Shea & Gould, a New York law firm, for legal malpractice in Delaware. [FN26] The plaintiff argued that personal jurisdiction existed based on the defendants' hiring of Richards, Layton & Finger ("RL & F"), a Delaware law firm. [FN27] However, RL & F was hired merely to offer opinions on Delaware corporate law to the defendant so that the defendant could assist ICC in its sale of the assets of a Delaware corporation that it owned. [FN28] While ICC was also subject to a lawsuit, through its subsidiary Delaware corporation, that litigation occurred in Oregon's federal district court. [FN29] The court ultimately concluded that sections (c)(1)-(3) of the long-arm statute did not authorize personal jurisdiction, because the defendants performed no actions in Delaware. They simply received the benefit of services performed by another in Delaware. [FN30]

FN24. 1993 WL 331172 (Del.Super.).

FN25. 1994 WL 750324 (Del.Super.).

FN26. International Controls, 1993 WL 331172, at *1.

FN27. Id. at *3.

FN28. Id. at * 1.

FN29. Id. at *2.

FN30. Id. at *3-*4.

On the other hand, Lester appears similar to the present action. In Lester, the plaintiff was injured in an industrial accident in Delaware, yet lived in Maryland. [FN31] The plaintiff discharged the previous Maryland attorney assisting him in the matter, and had his file transferred to the defendant, another Maryland attorney. [FN32] The court held that these facts demonstrated a contract to supply services. [FN33] The defendant, while advising the plaintiff to obtain Delaware counsel, nevertheless continued to work for the plaintiff. [FN34] The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



court found that the defendant's contacts with the Industrial Accident Board and the plaintiff's employer demonstrated that the defendant made "a broad initial undertaking and did in fact serve the plaintiff as an attorney, albeit without formal appearance in Delaware, in the worker's compensation matter." [FN35] Thus, these facts met 10 Del. C. § 3104(c)(2)'s provision for the court's exercise of personal jurisdiction over a nonresident who has contracted to supply services in this State.

FN31. Lester, 1994 WL 750324, at *1.

FN32. Id.

FN33. Id.

FN34. Id. at *2.

FN35. Id.

***6** Based on Lester, the Court can exercise personal jurisdiction under section (c)(2) of the long-arm statute. From 2000 to 2004, the Plaintiff retained the Defendant to provide assistance in filing its Certificate of Incorporation with the Delaware Secretary of State and serve as its legal counsel. As part of that contract, the Defendant became involved in the litigation initiated by Immedient, another Delaware corporation, against the Plaintiff in the Delaware Superior Court. As part of that litigation, the Defendant assisted the Plaintiff in obtaining Delaware counsel, and in drafting some language related to a part of its Answer to Immedient's Complaint. Billing records indicate that, following the Plaintiff's Answer, the Defendant called, corresponded with, and generally assisted Delaware counsel in the Delaware litigation. This demonstrates that the Defendant, much like the defendant in Lester, made a broad initial undertaking, and served as one of the Plaintiff's attorneys in the action begun by Immedient in the Delaware Superior Court. Therefore, based on the services provided by the Defendant in the Delaware action, the Court holds that the Plaintiff has made a prima facie case that the Court can exercise personal jurisdiction under our long-arm statute.

While the Court has found the nonresident Defendant subject to our jurisdiction under the long-arm statute, this Court must not exercise personal jurisdiction over a defendant when doing so would violate the defendant's due process. If the defendant is not present within the state, due process requires that he have certain minimum contacts with it to ensure that he has fair warning that a particular activity may subject him to jurisdiction in another state . [FN36] The required minimum contacts are "such that maintenance of the suit does not offend traditional notions of fairplay and substantial justice." [FN37] This analysis requires an evaluation of the quality and nature of the activity. [FN38] Returning to Lester, that court concluded that because the underlying "workers compensation matter had to be resolved in Delaware ... it [was] not unreasonable to anticipate that defendant may be haled into a Delaware court under notions of fair play and substantial justice." [FN39]

FN36. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

FN37. Id.

FN38. Id. at 319.

FN39. Lester, 1994 WL 750324, at *2.

As to the due process prong of the analysis in the present case, the Plaintiff has demonstrated that the Defendant had numerous written and oral communications to and from Delaware with Margules and Newcomer, both Delaware attorneys, regarding the Delaware litigation involving the Plaintiff. In addition, the Defendant was aware that the matter was one that was currently in the Delaware court system and had to be resolved in Delaware. Based on the above facts and the reasoning of Lester, the Defendant had notice that it could be haled into a Delaware court for legal malpractice arising from the Delaware litigation.

Therefore, because the Plaintiff has made a prima facie case that section (c)(2) of the long-arm statute covers the Defendant, and because the Court's exercise of jurisdiction does not offend due process, the Defendant's motion is DENIED.

The Capeling and HHHGM and Newcomer and MMWR Motion to Dismiss Due to Expiration of the Statute of Limitations

***7** Defendants Capeling/HHHGM and Newcomer/

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



MMWR argue that the statute of limitations works as a bar to prevent this action from proceeding. Capeling/HHHGM begin by arguing that Tennessee's one year statute of limitations applies to the action. This argument must fail, for parties do not carry the statute of limitations of their home state with them. As the Delaware Court of Chancery has held:

"Where the law of two different states may apply to an action, Delaware Courts apply the Restatement (Second) Conflicts of Laws to determine which state law applies. With respect to questions of which state's statute of limitations to apply, the courts are instructed by the Restatement to apply the statute of limitations of the forum." [FN40]

FN40. Juran v. Bron, 2000 WL 1521478, at *10 (Del. Ch.). Thus, in this case the Court will apply Delaware's statute of limitations.

Turning to the Delaware statute of limitations, the Delaware case law is clear that 10 Del. C. § 8106 provides a three-year statute of limitations governing these actions. [FN41] Furthermore, as to legal malpractice actions, Delaware Courts have specifically held that the three year statute of limitations contained in 10 Del. C. § 8106 controls. [FN42] The statute begins to run at the time of the alleged malpractice. Ignorance of the facts does not act as an obstacle to the operation of the statute. [FN43] The only exceptions to this rule are in cases of infancy, incapacity, fraud and the absence of observable factors that would place a layman on notice of a problem, such as a title defect. [FN44] In such cases, the statute begins to run when the defect is, or should have been, discovered. [FN45] This date of discovery exception applies only in cases "where the negligence was inherently unknowable by a blamelessly ignorant plaintiff." [FN46]

FN41. Certainteed Corp. v. Celotex Corp., 2005 WL 217032, *5 (Del. Ch.2005).

FN42. Began v. Dixon, 547 A.2d 620, 623 (Del.Super.1988). See also Hood v. McConemy, 53 F.R.D. 435 (D.Del.1971) ("This section governs actions for legal malpractice, regardless of whether such an action sounds in contract or tort.").

FN43. Oropeza v. Maurer, 2004 WL 2154292, at * 1 (Del.2004).

FN44. Id.

FN45. Id.

FN46. Scott v. Bosari, 1994 WL 682615, at *9 (Del.Super.1994).

In the present case, Plaintiff defends against the Defendants' claims by arguing that the statute of limitations was tolled by (1) Defendants' fraudulent concealment; (2) the application of the date of discovery exception, and the fact the claims were inherently unknowable, and it was blamelessly ignorant, or (3) the defense of equitable tolling. First, Plaintiff's arguments as to Defendants' fraudulent concealment and the defense of equitable tolling are not made against the Defendants who are claiming that the statute of limitations has run. Instead, the Plaintiff argues that it is Margules who committed fraudulent concealment and the self-dealing necessary to claim equitable tolling. Because there is no claim of fraudulent concealment or self-dealing against these Defendants, these two arguments must fail.

As to the date of discovery exception, the Delaware Superior Court's holding in Began v. Dixon [FN47] is instructive. The Began Court was faced with a legal malpractice action against a divorce attorney. [FN48] The divorce attorney, the defendant, Gerald E. Dixon, represented Edward J. Began, the plaintiff, during Began's divorce. [FN49] On March 16, 1983, the plaintiff, apparently dissatisfied with the legal services being provided by the defendant, sought the assistance and advice of independent counsel. [FN50] The new attorney entered his appearance on April 4, 1983. [FN51] By April 2, 1986, the plaintiff had hired a second attorney to file a legal malpractice action against the defendant. [FN52] The defendant moved to dismiss plaintiff's complaint on the grounds that it was time barred. [FN53] The Court stated the statute of limitations law discussed above. As to the date of discovery rule, the court held that even, if the rule applied, the court "must presume the plaintiff discovered the allegedly negligent cause of conduct at least by the time he consulted with independent counsel in March of 1983." [FN54] Thus, the Court concluded that the March 1983 date of independent consultation clearly took the April

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



1986 complaint outside the statute of limitations. [FN55]

FN47. Began, 547 A.2d 620.

FN48. Id. at 622.

FN49. Id.

FN50. Id.

FN51. Id.

FN52. Id.

FN53. Id.

FN54. Id. at 623 (citing Ewing v. Beck, 520 A.2d 653, 664 (Del.1987) ("[W]e also hold that there shall be a presumption that a patient who actually consults with an independent health care provider about the same condition which is subsequently the subject matter of an alleged negligent medical continuum knew or in the exercise of reasonable diligence could have known about the prior negligent course of conduct on date of the consultation with the independent health care provider. If a patient receives independent medical advice from a skilled health care provider in the form of a second opinion or consultation, that patient has a duty of inquiry not only about his condition but about his prior course of medical treatment.")).

FN55. Id. at 624.

***8** In the present case, the Plaintiff states that he consulted with Margules/BMF on January 30, 2002, and signed a retainer that day. By February 11, 2002, Margules/BMF were substituted in place of Newcomer/MMWR. "Independent counsel," as used in the Began case, would include counsel separate and apart from the previously retained counsel, such that the new counsel is free from the control of the previous counsel. There is little doubt that Margules/BMF, an attorney/firm separate and apart from both Newcomer/MMWR and Capeling/ HHHGM, is free from the control of the previous counsel such that it qualifies as independent counsel. Based on this conclusion, the Plaintiff cannot prove any set of facts that would support its "blamelessly ignorant" contention. Therefore, the statute of limitations began to accrue against these Defendants on January 30, 2002, and no tolling occurred. Because the Complaint was filed on April 21, 2006, over four years after Plaintiff sought independent counsel, the three year statute of limitations has expired, and the action against Newcomer/MMWR and Capeling/HHHGM is time barred. [FN56]

FN56. Such a determination obviates the need to address the Defendants' argument that the Plaintiff had notice of the alleged legal malpractice by way of the April 22, 2003, motion to amend the Complaint. This determination also obviates the need to discuss the Plaintiff's decision to ask the Prothonotary's Office to hold the Praecipe. Thus, the Plaintiff's eventual released of the Praecipe on May 12, which the Defendants claimed took the Plaintiff outside the statute of limitations by 21 days, is irrelevant.

Therefore, for the foregoing reasons, the Defendants' Motion to Dismiss Due to Expiration of the Statute of Limitations is GRANTED .

Additionally, the Plaintiff has alleged that the Defendant, Capeling, filed a false affidavit with the Court. Any such misrepresentations would, presumably, be matters to be argued at an evidentiary hearing. However, since the alleged discrepancies do not affect this statute of limitations issue, these allegations are deemed MOOT.

The Margules/BMF, Capeling/HHHGM and Newcomer/MMWR Superior Court Civil Rule 12(b)(6) Motions to Dismiss Counts I and III

Defendants Margules/BMF, Capeling/HHHGM and Newcomer/MMWR, in their Motions to Dismiss, argue that Counts I and III of the First Amended Complaint should be dismissed under Delaware Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Those Defendants also contend that the Plaintiff is not legally permitted to seek recovery of the attorney fees paid to its current counsel, nor is it permitted to seek disgorgement of the fees paid to the Defendants in the underlying matter. [FN57]

FN57. The Court has already ruled in favor of Capeling/HHHGM and Newcomer/MMWR as to their Motion to Dismiss Due to the Expiration of the Statute of Limitations. The Plaintiff's entire



Complaint has been dismissed as to them. Therefore, the Court's decision as to this motion will affect only Margules/BMF.

When reviewing a Rule 12(b)(6) motion to dismiss, the Court "will consider all well-pleaded facts in the complaint and accept them as true." [FN58] The motion should be granted "only where it appears with reasonable certainty that [the plaintiff] would be unable to prevail on any set of facts inferable from the complaint." [FN59] The motion will be denied "if the plaintiff may recover under any conceivable set of circumstances susceptible to proof under the complaint." [FN60] In viewing the facts, the Court must draw "all reasonable inferences in favor of the non-movant." [FN61] The Court may consider documents that are "integral to the plaintiff's claim and incorporated in the complaint" in deciding a motion to dismiss. [FN62]

FN58. AT & T Corp. v. Clarendon America Ins., 2006 WL 2685081, at *3 (Del.Super.).

FN59. Lord v. Souder, 748 A.2d 393, 398 (Del.2000).

FN60. Rinaldi v. Iomega Corp., 1999 WL 1442014, at *2 (Del.Super .).

FN61. Id.

FN62. In re Santa Fe Pacific Corp. S'holder Litig., 669 A.2d 59, 69-70 (Del.1995).

***9** First, for the Plaintiff to maintain a legal malpractice action in Delaware, it must meet each prong of a three element test, which includes proving: "(1) the employment of an attorney; (2) the attorney's neglect of a professional obligation; and (3) resultant loss." [FN63] To prove the third element, the damages element, the plaintiff in a legal malpractice action must demonstrate that "but for his lawyer's negligence, [he] would have been successful" in the underlying action. [FN64] As the Superior Court concluded in Middlebrook v. Ayers: "Thus, in order to sustain a claim of professional negligence against a Delaware attorney, plaintiff must establish the applicable standard of care through the presentation of expert testimony, a breach of that standard of care, and a causal link between the breach and the injury." [FN65] In the case at bar, the Defendants have elected to attack only the requirement of proximate cause, the third element, in this motion.

FN63. Sanders v. Malik, 1997 WL 817854, at *2 (Del.Super.).

FN64. Trader v. Streett, 1997 WL 528043, at * 2 (Del.Super.).

FN65. Middlebrook v. Ayers, 2004 WL 1284207, at * 10 (Del.Super.).

In the present case, the Plaintiff can withstand this motion only if, taking the well-pleaded facts as true and viewing all reasonable inferences in favor of the non-movant, but for the Defendants' negligence it would have been successful in the underlying action.

The Defendants, to support the motion, argue that Judge Cooch's legal rulings and factual findings reflect that the Plaintiff lost on the merits, and consequently would not have succeeded on any additional counterclaims. Therefore, Defendants assert Plaintiff cannot succeed in this legal malpractice action. The Plaintiff contends, citing case law from other jurisdictions, that the judicial upon opinion which Defendants rely is not admissible in the present action. In addition, the Plaintiff argues that the Defendants are essentially making a collateral estoppel argument, and that the doctrine does not apply in legal malpractice cases.

Again, in order for Plaintiff to prevail in this legal malpractice action, it must prove that it would have prevailed on the three counterclaims it contends Defendants were negligent in failing to plead in an amended counterclaim. To do so, it must be able to establish that the facts would have been borne out, at the very least on a prime facie basis, on those counterclaims. If collateral estoppel applies, then it would bar the Plaintiff from relitigating the facts in the underlying suit. The Defendants argue that would mean that their motion must be granted, since the Plaintiff cannot state a claim upon which relief may be granted.

Collateral estoppel is a refinement of the doctrine of res judicata. [FN66] When the doctrine was originally adopted, the Delaware Supreme Court stated that, "where a question of fact essential to the judgment is litigated and determined by a valid and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action. In such situation, a party is estopped from relitigating the same issue again in the subsequent case." [FN67] However, the Delaware Supreme Court has since refined the effect of collateral estoppel. [FN68] While res judicata bars a suit involving the same parties based on the same cause of action, collateral estoppel bars any party from relitigating factual issues previously litigated. [FN69] "Originally, many jurisdictions required mutuality to assert collateral estoppel. Mutuality requires a party attempting to bar an adversary from relitigating an issue to have been a party in the prior litigation or in privity with a party in the prior litigation." [FN70] The Delaware Supreme Court, however, has stated that our state, like so many other jurisdictions, has abandoned this requirement. [FN71] The modern trend of decision and the rule in Delaware expand the use of the doctrine to situations where total mutuality does not exist. [FN72] The Delaware Supreme Court has explained that "the [current] test for applying collateral estoppel [only] requires that (1) a question of fact essential to the judgment (2) be litigated and (3) determined (4) by a valid and final judgment." [FN73]

FN66. Tyndall v. Tyndall, 238 A.2d 343, 346 (Del.1968).

FN67. Id.

FN68. Columbia Cas. Co. v. Playtex FP, Inc., 584 A.2d 1214, 1216 (Del.1991).

FN69. Id., n. 4.

FN70. Id. at 1217.

FN71. Id.

FN72. Id. ("Thus, many jurisdictions [including our own] no longer require a litigant have been a party in the prior litigation or in privity with a party in the prior litigation. It is sufficient that the party against whom collateral estoppel is asserted was a previous party.").

FN73. Taylor v. State, 402 A.2d 373 (Del.1979).

*10 To begin, the Plaintiff's argument that Judge

Cooch's opinion is inadmissible evidence is moot because the doctrine of collateral estoppel is applicable in legal malpractice cases. [FN74] Hence it is the primary source for a subsequent court to turn to in order to ascertain whether the elements of collateral estoppel are met.

FN74. See Sanders, 1997 WL 817854, at *2.

Plaintiff argues that Defendants committed legal malpractice by not filing "a breach of contract counterclaim, an additional fraud and misrepresentation counterclaim and a negligent misrepresentation counterclaim." Turning to the collateral estoppel elements, the Court notes that, in addressing the breach of contract claim by Immedient against HealthTrio, Judge Cooch held that HealthTrio had not proved by a preponderance of the evidence that its performance under the contract was excused by Immedient's alleged failure to perform under the same contract. [FN75] Judge Cooch's ruling indicates that the elements of collateral estoppel have been met as to the Plaintiff's allegation that the Defendants should have included a breach of contract counterclaim, for: (1) a question of fact essential to the judgment in this case, to wit: that Immedient breached its contract with HealthTrio; (2) has been litigated, because there was a trial at which evidence on this point was presented; (3) and determined, because Judge Cooch issued an opinion in the case deciding the point; (4) by a final and binding judgment, because Judge Cooch issued an opinion that the Plaintiff did not appeal. Therefore, collateral estoppel bars the Plaintiff from relitigating the Defendants' alleged failure to plead such a counterclaim.

FN75. Immedient Corp. v. HealthTrio, Inc., 2005 Del.Super. LEXIS 262, at *29-34.

Judge Cooch's opinion in Immedient v. HealthTrio also provides the basis for a collateral estoppel ruling as to the additional fraud and misrepresentation counterclaim and the negligent misrepresentation counterclaim, which Plaintiff alleges should have been raised. Judge Cooch held that based on HealthTrio's background and experience in computers, the Court could "only harmonize the evidence by finding that HealthTrio did not contemporaneously believe that Immedient had misled them into executing the contract or that Immedient had breached the contract first." [FN76]

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Additionally, the Court held that HealthTrio had "waived any affirmative defense or counterclaim for fraud by entering as it did into subsequent agreements." [FN77] Thus, the elements of collateral estoppel have been met as to the additional fraud and misrepresentation counterclaim and the negligent misrepresentation counterclaim the Plaintiff asserts Defendants should have raised, because: (1) a question of fact essential to the judgment in this case, to wit: that Immedient committed fraud or negligently misrepresented facts; (2) has been litigated, because there was a trial at which evidence on this point was presented; (3) and determined, because Judge Cooch issued an opinion in the case deciding the point; (4) by a final and binding judgment, because Judge Cooch issued an opinion that the Plaintiff did not appeal. Because the doctrine of collateral estoppel works to prevent this Court from reviewing the facts necessary for Plaintiff to have prevailed in the underlying action there is "no conceivable set of circumstances susceptible to proof under the complaint" upon which the Plaintiff can prevail on the legal malpractice claim. Therefore, the motion is GRANTED as to Count I of the First Amended Complaint.

FN76. Id. at 49.

FN77. Id. at 36.

***11** Second, the Plaintiff has included a breach of contract claim against all the Defendants. While there is an apparent dearth of Delaware case law on the requirements to maintain a breach of contract action against an attorney, Pennsylvania case law is instructive on the point. The Pennsylvania Superior Court, an intermediate appellate court in that state, has held that "[a] client who sues his attorney on an assumpsit theory must allege that an attorney breached a contract term or failed to follow a specific instruction of the client." [FN78] In F & G Associates v. Pomerantz, [FN79] the Court of Common Pleas of Philadelphia, the state's trial level court, dealt with a 12(b)(6) motion to dismiss a breach of contract claim against an attorney. Applying the established case law, the court stated that "a complaint based on the averment that an attorney failed to exercise the requisite duty of care toward them, and which did not aver a breach of a specific provision of their contract, does not state a true contract cause of action." [FN80] That court, turning to the facts before it, concluded that because plaintiffs' complaint did not plead facts that would support a breach of contract claim it must be dismissed. [FN81] Specifically, that court found that the plaintiffs failed to identify even a single contract provision that defendants breached, or a specific instruction with which defendants failed to comply. [FN82] That court, then, concluded that it was impermissible for a plaintiff to assert both negligence and breach of contract claims based on the same conduct "in an attempt to have two bites at the apple." [FN83] Continuing, that court stated:

FN78. Rogers v. Williams, 616 A.2d 1031, 1033 (Pa.Super.1992).

FN79. 2000 WL 33155748 (Pa.C.P.).

FN80. Id. (citing Hoyer v. Frazee, 470 A.2d 990, 992-993 (Pa . Super.1984)).

FN81. Id.

FN82. Id.

FN83. Id.

> "A contract claim must relate to conduct distinct from a tort claim. In the context of legal malpractice, a tort claim and a breach of contract claim are not alternative theories of recovery for the same conduct. If they were, 'claims in tort and claims in breach of contract, at least within the context of service contracts, would be indistinguishable.' " [FN84]

FN84. Id. (citing Guy v. Liederbach, 459 A.2d 744, 752 (Pa.1983)). See Sherman Indus. Inc. v. Goldenhammer, 683 F.Supp. 502, 506 (E.D.Pa.1988).

In the present case, the Plaintiff has sought yet another ground on which to hang the success of its complaint, attempting another bite of the same apple. The Plaintiff contends the Defendants failed to fulfill their duty as attorneys when they failed to include, in a timely manner, the aforementioned counterclaims in the pleadings. This claim is a repetition of the legal malpractice claim. Additionally, neither the Plaintiff's Complaint nor its First Amended Complaint identified a single contract provision allegedly breached or a specific

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



client instruction not followed. Therefore, because the Plaintiff cannot "recover under any conceivable set of circumstances susceptible to proof under the complaint" the Defendants' motion is GRANTED as to Count III.

Therefore, for the foregoing reasons, Counts I and III of the First Amended Complaint are DISMISSED as to Margules/BMF.

Additionally, the Plaintiff's First Amended Complaint seeks to recoup all attorneys' fees paid to its counsel in this matter, and to disgorge the attorneys' fees paid to Margules/BMF. The Defendant, Margules/BMF, argues these prayers for relief should be dismissed as contrary to Delaware law. This issue is one to be resolved at trial.

CONCLUSION

***12** Accordingly, the Horwitz and Oberstein/OKH motion to dismiss for lack of jurisdiction due to the forum selection clause is GRANTED and these parties are DISMISSED; the Capeling/HHHGM motion to dismiss for lack of personal jurisdiction is DENIED; the Capeling/HHHGM and Newcomer/ MMWR motion to dismiss due to the time barred nature of the action is GRANTED and these parties are DISMISSED; and the Margules/BMF Rule 12(b)(6) motion to dismiss is GRANTED and Counts I and III are DISMISSED as to these parties. All that remains is Count II of the First Amended Complaint against Margules/BMF.

SO ORDERED.

2007 WL 544156 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# TAB 4

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.

**L & L CONSTRUCTION ASSOCIATES, INC., Plaintiff,
v.
SLATTERY SKANSKA, INC., Defendant.**

**No. CIV. 05-1289.**

March 31, 2006.

Bradshaw Rost, Tenenbaum & Saas, P.C., Bethesda, MD, for Plaintiff.

Edmund Michael Amorosi, Smith, Pachter, McWhorter & Allen, Vienna, VA, for Defendant.

MEMORANDUM OPINION

ROYCE C. LAMBERTH, District Judge.

***1** This matter comes before the Court on defendant's Motion [11] to Dismiss the Amended Complaint pursuant to Rules 12(b)(1), (b)(3), and (b)(6) of the Federal Rules of Civil Procedure. Defendant claims that the forum selection clause in the subcontract agreement makes this venue inappropriate. While defendant stylizes the motion to dismiss under Rule 12, the Court finds that the motion is more properly construed under the doctrine of forum non conveniens. Upon consideration of the parties' submissions and the entire record herein, the Court hereby grants defendant's motion to dismiss.

BACKGROUND

This action arises out of a construction contract to perform work for Washington Metropolitan Transit Authority ("WMATA") at the New York Avenue Metro station. Lane Construction Corp., a Connecticut corporation and defendant, Slattery Skanska, Inc. a New York corporation, formed a joint venture under the laws of New York, to perform work for WMATA. As part of the bidding process, plaintiff, L & L Construction Associates Inc., entered into a preliminary arrangement with defendant via a "Letter of Intent" on October 3, 2001, whereby the parties agreed that plaintiff would perform work for defendant upon award of the prime contract from WMATA. (Compl.¶ 8.) WMATA awarded the prime contract to defendant's joint venture, who then entered into a subcontract with plaintiff for the completion of certain underground utility work (the "Subcontract"). (Id. ¶¶ 10, 12.) The Subcontract contained a forum selection clause that required all litigation arising out of the Subcontract to be filed in the Supreme Court of the State of New York, County of Queens. (Subcontract, Art. 31, at 25.) The Subcontract also contained a merger clause which states that the Subcontract is the final agreement and all previous negotiations and representations are merged therein. (Subcontract, Art. 32, at 25.)

On June 20, 2005, plaintiff filed suit in this Court alleging breach of the October 3, 2001 Letter of Intent. Plaintiff avers that it was promised four-times more work than it received. On July 17, defendant moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted, arguing that the October 3 Letter of Intent was not an enforceable contract, but merely an agreement to agree. An opposition, reply, and sur-reply followed. Meanwhile, on August 10, 2005, plaintiff moved to amend the complaint, adding an additional count for promissory estoppel, but largely leaving the remaining portions of the complaint unaltered. On August 29, defendant filed a motion to dismiss the amended complaint under Rules 12(b)(1), 12(b)(3), and 12(b)(6). Defendant claims that the forum selection clause in the subcontract requires the parties to litigate in another forum. Plaintiff contends that defendant waived the right to raise the forum selection clause defense because the defense was not asserted in the initial motion to dismiss.

DISCUSSION

***2** The forum selection clause defense has "evaded precise classification." Marra v. Papandreou, 216 F.3d 1119, 1123 (D.C .Cir.2000). Indeed, many of the circuits have not resolved the issue. See New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24, 29 (2d Cir.1997); Haynsworth v. The Corp, 121 F.2d 956, 963 (5th Cir.1997). On the other hand, some circuits have viewed the forum selection clause defense under Rule 12: the Ninth Circuit has determined that the forum selection clause defense should be treated as a motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



pursuant to Rule 12(b)(3), Kukje Hwajae Ins. Co. Ltd., v. M/V Hundai Liberty, 294 F.3d 1171, 1174 (9th Cir.2002), while the First Circuit treats the defense as a motion pursuant to Rule 12(b)(6), Lambert v. Kysar, 983 F.2d 1110, 1112 n. 1 (1st Cir.1993). While the District of Columbia Circuit has not ruled on how the forum selection clause defense should be characterized, the Marra Court recognized that this defense is most analogous to a forum non conveniens motion or motion for transfer of venue under 28 U.S.C. § 1404. 216 F.3d at 1123.

The doctrine of forum non conveniens is the most appropriate lens to determine this issue. A Rule 12(b)(3) dismissal for improper forum is an inappropriate mechanism because the question is not whether the chosen venue is proper, but whether there is a more appropriate forum for this suit. Similarly, a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction would be inappropriate because there is no dispute about whether the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 or 1332. Finally, a Rule 12(b)(6) dismissal for failure to state a claim is not available because disposition of this motion requires review of the Subcontract, not allowed under Rule 12(b)(6) since it is not a pleading. The doctrine of forum non conveniens is an appropriate procedural mechanism for determining this issue because this is one of those rare circumstances where the Court has personal and subject matter jurisdiction, and venue is proper, but there is a more appropriate forum for resolving the dispute. See Gulf Oil Corp. v.. Gilbert, 330 U.S. 501, 504 (1947); see also 15 Charles Allen Wright Arthur R. Miller & Edward H. Cooper Federal Practice and Procedure § 3828, at 387-90 (2d ed.1986).

In granting the motion to dismiss for forum non conveniens, the Court must determine that the motion is timely, that an adequate forum exists which possesses jurisdiction over the case, that the private and public interests weigh in favor of dismissal and that plaintiff can reinstate its suit in the alternative forum without undue prejudice. Pain v. United Tech. Corp., 637 F.2d 775, 784-85 (D.C.Cir.1980).

A. Timeliness

L & L contends that Slattery waived the right to assert a defense based on the forum selection clause by failing to raise it in its first motion to dismiss. However, Rules 12(g) and 12(h) do not apply to the doctrine of forum non conveniens. Rule 12(g) states in pertinent part:

> ***3** If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except as a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

Rule 12(h) states: "(1) A defense of lack of jurisdiction over the person, improper venue, insufficiency of service of process is waived if omitted from a motion in the circumstances described in subdivision (g)." Rd. R. Civ. P. 12(h)(1). The plain text of the Federal Rules of Civil Procedure clearly state that the waiver provision of Rule 12(g) only applies to the types of motions permitted by Rule 12, namely, motions to dismiss under 12(b). Rule 12(g) does not apply to motions outside of Rule 12, and thus is not applicable to motions to dismiss under forum non conveniens.

Most importantly, a dismissal under forum non conveniens, like a motion for change of venue under 28 U.S.C. § 1404, is at the discretion of the court and may be made at any time. Cf. Abiola v. Abubakar, 267 F.Supp.2d 907, 918 (N.D.Ill.2003) (holding that the objection is not waived by failing to raise the issue in an answer or a motion to dismiss); accord Spencer v. Alcoa S.S. Co., 221 F.Supp. 343, 346 (E.D.N.Y.1963); Fifth & Walnut, Inc. v. Loew's, Inc., 76 F.Supp. 64, 67 (S.D.N.Y.1948;. Limitations on the time period for moving to dismiss only bar a defendant from making the objection at an unreasonable time. See In re Air Crash Disaster Near New Orleans, 821 F.2d 1147, 1165 (5th Cir.1987). In addition, courts have denied such motions when granting the motion would unduly prejudice the plaintiff. See Zelinski v. Columbia 300, Inc., 335 F.3d 633, 643 (7th Cir.2003).

Here, plaintiff filed the complaint on June 30, 2005. The initial motion to dismiss followed on July 17, and the second motion on August 10. Less than two months elapsed between the filing of the complaint and the raising of the objection. The

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Court finds that the delay in bringing this defense was not unreasonable to the plaintiff. Cf. id. (commenting that a motion made one month before the scheduled time of trial was unreasonable and prejudicial). Furthermore, there is no indication that the plaintiff would be unduly burdened by granting the objection. The plaintiff has not incurred substantial costs in preparing for trial. The only expenses that plaintiff has incurred thus far have been in the regular course of a motions practice and pre-trial discovery. Therefore, the Court finds that the objection of forum non conveniens is timely.

B. Presence of Adequate Forum

When considering a motion to dismiss based on forum non conveniens, the Court must (1) identify whether an adequate forum exists and (2) balance the relative conveniences to the parties against the presumption in favor of plaintiff's choice of forum. El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 676-77 (D.C.Cir .1996). However, when there is a valid forum selection clause in place, the Court must defer to the expressed intent of the parties unless plaintiff can demonstrate that enforcement would be unjust or that the contract is invalid due to fraud or overreaching. M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972).

***4** Since plaintiff reached out to defendant, a New York corporation, sought to enter into a contractual relationship with defendant, and waived the right to raise to objection to the designated forum by agreeing to the forum selection clause, the Court finds that venue in New York is appropriate. See Kotan v. Pizza Outlet, 400 F.Supp.2d 44, 48 (D.D.C.2005) (Lamberth, J.). More, plaintiff has not demonstrated that the forum selection clause is otherwise invalid.

The burden of invalidating a forum selection clause is heavy. See Carnival Cruise Lines v. Shute, 499 U.S. 585, 591-92 (1991) (commenting that a court is unlikely to set aside a forum selection clause even when the designated forum is remote). Plaintiff has failed to meet its burden. Plaintiff only makes conclusory allegations that the clause was the result of fraud and misrepresentations, but these allegations are insufficient to overcome the strong presumption in favor of enforcing forum-selection clauses. Since New York state court is a proper forum and plaintiff has failed to meet its burden to invalidate enforcement of the forum selection clause, the Court gives deference to the expressed intent of the parties and finds that the New York state court is a proper forum.

C. Scope of the Forum Selection Clause

Next, the Court must address whether the scope of the Subcontract and its forum selection clause governs the alleged breach. In addressing this question, the Court must "adhere to the objective of the law of contracts whereby the written language embodying the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract unless the written language is not susceptible of clear and definite undertaking, or unless there is fraud, duress or mutual mistake. Kyriakopoulos v. George Washington Univ., 866 F.2d 438, 444 n. 1 (D.C.Cir.1989). Furthermore, in deciding whether the forum selection clause is enforceable, the Court treats the clause as a contract unto itself. Marra, 216 F.3d at 1123. The Court only examines the forum selection clause, making no findings concerning the remaining portions of the contract or the merits of the case. Id.

The Court finds that the language of Articles 31 and 32 of the Subcontract, the forum selection and merger clauses, are clear, and the Court need not look beyond the text to interpret the contract. The merger clause states, in relevant parts, "except as expressly set forth herein, there have been no representation by either party to other to induce execution of this Subcontract, and all prior negotiations and understanding with respect to the subject matter are merged herein." (Subcontract, Art. 31, at 25.) The merger clause explains that the Subcontract was the complete and final agreement of the parties. (Subcontract, Art. 31, at 25.) All prior agreements, including the October 3 Letter of Intent, were to be merged into the Subcontract. The Court finds that the parties intended that all disputes arising out of the subject matter of the agreement, i.e., underground utilities work, would be governed by the forum selection clause.

D. Private and Public Interests

***5** Ordinarily, the Court must consider whether the private interests weigh in favor of granting the motion to dismiss. If the balance is in equilibrium, then the Court looks to the public interest factors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Finally, if the balance favors another forum, the Court must ensure that plaintiff can reinstate the suit in the alternative forum without undue inconvenience or prejudice. Pain v. United Tech. Corp., 637 F.2d at 784-84.

However, the presence of a forum selection clause, once again, changes the analysis. See Oversees Partners, Inc. v. Progen Musavirlik Ve Yonetim Hismetleri, LTD, 15 F.Supp.2d 47, 53 (D.D.C.1998). Normally, a court would analyze the private factors keeping in mind the substantial weight of the plaintiff's choice of forum. These private factors include

> [T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions to the enforceability [sic ] of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial.

Ott v. Kaiser-Georgetown Cmty. Health Plan, Inc., 689 F.Supp. 9, 10 (D.D.C.1988) (citing Pain, 637 F.2d at 784-85). However, the forum selection clause is now the dominant factor in the determination. See Bremen, 407 U.S. at 15. In Bremen, the Supreme Court stated that "in the light of present-day commercial realities and expanding international trade we conclude that the forum selection clause should control absent a strong showing that it should be set aside." Id. Plaintiff may escape enforcement of the forum selection clause only if it can demonstrate that it will be deprived of its day in court by trying the matter in New York state court. Plaintiff has not and cannot make that argument. Finally, dismissal will not unduly prejudice L & L as the statute of limitations has not run on the claim. See N.Y. C.P.L.R. § 213 (2004) (setting statute of limitations to six years on actions for breach of contract).

The motion is timely, the designated forum is appropriate, the scope of the forum selection clause covers the instant dispute, and the Court will grant defendant's motion.

CONCLUSION

For the foregoing reasons, the Court grants defendant's motion [11] and dismisses the action on the basis of forum non conveniens.

A separate Order shall issue this date.

2006 WL 1102814 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# TAB 5

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

**LITTLE SWITZERLAND, INC., Plaintiff,
v.
DESTINATION RETAIL HOLDINGS CORPORATION; Young Caribbean Jewellery Company
Limited; Alliance International Limited; CEI Distributors Inc.; and Stephen
G.E. Crane, Defendants.**

**No. CIV. A. 98-315-SLR.**

March 31, 1999.

Alan J. Stone, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, attorneys for plaintiff. Of Counsel: R. Todd Cronan, Esquire and Jeremy M. Sternberg, Esquire, of Goodwin, Procter & Hoar LLP, Boston, Massachusetts.

Gregory P. Williams, Esquire, Raymond J. DiCamillo, Esquire, and John S. Mills, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, attorneys for defendants. Of Counsel: William J. McSherry, Jr., Esquire, of Battle Fowler, New York, New York.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

***1** Plaintiff Little Switzerland, Inc. ("LSI") filed suit in this court seeking damages related to a failed merger transaction with defendants Destination Retail Holdings Corporation ("DRHC"), Young Caribbean Jewellery Company Limited ("Young Caribbean"), Alliance International Holdings Limited ("Alliance"), CEI Distributors, Inc. ("CEI"), and Stephen G.E. Crane ("Crane") (collectively "defendants"). More specifically, plaintiff LSI contends that the corporate defendants (allegedly controlled by defendant Crane) breached a merger agreement by failing to secure the financing necessary to close the merger, despite the lack of a financing contingency in the merger agreement. Plaintiff asserts this court's subject matter jurisdiction based solely upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

Defendants have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to Fed.R.Civ.P. 12(b)(7) for failure to join a party under Rule 19. In addition, defendant Crane has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction and pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for "aiding and abetting."

For the reasons that follow, defendants' motion to dismiss is denied.

II. FACTS

On or about February 4, 1998, a merger agreement ("the Agreement") was entered into by plaintiff LSI and defendants DRHC, Young Caribbean, Alliance and CEI. Plaintiff LSI is a Delaware corporation with its principal place of business in St. Thomas in the United States Virgin Islands. Defendant DRHC is an Island of Nevis corporation with its principal place of business located in Freeport in the Bahamas. Defendant Young Caribbean is a Cayman Islands corporation which is a subsidiary of DRHC. Defendant Alliance is a Bahamian corporation which is a wholly owned subsidiary of DRHC. Defendant CEI is a British Virgin Islands corporation which is a wholly owned subsidiary of DRHC. Defendant Crane, a resident of Freeport in the Bahamas, executed the Agreement as a corporate officer of DRHC and Young Caribbean (D.I.34, Ex. B)

Another signatory to the Agreement was LSI Acquisition Corp. ("LSI Acquisition"). LSI Acquisition is a Delaware corporation and a wholly owned subsidiary of DRHC established as a vehicle for accomplishing the merger at issue. Under the terms of the Agreement, the corporate defendants and LSI Acquisition agreed to acquire all of the outstanding stock of LSI for a price of $8.10 per share. The all-cash merger was structured so that LSI would merge with either LSI Acquisition or with another entity specified by DRHC, with LSI surviving as a wholly owned subsidiary of DRHC (unless DRHC elected to have another entity survive the merger). (D.I.34, Ex. B)

Plaintiff asserts that the Agreement was the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



culmination of a concerted effort on the part of defendant Crane to acquire control of LSI. (D.I.34, Ex. A) In connection with his plan to pursue a business combination with LSI, defendant Crane undertook the following steps. Crane directed that LSI Acquisition be incorporated in Delaware, with Crane described as President, director, and controlling stockholder. (D.I. 34, Ex. A; D.I. 55 ¶ 3) Crane directed that a series of offer letters be sent to LSI in 1997 and 1998. (D.I.34, Ex. G) When these offers were rejected by LSI, Crane initiated a proxy contest to take control of LSI's board of directors. As part of the proxy contest, Crane caused a lawsuit to be filed in the Court of Chancery for the State of Delaware whereby he was authorized to nominate his slate of "dissident directors" and secured LSI's shareholder list. [FN1] (D.I.34, Exs.A, H) On or about January 15, 1998, defendant Crane sent to LSI shareholders (some of whom allegedly reside in Delaware [FN2]) his proxy statement and accompanying letter describing the transaction at issue as an "all-cash, fully-financed offer." (D.I. 34, Ex. F at 20) On or about January 29, 1998, defendant Crane sent another letter to LSI shareholders urging support of DRHC's slate of board nominees "in order to maintain pressure on the Little Switzerland Board" to consummate a transaction with DRHC. (D.I.34, Ex. J) Crane once again described the transaction as an "all-cash, fully-financed offer...." in the January 29, 1998 missive. (D.I.34, Ex. J) Crane caused his attorneys to issue a series of press releases in support of his acquisition plan. (D.I.34, Ex. A)

***2** On or about February 4, 1998, plaintiff LSI and the corporate defendants executed the Agreement. Crane personally negotiated the terms of the Agreement with LSI and executed the Agreement on behalf of DRHC, Young Caribbean, and LSI Acquisition. (D.I.34, Ex. B) The Agreement included various representations and warranties. Of especial relevance to the dispute at bar are the representations by defendants that they had: (1) "a combined net worth in excess of $48 million ...;" and (2) "financing commitments in place which, together with cash presently on hand, [would] provide sufficient funds to purchase and pay for the shares pursuant to the Merger in accordance with the terms of this Agreement and to consummate the transactions contemplated hereby...." (D.I. 34, Ex. B at 24, 26) The Agreement also provided that it "shall be governed and construed in accordance with the laws of the State of Delaware" and that the parties "irrevocably and unconditionally consent to the jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware...." (D.I. 34, Ex. B at 58)

On or about May 8, 1998, LSI shareholders voted in favor of the merger. Despite their representations to the contrary, defendants were unable to meet their obligation to tender the $8.10 per share consideration to LSI shareholders. LSI then commenced this action for breach of the Agreement.

III. ANALYSIS

A. Subject Matter Jurisdiction

Plaintiff at bar asserts jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. [FN3] It is well settled that, in order to sustain diversity jurisdiction, all of the parties on one side of the controversy must be citizens of different states than all of the parties on the other side. See Midlantic Nat'l Bank v. Hansen, 48 F.3d 693, 696 (3d Cir.1995); see also Transamerica Corp. v. Reliance Ins. Co., 884 F.Supp. 133, 137 (D.Del.1995). For purposes of determining diversity jurisdiction, a corporation has "dual citizenship" and is considered a citizen of the state of its incorporation and the state where its principal place of business is located. See 28 U.S.C. § 1332(c)(1); Mid-Atlantic, 48 F.3d at 696; Transamerica Corp., 884 F.Supp. at 137. If LSI Acquisition were made a party to this action, the requirement of complete diversity would not be met because both LSI and LSI Acquisition are Delaware corporations. See Johnson & Johnson v. CooperVision, Inc., 720 F.Supp. 1116, 1120 (D.Del.1989).

Where jurisdiction is based upon a diversity of citizenship, a plaintiff cannot confer jurisdiction upon the federal court by its own determination as to who are the proper parties to an action. A federal court must ascertain the " 'principal purpose of the suit' ... and the 'primary and controlling matter in dispute'...," Indianapolis v. Chase National Bank, 314 U.S. 63, 69-70 (1941) (citations omitted), and "must disregard nominal or formal parties to the action [in order to] determine jurisdiction based only upon the citizenship of the real parties to the controversy." Rose v. Giamatti, 721 F.Supp. 906,

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



914 (S.D.Ohio 1989) (citing Navarro Savings Ass'n v. Lee, 446 U.S. 458 (1980)). A real party in interest has been characterized as "one who, by the substantive law, has the duty sought to be enforced or enjoined." Rose, 721 F.Supp. at 914.

***3** In examining whether the alignment of the parties is consistent with the invocation of federal jurisdiction, the court must undertake a two-step analysis. First, the court must identify "necessary" parties under Fed.R.Civ.P. 19(a). As explained by the Third Circuit in Angst v. Royal MacCabees Life Ins. Co., 77 F.3d 701 (3d Cir.1996),

> Rule 19(a) requires the joinder of a party who is subject to service of process and within the court's subject matter jurisdiction when:
> (1) in the person's absence complete relief cannot be accorded among those already parties, or
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
> (i) as a practical matter impair or impede that person's ability to protect that interest or
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Id. at 705. Under Rule 19(a), the court need only find that a party's absence "results in any of the problems identified in the rule." Id. at 706.

If the court concludes that a party is "necessary" at the time the complaint is filed, the party should be joined if feasible. If joinder is not feasible, [FN4] then the court proceeds to the second step of the analysis, that is, whether "in equity and good conscience the action should proceed among the parties before it, or [alternatively, whether the action] should be dismissed." Fed.R.Civ.P. 19(b). Rule 19(b) lists four factors to be considered by the court, in light of the facts of a given case:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

Defendants assert that LSI Acquisition is both a necessary and indispensable party. In support of their assertion, defendants compare the allegations of the complaint with the provisions of the Agreement and conclude that LSI Acquisition's obligations under those provisions of the Agreement cited in the complaint [FN5] are joint with (and not severable from) those of the other corporate defendants. Although the court agrees that the Agreement says what it says, other facts of record require consideration before a conclusion as to joinder can be drawn.

Section 1.01 of the Agreement provides that LSI Acquisition, the identified "Sub," was essentially a fungible actor in the transaction:

> At the election of Parent, any direct or indirect wholly owned subsidiary of Parent may be substituted for Sub as a constituent corporation in the Merger. In the event such a subsidiary is substituted for Sub, Parent will cause such subsidiary to become a party to this Agreement and to assume and perform the obligations of Sub hereunder. Notwithstanding the foregoing, Parent may elect ... that instead of merging Sub into the Company as hereinabove provided, to merge the Company into Sub or another direct or indirect wholly owned subsidiary of Parent ....

***4** (D.I. 34, Ex. B at 2) As stipulated to by the parties:

> LSI Acquisition Corp. ("LSI Acquisition") was established as a vehicle for accomplishing a triangular merger through which Little Switzerland Inc. ("Little Switzerland") would be merged into a corporate entity owned in its entirety by Destination Retail Holdings Corporation ("DRHC").
> LSI Acquisition was to be the merger subsidiary pursuant to the Agreement and Plan of Merger dated February 4, 1998 (the "Merger Agreement"), but this purpose was never accomplished because the merger did not close.
> Incorporating LSI Acquisition was purely a ministerial act accomplished by a paralegal at a law firm representing DRHC.
> LSI Acquisition has conducted no business to date other than the execution of the Merger Agreement, thereby, among other things, agreeing to serve as an entity which could potentially merge with Little Switzerland under the Merger

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Agreement.
LSI Acquisition currently has no assets and no liabilities other than those it would obtain if the merger closed.
(D.I.35) [FN6]

In applying Rule 19(a) to the facts of this case, the court must determine whether "complete relief" can be accorded among those who are already parties in LSI Acquisition's absence. The specific question framed by the record is whether the court "can grant complete relief in a breach of contract action to the parties before it when only [four] of [five] co-obligors [have] been joined as [defendants]." Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 405 (3d Cir.1993) (footnote omitted). The Third Circuit in Janney Montgomery Scott recognized "a strong trend in favor of a principle that co-signors or co-obligors on a contract are jointly and severally liable for its performance." Id. The Third Circuit concluded that if an agreement "can be construed or interpreted as a contract imposing joint and several liability on its co-obligors, ... complete relief may be granted in a suit against only one of them." Id. at 406. Cf. Bank of Am. Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assocs., 844 F.2d 1050, 1054 (3d Cir.1988) (noting that "Professor Moore instructs that 'all joint obligors should be joined in order that there may be a complete determination of the controversy, provided ... their joinder would not destroy federal jurisdiction.' ... However, if such joinder would destroy diversity, 'the court can proceed without the joinder of all joint obligors." ') (citation omitted).

Defendants argue that "[b]ecause the obligations of DRHC, Young Caribbean, Alliance, CEI, and LSI Acquisition under the Merger Agreement are not severable, LSI Acquisition's absence would leave the named defendants subject to a substantial risk of incurring 'double or inconsistent obligations." ' (D.I. 19 at 12) The specific risk identified is that LSI could sue LSI Acquisition in a separate proceeding, thus "expos[ing] DRHC to multiple or inconsistent judgments." (Id.) [FN7]

*5 Although defendants argue that the obligations of the corporate defendants are not severable, they cite to no portion of the record or to any case law in support of their assertion. (D.I. 19 at 12) Indeed, if anything, various provisions of the Agreement

indicate an intention that there be joint and several liability among the co-obligors. [FN8] Because the Agreement can be construed to impose joint and several liability, LSI Acquisition is not a necessary party under Rule 19(a)(1).

Turning to the concerns raised in Rule 19(a)(2), the court finds that defendants have failed to adequately identify LSI Acquisition's "interest relating to the subject of the action," save for its interest in avoiding litigation. In that respect, the court further concludes that the risk of subsequent litigation being pursued against LSI Acquisition (thus exposing DRHC to the risk of multiple or inconsistent obligations) [FN9] is simply too remote and speculative to constitute a "substantial risk."

Having determined that LSI Acquisition is not a necessary party pursuant to Fed.R.Civ.P. 19(a), the court need not "navigate the path of equity and good conscience" in order to determine whether to dismiss the action pursuant to Rule 19(b). Given the court's findings above and the overlapping concerns of Rule 19(a) and (b), suffice it to say that it is unlikely, in the absence of additional evidence, that LSI Acquisition would be deemed indispensable, thus requiring dismissal of the action.

B. Personal Jurisdiction

Defendant Crane contends that this court lacks personal jurisdiction over him and accordingly moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(2). To defeat a Rule 12(b)(2) motion to dismiss, plaintiff bears the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir.1990). Bare pleadings and allegations are insufficient to withstand a Rule 12(b)(2) motion; rather, a plaintiff "must sustain its burden of proof ... through sworn affidavits or other competent evidence." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n. 9 (3d Cir.1984). Once a plaintiff has made out a prima facie case, the burden shifts to defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir.1993) (internal quotations and citation omitted). In reaching its determination, the court must accept as true all well-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



pled facts and draw all reasonable inferences from the facts in favor of LSI, the nonmoving party. Shushan, 954 F.2d at 142 n. 1.

This court may assert personal jurisdiction to the extent permitted under the Delaware long arm statute, 10 Del. C. § 3104, Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 293 (3d Cir.1985), and the due process clause of the Fourteenth Amendment. Jeffreys v. Exten, 784 F.Supp. 146, 152-53 (D.Del.1992). In determining whether jurisdiction lies the court must apply a two-step analysis: "First, [the] court must determine whether the alleged conduct of a defendant comes within one of the provisions of the long-arm statute.... [T]hen the court must proceed to consider whether the exercise of jurisdiction over a particular defendant violates due process interests." Blue Ball Properties, Inc. v. McClain, 658 F.Supp. 1310, 1315 (D.Del.1987).

1. Delaware Long Arm Statute

***6** Plaintiff alleges that personal jurisdiction over defendant Crane is proper under 10 Del. C. § 3104(c). This section provides in pertinent part that "a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; ... [or] (3) Causes tortious injury in the State by an act or omission in this State." 10 Del. C. § 3104(c)(1) and (3). As this court has held, this section is to be construed liberally, favoring the exercise of jurisdiction. Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, 833 F.Supp. 437, 444 (D.Del.1993). Accord Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 863 F.Supp. 186, 188 (D.Del.1993) ("The long arm statute 'is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." ') (citation omitted).

a. Transacting Business in Delaware

In support of its contention that defendant Crane transacted business in Delaware, plaintiff LSI argues "that the single act of incorporating a business in Delaware, even in the absence of other contacts with the forum state Delaware, may be sufficient to confer jurisdiction" under 10 Del. C. § 3104(c)(1). (D.I. 33 at 22) The Supreme Court of the State of Delaware held in Papendick v. Bosch, 410 A.2d 148 (Del.1979), that a single act of incorporation in Delaware will suffice to confer personal jurisdiction over a nonresident defendant responsible for the transaction, if such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates. See Cairns v. Gelmon, No. Civ. A. 16062, 1998 WL 276226 (Del. Ch. May 21, 1998) at *3; Arnold v. Society for Savings Bancorp, Inc., Civ. A. No. 12883, 1993 WL 526781 (Del. Ch. Dec. 17, 1993) at *3, reversed on other grounds, 650 A.2d 1270 (Del.1994). The question, then, is whether the relationship between defendant Crane, the incorporation of LSI Acquisition under Delaware law, and plaintiff's cause of action is sufficient to subject Crane to this court's personal jurisdiction.

The court finds the relationship to be insufficient. LSI Acquisition, although incorporated in Delaware, was a fungible corporate entity in terms of the proposed merger transaction. Not only could another corporation have been substituted for LSI Acquisition but, more significantly (and unlike the facts in both Cairns and Arnold ), the transaction was never consummated, leaving LSI Acquisition a shell company with no business activities, no assets, and no actual role in the transaction. The court concludes, therefore, that under the factual record presented, the act of incorporating LSI Acquisition in Delaware is insufficient to confer personal jurisdiction over defendant Crane. [FN10]

b. Tortious Acts in Delaware

Jurisdiction under § 3104(c)(3) requires that the tortious act itself, and not merely the resulting harm, occur in Delaware. See Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F.Supp. 1458, 1468 (D.Del.1991). This interpretation is necessary to distinguish § 3104(c)(3) from § 3104(c)(4), which provides for jurisdiction over one who

> ***7** [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from services, or things used or consumed in the State ....

This latter section, known as a grant of "general jurisdiction," clearly does not require a nexus

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



between the cause of action and a defendant's activities in the State, but does require a higher level of regular contacts in the State than do the other "specific jurisdiction" subsections. To give this subsection any meaning, the court must read § 3104(c)(3) as requiring a connection between the alleged tortious activity and defendant Crane's "presence" in Delaware.

It is undisputed that defendant Crane has not had any physical presence in the State of Delaware. Plaintiff contends, however, that Crane "was directly and personally responsible for a series of actions--all taken in Delaware--with the objective of acquiring control of Little Switzerland, a Delaware corporation." (D.I. 33 at 23) As a basis for this conclusion, plaintiff relies on Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc., 833 F.Supp. 437 (D.Del.1993). In Mobil Oil, the court exercised jurisdiction over an individual defendant who had authorized, in his official capacity, the corporate act that was the subject of plaintiff's suit.

The crux of LSI's complaint against defendants is that they misrepresented to LSI and its shareholders that they were capable of consummating an all-cash merger transaction; in fact, defendants were not able to consummate such a deal and, therefore, breached the Agreement. The representations made in the materials of record, therefore, are related to the causes of action as "necessary precursors to the execution of the Merger Agreement ...." (D.I. 33 at 25) These representations as published in the proxy statement and the January 16 and 29, 1998 letters were signed by defendant Crane and were directed to be circulated by defendant Crane.

In order to find jurisdiction under 10 Del. C. § 3104(c)(3), a defendant must have caused a tortious injury in Delaware by its acts or omissions in Delaware. Plaintiff's invocation of subsection (c)(3) fails on the second of these requirements. Although defendant Crane arguably caused tortious injury in Delaware by mailing to Delaware residents materials containing misrepresentations, this court has held that

> [t]he "act" of mailing, for purposes of subsection (c)(3), is complete when the material is mailed. Any other interpretation of the statute would mean that anytime tortious injury was felt in Delaware, the alleged tortfeasor could be deemed to have committed an "act" in Delaware. [Plaintiff's] construction of the statute would "eviscerate the distinction between subsections (c)(3) and (c)(4) ...." ... Simply put, in order for a defendant to commit an act in Delaware and be subject to subsection (c)(3), the defendant, or an agent of the defendant, must be present in Delaware when the deed is done.... There was no such presence with regard to the mailing of the billing statements, the mailing of the promotional material, or the placement of the advertisements....

***8** Sears, Roebuck & Co. v. Sears plc, 744 F.Supp. 1289, 1294 (D.Del.1990) (citations omitted). See also Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F.Supp. 1468. The court does not understand the materials to have been mailed from Delaware but to Delaware. Therefore, defendant Crane has not committed an "act" in Delaware for purposes of conferring jurisdiction under 10 Del. C. § 3104(c)(3).

c. Agency Theory

Plaintiff LSI contends that defendant Crane is subject to this court's personal jurisdiction because his "agents" had the requisite contacts with the forum. "It is true that a person who is controlled by a principal may be deemed an agent," Wesley-Jessen Corp., 863 F.Supp. at 188, and that actions taken by an agent in the forum state are imputed to the principal for purposes of jurisdiction, Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 481 (Del.1992).

The "agents" identified by plaintiff at bar are the attorneys (and their staff) who incorporated LSI Acquisition in Delaware and instituted the lawsuit in Delaware relating to the proxy contest. Plaintiff argues that, because these "acts" took place in Delaware and "were necessary precursors to the execution of the Merger Agreement," there is a sufficient nexus between the conduct in the state and the tortious injury alleged in plaintiff's lawsuit to satisfy the jurisdictional prerequisites of section 3104(c)(3). (DI 33 at 25)

The court finds, however, that the "acts" performed by the "agents" in Delaware, while arguably of historical relevance, are too far removed from the causes of action asserted by plaintiff to justify the imposition of personal jurisdiction on the principal, defendant Crane.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



d. Conspiracy Theory

Under Delaware law, the actions of a conspirator may be attributed to a co-conspirator for the purposes of asserting personal jurisdiction. [FN11] Hercules, 611 A.2d at 481-82. To assert jurisdiction under this theory, a plaintiff must establish that:

(1) a conspiracy ... existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

Id. at 482. Accord Wesley-Jessen Corp., 863 F.Supp. at 189.

Plaintiff LSI alleges that defendant Crane "was part of a conspiracy to breach the Merger Agreement, make misrepresentations regarding the Merger Agreement and otherwise unlawfully harm [LSI's] business." (D.I. 33 at 32; D.I. 1, ¶ 46) Plaintiff further alleges that one of Crane's co-conspirators was Robert Cordes, the President of Alliance, CEI and Aspen (Aspen being the corporate entity which instituted the Chancery Court action). (D.I.34, Exs.B, H) Harking back to the proxy contest and the related lawsuit, plaintiff asserts that "Crane and Cordes were co-conspirators and the acts of one can be attributed to the other both for jurisdictional and liability purposes." (D.I. 33 at 32)

***9** A conspiracy is defined as "[a]n agreement manifesting itself in words or deeds and made by two or more persons confederating to do an unlawful act or use unlawful means to do an act which is lawful." Webster's New International Dictionary 485 (1993). There is evidence of record that the defendants engaged in a concerted effort to take control of plaintiff LSI. Plaintiff has asserted that defendants engaged in unlawful conduct (e.g., fraud) to effectuate their business plan. Reviewing the facts and inferences to be drawn from the pleadings in the light most favorable to the nonmoving party, the court finds the first two prongs of the conspiracy test satisfied.

The next inquiry is whether the acts identified by plaintiff constitute "substantial acts" which occurred in Delaware or, alternatively, whether "substantial effects" in furtherance of the conspiracy occurred in Delaware. Defining the scope of the term "substantial act" commensurate with the requirements of 10 Del. C. § 3104(c), the court finds that the acts performed in the State of Delaware are not "substantial" enough (i.e., do not have a sufficient nexus to the controversy at issue) to confer personal jurisdiction over defendant Crane. The court finds, however, that the defendant's personal conduct outside the State of Delaware had a "substantial effect in furtherance of the conspiracy in the forum state." More specifically, the materials containing the representations at issue were mailed into Delaware at Crane's direction. Such communications with LSI shareholders (including Delaware shareholders) had the effect of forcing LSI's directors to agree to the merger. LSI executed the Agreement based on those same representations as recited in the Agreement. The court further finds that defendant Crane knew or had reason to know that the acts outside the forum state would have an effect in the forum state and that the effect was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

e. Controlling Person Theory

Plaintiff asserts as yet another jurisdictional basis a theory that defendant Crane's control over the transaction and the corporate defendants fairly subject him to the jurisdiction of this court. More specifically, the argument is that, because the corporate defendants are subject to personal jurisdiction in Delaware by virtue of Section 8.06 of the Agreement, so too is defendant Crane, as "the controlling person responsible for the actions taken by the corporate defendants in their efforts to acquire" LSI. (D.I. 33 at 29)

Under Delaware law, "merely contracting with" a Delaware corporation does not provide the necessary connections between the contract and the forum to support a finding of jurisdiction. Abajian v. Kennedy, Civ. A. No. 11425, 1992 WL 8794 (Del. Ch. Jan. 17, 1992) at *10. Therefore, merely executing the Agreement on behalf of the corporate signatories does not confer individual responsibilities on or personal jurisdiction over defendant Crane. Plaintiff cites to Soviet Pan Am Travel Effort v. Travel Committee Inc., 756 F.Supp. 126 (S.D.N.Y.1991), for the broad

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



proposition that an out-of-state corporation and its shareholder are subject to personal jurisdiction in New York (under New York law) "based not on their own actions but instead on the actions" of an affiliated corporation in New York over which they exerted "some control in the matter." Id. at 130.

***10** Of course, New York law and its interpretation are not controlling in the case at bar. The court finds no evidence that plaintiff's "controlling person" theory has found acceptance in Delaware as an alternate basis for asserting personal jurisdiction over a nonresident. Therefore, although the record indicates that defendant Crane was the moving force behind the transaction in dispute and that he controlled some, if not all, of the corporate defendants and directed some, if not all, of their activities relating to the transaction in dispute, nevertheless, the court finds that these facts add nothing to the traditional analyses under 10 Del.C. § 3104(c).

f. Alter Ego Theory

Plaintiff asserts that defendant Crane is subject to personal jurisdiction "upon a showing that the corporate defendants are his alter egos under Delaware law." (D.I. 33 at 26) Assuming for purposes of argument that plaintiff has demonstrated that the corporate defendants' activities satisfy the requirements of 10 Del. C. § 3104(c), plaintiff has not sufficiently "show[n] fraud, injustice or inequity in the use of the corporate form" "distinct from the tort alleged in the complaint." Sears plc, 744 F.Supp. at 1304-05.

D. Due Process

Having concluded that jurisdiction over defendant Crane exists under Delaware law, the court must also determine whether the requirements of the due process clause of the Constitution would prevent this court from asserting jurisdiction. The Supreme Court of the United States set forth the relevant due process requirements in International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945):

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Milliken v. Meyer, 311 U.S. 457 ....

In Hanson v. Denckla, 357 U.S. 235, 253 (1958), the Supreme Court noted further:

> [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

In addition, the "defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

> By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," ... the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit ...."

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (citations omitted). In a case such as the present,

> ***11** [w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, th[e] "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, ... and the litigation results from alleged injuries that "arise out of or relate to those activities ...."

Id. at 472-73 (citations and footnotes omitted).

As noted above, the court has found that defendant Crane "controlled" the transaction at issue, including negotiating the final terms of the Agreement with plaintiff LSI. As admitted by defendants, Crane is a "controlling person" of at least DRHC and Young Caribbean and executed the Agreement on their behalf. (D.I. 19 at 18; D.I. 33 at 25; D.I. 34, Ex. B) The Agreement, of course, specifically provides for a Delaware forum. Under these circumstances, where the court has found contacts sufficient to uphold personal jurisdiction, the court further finds that defendant Crane should reasonably have anticipated being haled into court in Delaware, thus satisfying "traditional notions of fair play and substantial justice." International Shoe, 326 U.S. at 316.

E. Aiding and Abetting Claim

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Defendants urge the court to dismiss LSI's aiding and abetting claim against Crane, arguing that "LSI has not cited any Delaware authority recognizing a cause of action for aiding and abetting a breach of contract or misrepresentation." (D.I. 41 at 19). Defendants acknowledge that Section 876 of the Restatement (Second) of Torts recognizes the tort of "aiding and abetting," but contend that Section 876 "does not apply to allegations of wrongdoing premised on agency principles." (Id.)

It would appear that Delaware recognizes a cause of action for aiding and abetting. See In re Santa Fe Pac. Corp. Shareholder Litig., 669 A.2d 59, 72 ((Del.1995). While it may be true that one cannot be both an "aider and abetter" and a principal to an agent, inconsistent legal theories at this stage of the proceedings are not cause for dismissal.

IV. CONCLUSION

For the reasons stated, defendants' motions to dismiss and to stay discovery are denied. An order shall issue.

FN1. The suit was filed by Aspen Investments, Inc., another corporation allegedly controlled by defendant Crane. Aspen is a corporation organized and existing under the laws of the Republic of Panama, with a business address of Freeport in the Bahamas. (D.I. 34, Ex. F at 1; Ex. H at 1)

FN2. Plaintiff has submitted the affidavit of William Carey who avers, inter alia, that Delaware residents are included among LSI's shareholder list. (D.I.37, ¶¶ 5, 6) There is no evidence of record to the contrary.

FN3. Although "[t]he burden of proving diverse citizenship falls on the party invoking federal jurisdiction," Rashid v. Kite, 957 F.Supp. 70, 72 (E.D.Pa.1997), generally when reviewing a motion to dismiss under Fed.R.Civ.P. 12, all well-pled facts are taken as true and all inferences therefrom viewed in a light most favorable to the nonmoving party. Carteret Savings Bank FA v. Shushan, 954 F.2d 141, 142 n. 1 (3d Cir.1992).

FN4. For instance, joinder in this case would destroy the diversity among the parties, thus depriving the court of subject matter jurisdiction.

FN5. Sections 1.01, 4.01, 4.04, 5.05, and 6.03. (D.I.34, Ex. B)

FN6. Although counsel for defendants asserted at oral argument that one could not assume that LSI Acquisition would "always be what it is today" (D.I. 55 at 10), the court's charge is to determine a party's role at the time the complaint was filed and not engage in speculation about its future role. See Angst, 77 F.3d at 706.

FN7. At oral argument, counsel also argued that if LSI Acquisition remains exposed to separate legal proceedings, "certainly, Little Switzerland or its stockholders could then try to go up the ladder to other corporations or persons." (D.I. 55 at 10) LSI has stipulated that it will not sue LSI Acquisition, "except to the extent that LSI Acquisition is the recipient of funds transferred fraudulently from any of the defendants" at bar. (D.I.44) A derivative suit has been filed in this court; LSI Acquisition is not a named defendant. (Civil Action No. 99-176, D.I. 1)

FN8. The preface to Article IV of the Agreement provides that: "Parent, Sub and the Parent Related Entities, jointly and severally represent and warrant to the Company as follows: ..." (Emphasis added) Section 4.02 of the Agreement provides that the Agreement "constitutes a valid and binding agreement of each of Parent, Sub and the Parent Related Entities, enforceable against each of Parent, Sub and the Parent Related Entities...." (emphasis added) Section 8.10 of the Agreement provides in relevant part that: "Parent shall cause Sub to perform its obligations hereunder and shall be fully liable, severally and jointly, for any failure of Sub to perform such obligations." (emphasis added)

FN9. The fact that a derivative suit has been instituted against DRHC supports the notion that LSI Acquisition, a non-operating, no-asset corporate entity, is not a real party in interest.

FN10. This conclusion is not inconsistent with the finding that LSI Acquisition is not a necessary party to the litigation.

FN11. Defendants assert that, "as a matter of law, a corporation cannot conspire with its officers and agents." (D.I. 41 at 16) Assuming that to be the case, see Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc., Civ. A. No. 12036,



1991 WL 129174 (Del. Ch. July 10, 1991) at *4, the court finds that defendants cannot assert both that defendant Crane does not control all of the corporate defendants (for purposes of avoiding personal jurisdiction under the agency and controlling person theories) and that he does control all of the corporate defendants (for purposes of avoiding personal jurisdiction under a conspiracy theory). At this juncture, on a motion to dismiss, the court declines to adopt defendants' varying versions of the facts and will analyze LSI's conspiracy theory as though defendant Crane were neither a principal nor a controlling person of all of the corporate entities.

1999 WL 223496 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

# TAB 6

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

**MCNEIL NUTRITIONALS, LLC, Plaintiff,
v.
THE SUGAR ASSOCIATION, et al., Defendants.**

**No. C.A. 05-69(GMS).**

April 29, 2005.

Steven J. Balick, Wilmington, DE, for Plaintiff.

Sarah Elizabeth Diluzio, Potter Anderson & Corroon, LLP, Wilmington, DE, for Defendant.

MEMORANDUM

SLEET, J.

I. INTRODUCTION

***1** On February 8, 2005, plaintiff McNeil Nutritionals, LLC ("McNeil") brought the present action against The Sugar Association, The Sugar Association's seventeen member companies, [FN1] the American Sugarbeet Growers Association, and Qorvis Communications, LLC ("Qorvis"). The complaint alleges one count of false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1998), one count of deceptive trade practices in violation of the Delaware Uniform Deceptive Trade Practices Act, Del.Code Ann. tit. 6, §§ 2531 et seq., and one count of unfair competition and product disparagement in violation of Delaware common law. (D.I. 1 ¶¶ 60-71.) On March 25, 2005, a Motion to Dismiss was filed on behalf of all twenty defendants, in which it is argued (among other things) that the court does not have personal jurisdiction over fifteen of the defendants. (D.I.28.) McNeil responded with a Motion for Enlargement of Briefing Schedule in Order to Permit Discovery Necessary to Respond to Motion to Dismiss. (D.I.30.) For the following reasons, the court will grant McNeil's motion and permit limited and appropriate jurisdictional discovery.

FN1. The Sugar Association's seventeen member companies include: The Amalgamated Sugar Co., American Crystal Sugar Co., American Sugar Cane League, American Sugar Refining, Inc., Atlantic Sugar Ass'n, Hawaiian Sugar & Transportation Coop., Imperial Sugar Co., Michigan Sugar Co., Minn-Dak Farmers Coop., Okeelanta Corp., Osceola Farms Co., Rio Grande Valley Sugar Growers, Inc., Southern Minnesota Beet Sugar Coop., Sugar Cane Growers Coop. of Florida, United States Sugar Corp., Western Sugar Coop., and Wyoming Sugar Co.

II. DISCUSSION

The Sugar Association is a Delaware non-profit corporation (D.I. 28 Ex. C ¶ 1), comprising seventeen member companies who are "producers and growers of sugar in the United States" (D.I. 34 Ex. 3). Its stated mission is "educating health professionals, media, government officials, and the public about sugar's goodness." (Id.) McNeil, on the other hand, is a Delaware limited liability company that markets products containing the no-calorie sweetener sucralose, which is sold under the name Splenda. (D.I. 1 ¶ 3.) Obviously, sugar and Splenda are competing products. McNeil alleges that a decrease in sugar consumption in recent years (id.¶ 37) has led The Sugar Association to mount "a false and malicious smear campaign" against Splenda through press statements and internet websites, including The Sugar Association's "Truth About Splenda" website (id. ¶¶ 1-2; see also id. ¶¶ 41-55). Consequently, McNeil brought the present action against The Sugar Association and nineteen others. As mentioned above, the twenty defendants include The Sugar Association, its seventeen member companies, the American Sugarbeet Growers Association, and Qorvis. Of those twenty, thirteen member companies, the American Sugarbeet Growers Association, and Qorvis argue that they do not have sufficient contacts with Delaware for the court to exercise personal jurisdiction over them in this matter. Rather than answering the defendants' contentions, McNeil argues it should be permitted to engage in limited jurisdictional discovery.

"Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous." ' Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). "Thus,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



resolution of this motion begins with the presumption in favor of allowing discovery to establish personal jurisdiction." Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, "[t]he court must be satisfied that there is some indication that [these] particular defendant[s] [are] amenable to suit in this forum." Id. at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." Id. at 476. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous." ' Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 107 F.3d 1026, 1042 (3d Cir.1997). See also B.L. Poe v. Babcock Int'l, 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be some competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." Hansen, 163 F.R.D. at 475. See also Impact Labs, Inc. v. X-Rayworld.com, Inc., No. 03-211-GMS, 2003 WL 21715872, at *3 (D.Del. July 24, 2003) (permitting jurisdictional discovery on the basis of an affidavit merely reflecting that a defendant-company's President and CEO held out the defendant-company's principal place of business as Delaware).

A. The Thirteen Member Companies

*2 The thirteen member companies [FN2] objecting to personal jurisdiction disavow (by individual affidavits) the notion that they have any direct contacts with Delaware. [FN3] (See D.I. 28 Exs. D-P.) Furthermore, The Sugar Association's President and CEO, Andrew C. Briscoe III, asserts in his affidavit ("the Briscoe affidavit") that The Sugar Association did not obtain either "approval" or "specific approval" from board members or member companies in issuing the various statements complained of in McNeil's complaint. (D.I. 28 Ex. C ¶¶ 8-12.) Therefore, the defendants argue, "McNeil should be required to make a preliminary showing that the individual Members were involved in determining the content of the 'Truth About Splenda' website or engaged in other activity generically charged in the complaint before this Court permits discovery." (D.I. 31 at 3.)

FN2. These thirteen companies include: American Crystal Sugar Co., American Sugar Cane League, Atlantic Sugar Ass'n, Hawaiian Sugar & Transportation Coop., Imperial Sugar Co., Michigan Sugar Co., Minn-Dak Farmers Coop., Osceola Farms Co., Rio Grande Valley Sugar Growers, Inc., Southern Minnesota Beet Sugar Coop., Sugar Cane Growers Coop. of Florida, Western Sugar Coop., and Wyoming Sugar Co.

FN3. One exception is Imperial Sugar Co., a Texas corporation. Imperial Sugar admits to (1) deriving less than 0.1% of its revenue in Delaware, (2) selling to Delaware customers over the internet, and (3) filing for Chapter 11 protection in Delaware in 2001, which was allegedly resolved within that same year. (D.I. 28 Ex. H.)

McNeil responds by pointing to the following statement on The Sugar Association's website, on a page entitled "Who We Are":

> The Sugar Association's member companies are producers and growers of sugar in the United States. The Board of Directors is comprised of decision-making representatives from each of these companies or organizations.... Three advisory committees comprised of member company staff help guide the direction of Public Policy, Public Education, and Scientific Affairs for the Association.

(D.I. 34 Ex. 3 (emphasis added).) [FN4] Furthermore, each of the thirteen objecting member companies is listed on the website as either (or both) a board member or a member company. Of course, it is well established that a defendant's mere "status as a stockholder and officer of a Delaware corporation is an insufficient basis for the court to exercise personal jurisdiction over him pursuant to [the long-arm statute]." Impact Labs, 2003 WL 21715872, at * 2. However, McNeil's theory of jurisdiction is that the member companies are (1) "acting under the guise of a Delaware corporation (the [Sugar] Association)," (2) "to falsely attack and disparage a product sold by a Delaware limited liability company (McNeil)," and (3) "thereby causing economic injury in the State of Delaware." (D.I. 33 at 8.) Although the court is not prepared at this juncture to hold that proof of these three assertions would necessarily establish personal

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



jurisdiction, such proof would at least constitute "some indication" that the member companies are amenable to suit in Delaware. Indeed, the website's assertion that staff from member companies help to guide public policy, public education, and scientific affairs of The Sugar Association certainly gives evidentiary credence, albeit thinly, to McNeil's jurisdictional theory. Moreover, the excerpt satisfies the defendants' demand that McNeil make a preliminary showing as to the member companies' involvement in "The Truth About Splenda" website or other activities charged in the complaint. Therefore, the court will permit McNeil to take limited and appropriate jurisdictional discovery from the thirteen objecting member companies.

FN4. Excerpts from The Sugar Association's website were submitted as part of the affidavit of McNeil's counsel, Steven A. Zalesin. (D.I.34.) The court notes that The Sugar Association's website is separate from the "Truth About Splenda" website, excerpts of which were also submitted as part of Zalesin's affidavit.

B. The American Sugarbeet Growers Association

***3** According to the Briscoe affidavit, the American Sugarbeet Growers Association is not a member of The Sugar Association. (D.I. 28 Ex. C ¶ 7.) Instead, it allegedly "facilitates the selection" of four sugarbeet growers to sit on The Sugar Association's board of directors in an advisory capacity only. (Id.) Furthermore, Luther Markwart, Executive Vice President of the American Sugarbeet Growers Association, submitted an affidavit in which he asserts that the advisory board members representing his organization have "no authority to approve any policy, actions, or financial obligations taken by the Sugar Association." (D.I. 28 Ex. Q ¶ 18.) Markwart also denies any contacts between his organization and Delaware. (D.I. 28 Ex. Q.) The only other evidence regarding the American Sugarbeet Growers Association that the court can find is in the website excerpt provided by McNeil, which merely verifies that the organization has four representatives on The Sugar Association's board of directors. (D.I. 34 Ex. 3.)

The question of whether to permit jurisdictional discovery with regard to this defendant is a closer case. The dispositive evidence regarding the member companies is the website's statement that staff from member companies help to guide the direction of public policy, public education, and scientific affairs for The Sugar Association. Yet, it is undisputed that the American Sugarbeet Growers Association is not a member company. Were the court to strictly construe the website's language, the evidence would be inapposite. However, taking notice of the fact that statements on the internet are often written without the same precise intent as are, say, claims in a patent, and recalling the presumption in favor of permitting jurisdictional discovery, the court is convinced that the evidence presented by McNeil is sufficient to permit limited and appropriate jurisdictional discovery to be taken from the American Sugarbeet Growers Association as well.

C. Qorvis

Qorvis is allegedly a public relations firm that aids The Sugar Association in promoting its "education program about the chemical sucralose." (D.I. 28 Ex. R ¶ 19.) But according to the affidavit of Michael Petruzello, Qorvis' Managing Partner, the "Truth About Splenda" website "was designed and is maintained by Qorvis' web designer in Virginia." (Id.) Petruzello further asserts that the "website, which is not targeted at Delaware or its residents, does not advertise Qorvis' services, allow visitors to contract for Qorvis' services, offer any products or services for sale, solicit donations of any kind, or generate revenues for Qorvis." (Id.) The only contact with Delaware admitted by Qorvis in connection with its work for The Sugar Association is the sending of one postcard, out of five to ten thousand sent as part of a national mailing campaign regarding sucralose, to a health reporter for the Wilmington News Journal in New Castle, Delaware. (Id.¶ 16.) Qorvis also maintains a website accessible from Delaware, but it "is not commercially interactive and cannot be used to conduct commercial activities with Delaware residents." (Id.¶ 17.) Qorvis' other admitted contacts with Delaware are relatively insignificant and unrelated to the present litigation. However, Petruzello's affidavit fails to mention that the "Truth About Splenda" website contains the following invitation: "For more information about the 'Truth About Splenda' campaign or to get involved, please contact Rich Masters at Qorvis Communications...." The sentence continues by offering Masters' contact information, including his telephone number and email address. (D.I. 34 Ex. 1.)

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

***4** In their motion to dismiss, the defendants argue that the mere ownership or maintenance of a passive website accessible in Delaware does not render Qorvis amenable to suit in this jurisdiction. (D.I. 28 at 19.) Here, however, the evidence suggests Qorvis has done more than that. In addition to creating and maintaining the "Truth About Splenda" website for a Delaware corporation, Qorvis sent information regarding sucralose to a Delaware reporter, and held itself out as the point of contact for anyone interested in learning about or becoming involved with the campaign of a Delaware corporation. While these acts may or may not ultimately be sufficient to establish personal jurisdiction, they certainly give "some indication" that Qorvis is amenable to suit in Delaware. Thus, McNeil will be permitted to take limited and appropriate jurisdictional discovery from Qorvis.

III. CONCLUSION

For the aforementioned reasons, McNeill will be permitted to take limited and appropriate jurisdictional discovery from all fifteen above-mentioned defendants.

ORDER

IT IS HEREBY ORDERED THAT:

1. McNeil Nutritionals, LLC's ("McNeil") Motion for Enlargement (D.I.30) be GRANTED;
2. McNeil be permitted to take limited and appropriate jurisdictional discovery from the following fifteen defendants: American Crystal Sugar Co., American Sugar Cane League, Atlantic Sugar Ass'n, Hawaiian Sugar & Transportation Coop., Imperial Sugar Co., Michigan Sugar Co., Minn-Dak Farmers Coop., Osceola Farms Co., Rio Grande Valley Sugar Growers, Inc., Southern Minnesota Beet Sugar Coop., Sugar Cane Growers Coop. of Florida, Western Sugar Coop., Wyoming Sugar Co., the American Sugarbeet Growers Association, and Qorvis Communications, LLC;
3. McNeil shall answer the defendants' Motion to Dismiss (D.I.28) by July 29, 2005; and
4. The defendants shall reply to McNeil's answer in the time provided by the Local Rules.

2005 WL 1000242 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

# TAB 7

United States Court of Appeals,
Federal Circuit.

**TEVA PHARMACEUTICALS USA, INC., Plaintiff-Appellant,
v.
NOVARTIS PHARMACEUTICALS CORPORATION, Novartis Pharma AG and Novartis International Pharmaceutical Ltd., Defendants-Appellees.**

**No. 06-1181.**

March 30, 2007.

Background: Competitor that had filed abbreviated new drug application (ANDA) for generic drug brought action against patent holder for declaratory judgment on validity or infringement of method patents not challenged in holder's suit alleging infringement of drug patent. The United States District Court for the District of New Jersey, Jose L. Linares, J., 2005 WL 3619389, dismissed suit for lack of jurisdiction. Competitor appealed.

Holdings: The Court of Appeals, Gajarsa, Circuit Judge, held that: (1) actual controversy is the sole requirement for federal court jurisdiction under the Declaratory Judgment Act (DJA) and statute conferring subject matter jurisdiction over declaratory judgment action on infringement or validity of drug patent, and (2) the competitor had an injury-in-fact and justiciable Article III controversy with holder.

Reversed.

Friedman, Senior Circuit Judge, concurred in the judgment and filed opinion.

**[1] Declaratory Judgment 393**
118Ak393
Dismissal of declaratory judgment action for lack of jurisdiction presents a question of law reviewed without deference.

**[1] Federal Courts 755**
170Bk755
Dismissal of declaratory judgment action for lack of jurisdiction presents a question of law reviewed without deference.

**[2] Declaratory Judgment 393**
118Ak393
The determination of whether an actual controversy exists under the Declaratory Judgment Act (DJA) in a patent case is a question of law reviewed de novo. 28 U.S.C.A. § 2201.

**[2] Federal Courts 776**
170Bk776
The determination of whether an actual controversy exists under the Declaratory Judgment Act (DJA) in a patent case is a question of law reviewed de novo. 28 U.S.C.A. § 2201.

**[3] Declaratory Judgment 393**
118Ak393
District court's factual findings supporting its determination on questions of actual controversy and jurisdiction under the Declaratory Judgment Act (DJA) are reviewed for clear error. 28 U.S.C.A. § 2201.

**[3] Federal Courts 870.1**
170Bk870.1
District court's factual findings supporting its determination on questions of actual controversy and jurisdiction under the Declaratory Judgment Act (DJA) are reviewed for clear error. 28 U.S.C.A. § 2201.

**[4] Federal Civil Procedure 103.2**
170Ak103.2
A justiciable Article III controversy requires the party instituting the action to have standing and the issue presented to the court to be ripe. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[4] Federal Courts 12.1**
170Bk12.1
A justiciable Article III controversy requires the party instituting the action to have standing and the issue presented to the court to be ripe. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[5] Federal Civil Procedure 103.3**
170Ak103.3
Article III standing requires a plaintiff to allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



redressed by the requested relief. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[6] Federal Civil Procedure 103.2**
170Ak103.2
Of the three Article III standing requirements, injury-in-fact is the most determinative; whatever else the case or controversy requirement embodies, its essence is a requirement of injury in fact. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[6] Federal Courts 12.1**
170Bk12.1
Of the three Article III standing requirements, injury-in-fact is the most determinative; whatever else the case or controversy requirement embodies, its essence is a requirement of injury in fact. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[7] Federal Civil Procedure 103.2**
170Ak103.2
An injury-in-fact necessary for Article III standing must be personal, concrete, and particularized and actual or imminent. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[8] Declaratory Judgment 62**
118Ak62
Under the declaratory judgment standard of an actual controversy, all the circumstances must demonstrate the Article III justiciability requirement that the case be ripe for judicial review. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201(a).

**[9] Federal Courts 12.1**
170Bk12.1
The doctrine of ripeness focuses on the conduct of the defendant to determine whether the defendants actions have harmed, are harming, or are about to harm the plaintiff.

**[10] Federal Courts 12.1**
170Bk12.1
A controversy is "ripe" if the question presented is fit for judicial review, meaning it is entirely or substantially a question of law and postponing a decision would work a substantial hardship on the challenging party.

**[11] Constitutional Law 69**
92k69
Under the prohibition against advisory opinions, federal courts are to decide only actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[12] Federal Civil Procedure 103.2**
170Ak103.2
Congress by legislation may expand standing to the full extent permitted by Article III, thus permitting litigation by one who otherwise would be barred; Congress, however, cannot expand standing beyond the Article III jurisdiction of federal courts. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[13] Federal Civil Procedure 103.2**
170Ak103.2
As long as Congress remains within constitutional limits, it may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[14] Declaratory Judgment 232**
118Ak232

**[14] Declaratory Judgment 233**
118Ak233

**[14] Declaratory Judgment 300**
118Ak300
The Declaratory Judgment Act (DJA) and statute conferring subject matter jurisdiction over declaratory judgment action on infringement or validity of drug patent expand standing to constitutional limits and provide a way for plaintiffs to bring actions in federal court when they might otherwise be barred. 28 U.S.C.A. § 2201; 35 U.S.C.A. § 271(e)(5).

**[15] Declaratory Judgment 232**
118Ak232

**[15] Declaratory Judgment 233**
118Ak233
An actual controversy is the sole requirement for federal court jurisdiction under the Declaratory Judgment Act (DJA) and statute conferring subject matter jurisdiction over declaratory judgment action on infringement or validity of drug patent. 28 U.S.C.A. § 2201; 35 U.S.C.A. § 271(e)(5).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**[16] Declaratory Judgment 62**
118Ak62
An "actual controversy" within the meaning of the Declaratory Judgment Act (DJA) is the same as an Article III case or controversy. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201(a).

**[17] Declaratory Judgment 232**
118Ak232

**[17] Declaratory Judgment 233**
118Ak233

**[17] Declaratory Judgment 300**
118Ak300
Under the Declaratory Judgment Act (DJA) and statute conferring subject matter jurisdiction over declaratory judgment action on infringement or validity of drug patent, a plaintiff is only required to satisfy Article III, which includes standing and ripeness, by showing under all the circumstances an actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201(a); 35 U.S.C.A. § 271(e)(5).

**[18] Declaratory Judgment 5.1**
118Ak5.1
Unlike non-declaratory judgment actions, even if there is an actual controversy, the district court is not required to exercise jurisdiction to address the merits of a declaratory judgment action, as it retains discretion under the Declaratory Judgment Act (DJA) to decline declaratory judgment jurisdiction. 28 U.S.C.A. § 2201.

**[19] Courts 90(1)**
106k90(1)

**[19] Courts 90(2)**
106k90(2)
The Court of Appeals respects the principle of stare decisis and follows its own precedential decisions unless the decisions are overruled by the court en banc or by other controlling authority such as an intervening Supreme Court decision.

**[20] Declaratory Judgment 61**
118Ak61
A justiciable controversy within Article III is the only limitation on jurisdiction under the Declaratory Judgment Act (DJA). U.S.C.A. Const. Art. 3, § 2, cl. 1; 8 U.S.C.A. § 2201.

**[21] Federal Civil Procedure 103.2**
170Ak103.2

**[21] Federal Civil Procedure 103.3**
170Ak103.3
An Article III controversy is found where a plaintiff has demonstrated an injury-in-fact caused by the defendant that can be redressed by the court. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[22] Declaratory Judgment 234**
118Ak234
Patent holder's competitor that had filed abbreviated new drug application (ANDA) for generic drug had an injury-in-fact and justiciable Article III controversy with holder and, therefore, could file action for declaratory judgment on validity or infringement of method patents listed in Orange Book, even though holder had not sued or threatened to sue competitor over those patents after its paragraph IV certification; the holder had sued competitor for infringement of the drug patent, that suit, although a different case, created a present and actual controversy, and the declaratory judgment arose from the same controversy. U.S.C.A. Const. Art. 3, § 2, cl. 1; Federal Food, Drug, and Cosmetic Act, § 505(j)(2)(A)(vii), (j)(5)(C), 21 U.S.C.A. § 355(j)(2)(A)(vii), (j)(5)(C); 28 U.S.C.A. § 2201(a); 35 U.S.C.A. § 271(a), (e)(2)(A), (e)(5).

**[23] Health 319**
198Hk319
Patent holder's failure to sue for infringement of method patents when it sued for infringement of drug patent did not block holder from suing on the method patents, and the holder's suit on the patent expiring first invoked automatic thirty-month stay of competitor's abbreviated new drug application (ANDA) for generic drug, reserved option of future litigation on the method patents, and prevented the generic drug from entering the market until the expiration of the last patent. Federal Food, Drug, and Cosmetic Act, § 505(j)(5)(B)(iii), 21 U.S.C.A. § 355(j)(5)(B)(iii).

**[24] Federal Courts 12.1**
170Bk12.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



A justiciable controversy under Article III can arise from either an actual or an imminent injury. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[25] Declaratory Judgment 231.1**
118Ak231.1
A justiciable declaratory judgment controversy arises for the filer of an abbreviated new drug application (ANDA) when a patentee lists patents in the Orange Book, the ANDA applicant files its ANDA certifying the listed patents under paragraph IV, and the patentee brings an action against the submitted ANDA on one or more of the patents. U.S.C.A. Const. Art. 3, § 2, cl. 1; Federal Food, Drug, and Cosmetic Act, § 505(j)(2)(A)(vii), (j)(5)(C), 21 U.S.C.A. § 355(j)(2)(A)(vii), (j)(5)(C); 28 U.S.C.A. § 2201(a); 35 U.S.C.A. § 271(a), (e)(2)(A), (e)(5).

**[26] Federal Civil Procedure 103.2**
170Ak103.2
Congress has authority to give standing and create justiciable injuries through legislation for parties that might otherwise have no recourse as long as Congress does not exceed the limitations of Article III. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[26] Federal Courts 12.1**
170Bk12.1
Congress has authority to give standing and create justiciable injuries through legislation for parties that might otherwise have no recourse as long as Congress does not exceed the limitations of Article III. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**Patents 328(2)**
291k328(2)
5,246,937, 5,840,763, 5,866,581, 5,916,893, 6,124,304. Cited.

Henry C. Dinger, Goodwin Procter LLP, of Boston, Massachusetts, argued for plaintiff-appellant. With him on the brief were Shepard M. Remis and Roland H. Schwillinski. Of counsel on the brief were Allyn Z. Lite and Michael E. Patunas, of Lite Depalma Greenberg & Rivas, LLC, of Newark, New Jersey.

Hugh C. Barrett, Fitzpatrick, Cella, Harper & Scinto, of New York, New York, argued for defendants-appellees. With him on the brief were Robert L. Baechtold, Nicholas N. Kallas, and Simon D. Roberts.

Before MAYER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and GAJARSA, Circuit Judge.

GAJARSA, Circuit Judge.

***1** Teva Pharmaceuticals ("Teva") appeals from the dismissal of its declaratory judgment action by the United States District Court for the District of New Jersey. The district court, relying on our two-part declaratory judgment test for patent non-infringement as modified by our recent decision in Teva Pharmaceuticals USA, Inc., v. Pfizer, Inc., 395 F.3d 1324 (2005) ( "Pfizer"), found that Teva failed to establish a reasonable apprehension of imminent suit and that it therefore lacked jurisdiction over the declaratory judgment action. In light of the Supreme Court's recent decision in MedImmune, Inc. v. Genentech, Inc., --- U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), which finds that our declaratory judgment test for non-infringement or invalidity "conflicts" with its precedent, we reverse.

I. BACKGROUND

Novartis holds a New Drug Application ("NDA") for three strengths of the drug Famvir . Upon filing its Famvir NDA, Novartis listed five patents in the Food and Drug Administration's ("FDA") Orange Book, each of which covers and is directed to various aspects of Famvir , including U.S Patent Nos: 5,246,937 ("'937 patent"); 5,840,763 ("'763 patent"); 5,866,581 ("'581 patent"); 5,916,893 ("'893 patent"); and 6,124,304 ("'304 patent"). The ' 937 patent is directed to the active ingredient in Famvir , famciclovir, while the remaining Orange Book patents are directed to methods of therapeutic use ("method patents") of Famvir . The '937 patent expires in 2010, but the related therapeutic use patents do not expire until 2014-15.

In 2004, Teva filed an Abbreviated New Drug Application ("ANDA") with the FDA for generic famciclovir tablets in which Teva certified under paragraph IV of 21 U.S.C. § 355(j)(2)(A)(vii) that its drug did not infringe any of the five Novartis Famvir Orange Book patents or that the patents were invalid. Teva's paragraph IV certifications constitute technical infringement under 35 U.S.C. § 271(e)(1). Accordingly, Novartis had 45 days to sue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



on these patents in order to invoke a statutorily mandated 30-month stay to delay immediate FDA approval of Teva's famciclovir ANDA. See 21 U.S.C. § 355(j)(5)(B)(iii).

Novartis brought an infringement suit against Teva on the '937 patent alone and did not include in the action the related therapeutic use patents. The infringement suit is pending in the United States District Court for the District of New Jersey. Novartis Pharm. Corp. v. Teva Pharm. USA, Inc., No. 05-1887, 2005 WL 3664014 (D.N.J.2005).

After Novartis filed suit, Teva brought this declaratory judgment action on the four remaining method patents under 21 U.S.C. § 355(j)(5)(C) and 35 U.S.C. § 271(e)(5) to establish "patent certainty." Title 21 U.S.C. § 355(j)(5)(C) is a 2003 amendment to the ANDA statute entitled "civil action to obtain patent certainty." Under this provision, if the patentee or NDA holder does not bring an infringement suit within 45 days after receiving notice of a paragraph IV certification, the ANDA applicant may bring a civil action for a declaratory judgment that the patent at issue is invalid or will not be infringed by the drug for which the ANDA was submitted. Id. Title 35 U.S.C. § 271(e)(5) is a 2003 amendment to the patent statute that works in conjunction with the 2003 amendment to the ANDA statute to provide that in a civil action to obtain patent certainty, federal courts "shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought ... under § 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed." Teva argues that by bringing suit on the '937 patent alone in the first instance, "Novartis has sought to put Teva to the hard choice of either launching at risk of massive liability for patent infringement when the '937 patent expires or Teva prevails in the pending infringement action, or foregoing that opportunity and thereby effectively extending the term of the '937 patent." Appellant Br. 9 (footnotes omitted).

***2** Novartis moved to dismiss for lack of subject matter jurisdiction, arguing that Teva had no reasonable apprehension that it would be sued by Novartis for infringing the four method patents. In response, Teva argued that: (1) Novartis had already sued Teva on the underlying composition patent; (2) listing patents in the Orange Book established infringement as a matter of law; (3) Novartis had a history of aggressively suing generic drug companies; and (4) Novartis had declined to give Teva a covenant not to sue.

The district court dismissed Teva's declaratory judgment action requesting "patent certainty" on the four method patents. Teva Pharm., USA, Inc., v. Novartis Pharm. Corp., No. 05-2881, slip op. at 10, 2005 WL 3619389 (D.N.J. Dec. 12, 2005). In so doing, the district court applied our two prong "reasonable-apprehension-of-imminent-suit" test from Pfizer. [FN1] 395 F.3d at 1332. After comparing the facts of this case to those in Pfizer, the district court found that Teva had failed to establish a reasonable apprehension of imminent suit and that the district court therefore lacked jurisdiction over the declaratory judgment action. Teva, slip op. at 10. Teva timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

[1][2][3] The district court's dismissal of Teva's declaratory judgment action for lack of jurisdiction presents a question of law that we review without deference. See Pfizer, 395 F.3d at 1332 (citing Gen-Probe Inc. v. Vysis, Inc., 359 F.3d 1376, 1379 (Fed.Cir.2004)). The determination of whether an actual controversy exists under the Declaratory Judgment Act in a patent case is a question of law that we review de novo. BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir.1993). The district court's factual findings supporting its determination are reviewed for clear error. Id.

## II. ANALYSIS

### A.

Our starting point in analyzing Teva's appeal is the Declaratory Judgment Act, 28 U.S.C. § 2201(a) under which Teva filed this suit. The relevant text of the Act reads:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

In the ANDA context, Congress explicitly extended federal court declaratory judgment

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



jurisdiction under 28 U.S.C. § 2201 to ANDA paragraph IV disputes such as Teva's and did so "to the extent consistent with the Constitution." 35 U.S.C. § 271(e)(5). [FN2]

The Supreme Court recently re-affirmed that the Act's "actual controversy" requirement "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, 127 S.Ct. at 771 ("[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III.") (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

***3** In MedImmune, the Court found that its precedent "did not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." Id. Instead of applying a bright line, the Court stated that its decisions required:

> that the dispute be "definite and concrete, touching the legal relations of the parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

Id. (citing Aetna Life Ins. Co., 300 U.S. at 240-41, 57 S.Ct. 461).

Previously, the Court held that "the difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). In MedImmune, the Court re-affirmed the correct standard for determining a justiciable declaratory judgment action: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. (citing Md. Cas. Co., 312 U.S. at 273, 61 S.Ct. 510).

[4] Thus, MedImmune teaches that in a declaratory judgment action, "all the circumstances" must demonstrate that a justiciable Article III "controversy" exists. A justiciable Article III controversy requires the party instituting the action to have standing and the issue presented to the court to be ripe. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[5][6][7] Article III standing requires "[a] plaintiff [to] allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Of the three standing requirements, injury-in-fact is the most determinative: "[W]hatever else the 'case or controversy' requirement embodie[s], its essence is a requirement of 'injury in fact.' " Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 218, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (citing Ass'n of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). An injury-in-fact must be "personal," "concrete and particularized," and "actual or imminent." Lujan, 504 U.S. at 560, 112 S.Ct. 2130; Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

[8][9][10] Under the declaratory judgment standard, "all the circumstances" must demonstrate the Article III justiciability requirement that the case be ripe for judicial review. Abbott Labs. v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The doctrine of ripeness focuses on the conduct of the defendant to determine whether the defendants actions have harmed, are harming, or are about to harm the plaintiff. Ripeness can be an issue in obtaining anticipatory relief like declaratory judgments. Id. at 149, 87 S.Ct. 1507. A "controversy" is "ripe" if the question presented is "fit for judicial review," meaning it is entirely or substantially a question of law and postponing a decision would work a substantial hardship on the challenging party. Id. at 149-50, 87 S.Ct. 1507 (applying the test and holding that a regulation requiring drug manufacturers to change labeling was ripe for review before it was enforced because the regulation had an immediate and expensive impact on the plaintiffs' operations and plaintiffs risked a substantial sanction for non-compliance).

***4** [11] Similar to the ripeness doctrine and based

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



on the same constitutional "controversy" requirement is the Court's prohibition against advisory opinions. Under this doctrine, federal courts are to decide only "actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it." Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri, 361 U.S. 363, 367, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960). Although there can be a fine line between declaratory judgments and advisory opinions, the Supreme Court maintains the necessity of avoiding issuing advisory opinions based upon hypothetical facts. Elec. Bond & Share Co. v. Sec. & Exch. Comm'n, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936 (1938).

[12][13] Notwithstanding the Court's justiciability precedent, it is well established that Congress by legislation "may expand standing to the full extent permitted by [A]rticle [III] of [the] Constitution, thus permitting litigation by one who otherwise would be barred." Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Congress, however, cannot expand standing beyond the Article III jurisdiction of federal courts. Id. Thus, as long as Congress remains within constitutional limits, it may "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." Linda R.S. v. Richard D., 410 U.S. 614, 617 n. 4, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (citing Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J., concurring)).

[14][15][16][17][18] The Declaratory Judgment Act and 35 U.S.C. § 271(e)(5) are examples of legislation that expand standing to constitutional limits and provide a way for plaintiffs to bring actions in federal court when they might otherwise be barred. The sole requirement for federal court jurisdiction under both provisions is an "actual controversy," 28 U.S.C. § 2201(a), which is the same as an Article III case or controversy. See Aetna Life Ins., 300 U.S. at 239-41, 57 S.Ct. 461. This means that under both provisions, a declaratory judgment plaintiff is only required to satisfy Article III, which includes standing and ripeness, by showing under "all the circumstances" an actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, 127 S.Ct. at 771 (internal citations omitted). [FN3]

[19] In the instant case, we follow the Court's analysis in MedImmune in determining whether Teva has a justiciable controversy within the meaning of Article III. Id. By following MedImmune, we recognize that we are not relying on our two-part reasonable-apprehension-of-suit test. See, e.g., Pfizer, 395 F.3d at 1332-33. This court respects the principle of stare decisis and follows its own precedential decisions unless the decisions are "overruled by the court en banc, or by other controlling authority such as an intervening ... Supreme Court decision." Tex. Am. Oil Co. v. U.S. Dep't of Energy, 44 F.3d 1557, 1561 (Fed.Cir.1995) (en banc).

*5 Under our patent jurisprudence, we developed a two-part test to determine if an "actual controversy" exists in a general declaratory judgment action for patent non-infringement or invalidity. See, e.g., Pfizer, 395 F.3d at 1332-33. This test requires both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such an activity. See, e.g., id.

In MedImmune, the Supreme Court in a detailed footnote stated that our two-prong "reasonable apprehension of suit" test "conflicts" and would "contradict" several cases in which the Supreme Court found that a declaratory judgment plaintiff had a justiciable controversy. [FN4] 127 S.Ct. at 774 n. 11. In MedImmune, the Court disagreed with our "reasonable apprehension of imminent suit" test and re-affirmed that the "actual controversy" requirement in the Declaratory Judgment Act is the same as the "Cases" and "Controversies" requirement in Article III. Id. at 771. The Court further re-affirmed that an "actual controversy" requires only that a dispute be " 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



would be upon a hypothetical set of facts.' " Id. (quoting Aetna Life Ins. Co., 300 U.S. at 240-41, 57 S.Ct. 461). The Court summarized the declaratory judgment "actual controversy" requirement by quoting the "all the circumstances" test from Maryland Casualty. Id. Thus, because the Supreme Court in MedImmune cautioned that our declaratory judgment "reasonableapprehension-of-suit" test "contradict[s]" and "conflicts" with its precedent, these Federal Circuit tests have been "overruled by ... an intervening ... Supreme Court decision." Tex. Am. Oil Co., 44 F.3d at 1561; see also, Sandisk v. STMicroelectronics, 480 F.3d 1372 (Fed.Cir.2007). Therefore, we follow MedImmune's teaching to look at "all the circumstances" under Maryland Casualty to determine whether Teva has a justiciable Article III controversy.

B.

The district court was bound by our precedent in Pfizer to apply the "reasonable-apprehension-of-imminent-suit" test to Teva's declaratory judgment action. Teva, slip op. at 9, 2005 WL 3619389. In applying this test, the district court considered Teva's standing and concluded that Teva had failed to establish the type of injury-in-fact that we required in Pfizer because Teva could not show a reasonable apprehension of imminent suit. Teva, slip op. at 9, 2005 WL 3619389; see Pfizer, 395 F.3d at 1333 (requiring a showing of "imminent suit"). The district court found that because Teva could not establish an Article III controversy under our precedent, it did not have jurisdiction and dismissed Teva's declaratory judgment action.

***6** [20][21] We hold that MedImmune applies to Teva's declaratory judgment action and takes precedence over the district court's application of Pfizer, which required Teva to show a single type of Article III injury-in-fact, "a reasonable apprehension of imminent suit." 395 F.3d at 1333. The question in this case is whether Teva has a justiciable controversy within Article III, which is the only limitation on our jurisdiction under the Declaratory Judgment Act. See 28 U.S.C § 2201. An Article III controversy is found where a plaintiff has demonstrated an injury-in-fact caused by the defendant that can be redressed by the court. See Steel Co., 523 U.S. at 83, 118 S.Ct. 1003. In the present case, only the concrete injury-in-fact requirement under Article III is in dispute.

[22][23] We hold that under "all the circumstances" as found in this case, Teva has an injury-in-fact and therefore has a justiciable Article III controversy. Here, Novartis argues that there is no actual controversy between it and Teva on the four method patents in spite of Teva's paragraph IV certifications of the four method patents because Novartis has not filed suit nor threatened to sue Teva on the method patents. Moreover, Novartis contends that the suit on the '937 patent is an entirely different controversy. Novartis is incorrect. There is no question that Novartis has already filed suit based on Teva's act of infringement in submitting the ANDA. Under 35 U.S.C. § 271(e)(2)(A), submitting an ANDA, regardless of how many paragraph IV certifications it may contain, is a single act of infringement: "It shall be an act of infringement to submit--an [ANDA] application ... for a drug claimed in a patent or for the use of which is claimed in a patent." (Emphasis added). While it is true that the suit on the '937 patent is a different "case" than Teva's declaratory judgment action, Novartis created a present and actual "controversy" by choosing to sue under 35 U.S.C. § 271(e)(2)(A) on Teva's single act of infringement, thereby placing into actual dispute the soundness of Teva's ANDA and Teva's ability to secure approval of the ANDA. Thus, while Teva's declaratory judgment action and the pending '937 suit are different "cases," they arise from the same controversy created when Novartis listed its Famvir patents in the Orange Book, Teva submitted its ANDA certifying all five Famvir patents under paragraph IV, and Novartis sued Teva challenging the submission of Teva's ANDA. [FN5]

Novartis' conduct raises the questions of if and how 35 U.S.C. § 271(e)(2) applies to multiple suits between the same parties on the submission of a single ANDA with more than one paragraph IV certification. It is clear from the statutory language that recovering damages for a 35 U.S.C. § 271(e)(2)(A) infringement action is only time barred by the statutory six-year statute of limitations. See 35 U.S.C. § 286 ("[N]o recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."); see also, A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1030 (Fed.Cir.1992) (explaining that §

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



286 is "not a statute of limitations in the sense of barring a suit for infringement" ... but rather a "limit to recovery to damages for infringing acts committed within six years of the date of the filing of the infringement action."). Thus, Novartis has the right of an immediate action against Teva under 35 U.S.C. § 271(e)(2)(A) on any or all of the remaining Famvir Orange Book patents. [FN6] These actions could be brought at any time until the patents expire and damages would be limited only by the six-year limitations period. While it is unclear whether Novartis would be prohibited from suing under the doctrine of claim preclusion, Teva remains under the threat of an infringement suit because the 45-day statutory window does not preclude Novartis from pursuing additional infringement suits under 35 U.S.C. § 271(e)(2)(A). In light of Novartis' pending suit on the same ANDA, this threat of litigation is a present injury creating a justiciable controversy. Moreover, Novartis retains the right to sue Teva under the Famvir patents pursuant to 35 U.S.C. § 271(a). Therefore, Novartis has numerous opportunities to bring an action at any time for patent infringement and is not precluded by the 45-day window.

***7** [24] The district court erred in finding that Teva did not demonstrate an Article III controversy. Teva, slip op. at 6-10, 2005 WL 3619389. A justiciable controversy can arise from either an actual or an imminent injury. While it is true that several of Teva's grounds alleging an "actual controversy" when standing alone might not be sufficient, if taken as a whole these circumstances establish a justiciable controversy with Novartis that can be resolved by allowing Teva to bring a declaratory judgment.

First, Novartis listed its Famvir patents in the Orange Book. By so doing, Novartis represents that "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use or sale" of generic famciclovir covered by the claims of its listed Famvir patents. 21 U.S.C. § 355(b)(1); see Pfizer, 395 F.3d at 1341 (Mayer, J., dissenting). While this conduct on its own may not be sufficient to establish an Article III controversy, it is a circumstance to be considered in determining whether a justiciable controversy exists under the totality of the circumstances.

A second circumstance that supports Teva's claim of a justiciable controversy is Teva's submission of its ANDA certifying that it did not infringe Novartis' Famvir Orange Book patents or that the patents were invalid. The very act of submitting an ANDA is an act of infringement. 35 U.S.C. § 271(e)(2); see Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 678, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990) (holding that the statute creates an "act of infringement that consists of submitting an ANDA ... containing the fourth type of certification"). There is no question that under 35 U.S.C. § 271(e)(2), Novartis would have an immediate justiciable controversy against Teva as soon as Teva submitted the ANDA; indeed, that is exactly what occurred in this case. It logically follows that if such an action creates a justiciable controversy for one party, the same action should create a justiciable declaratory judgment controversy for the opposing party. In fact, the Supreme Court has stated: "It is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case." Md. Cas. Co., 312 U.S. at 273, 61 S.Ct. 510. This conclusion is supported in the legislative history of the 2003 "civil action to obtain patent certainty" amendment to the Hatch-Waxman Act:

> [T]he Hatch-Waxman Act has always provided that patent owners and brand drug companies can bring patent infringement suits against a generic applicant immediately upon receiving notice that the generic applicant is challenging a patent [by filing an ANDA]. The [ANDA] declaratory judgment provisions ... simply level the playing field by making it clear that the generic applicant can also seek a prompt resolution of these patent issues by bringing a declaratory judgment action if [it is not sued] ... within 45 days.

***8** 149 Cong. Rec. S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy, ranking member of the Senate HELP committee).

A third circumstance we find relevant in determining whether Teva has established an actual controversy is the combination of three statutory provisions: 1) the "civil action to obtain patent certainty" under 21 U.S.C. § 355(j)(5)(C); 2) the ANDA declaratory judgment provision under 35 U.S.C § 271(e)(5); and 3) the purpose of the Hatch-Waxman Act. The "civil action to obtain patent certainty," which was enacted in 2003 is designed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



prevent patentees from "gaming" the Hatch-Waxman Act. [FN7] See 21 U.S.C. § 355(j)(5)(C). This amendment specifically permits an ANDA applicant to file a declaratory judgment action under 28 U.S.C. § 2201 against the patent owner or the brand-name drug company "for a declaratory judgment that the patent [listed in the Orange Book] is invalid or will not be infringed by the drug" covered by the ANDA if the patentee has not brought an infringement action within 45 days. Id. By virtue of 35 U.S.C § 271(e)(5), Congress extended federal court jurisdiction over these ANDA declaratory judgment actions "to the extent consistent with the Constitution." 35 U.S.C. § 271(e)(5).

By filing a lawsuit on only one its five patents certified under paragraph IV in Teva's ANDA, Novartis has tried to simultaneously leverage the benefits provided to a patentee under the Hatch-Waxman Act and avoid the patentee's accompanying responsibilities. Novartis' '937 patent suit against Teva has invoked the statutory automatic 30-month stay and is concurrently insulating the four method patents from a validity challenge. In the statute, Congress explicitly required that in exchange for the 30-month stay, patentees were to "reasonably cooperate in expediting the action" of whether the paragraph IV patents were invalid or not infringed. [FN8] 21 U.S.C. § 355(j)(5)(B)(iii). Novartis' action insulates it from any judicial determination of the metes and bounds of the scope of the claims of its four Famvir method patents in relation to design-around, a determination that is central to the proper function of our patent system and is a central purpose of the Hatch-Waxman Act. Teva Pharm. USA, Inc. v. Pfizer Inc., 405 F.3d 990, 992 (Fed.Cir.2005) (rehearing en banc denied) (Gajarsa, J., dissenting).

It is clear from the legislative history that Congress intended this "civil action" to adjudicate the very controversy that Novartis has created here:

> The provision [a "civil action to obtain patent certainty"] ... is intended to clarify that Federal district courts are to entertain such suits for declaratory judgments so long as there is a "case or controversy" under Article III of the Constitution. We fully expect that, in almost all situations where a generic applicant has challenged a patent [by filing an ANDA with a paragraph IV certification] and not been sued for patent infringement, a claim by the generic applicant seeking declaratory judgment on the patent will give rise to a justiciable "case or controversy" under the Constitution. We believe that the only circumstance in which a case or controversy might not exist would arise in the rare circumstance in which the patent owner and brand drug company have given the generic applicant a covenant not to sue, or otherwise formally acknowledge that the generic applicant's drug does not infringe.
>
> ***9** The mere fact that neither the patent owner nor the brand drug company has brought a patent infringement suit within 45 days against a generic applicant does not mean there is no "case or controversy." The sole purpose of requiring the passage of 45 days is to provide the patent owner and brand-name drug company the first opportunity to begin patent litigation. Inaction within the 45-day period proves nothing, as there are tactical reasons why a patent owner or brand drug company might refrain from bringing suit on a patent within 45 days.
>
> For example, the brand drug company might have several patents listed in the Food and Drug Administration's Orange Book with respect to a particular drug. It could be in the company's interest to bring suit within 45 days on one patent and to hold the others in reserve. The suit on one patent would automatically stay approval of the generic application until the lawsuit is resolved or the 30 months elapses. Holding the other patents in reserve would introduce uncertainty that could discourage generic companies from devoting resources to bring the generic drug to market and that would give the brand drug company a second opportunity to delay generic competition by suing the generic company for infringement of the reserved patents after the resolution of the initial infringement suit.
>
> In each of these and in other circumstances, generic applicants must be able to seek a resolution of disputes involving all patents listed in the Orange Book with respect to the drug immediately upon the expiration of the 45-day period. We believe there can be a case or controversy sufficient for courts to hear these cases merely because the patents at issue have been listed in the FDA Orange Book, and because the statutory scheme of the Hatch-Waxman Act relies on early resolution of patent disputes. The declaratory judgment provisions in this bill are intended to encourage such early resolution of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



patent disputes.
149 Cong. Rec. S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy, ranking member of Senate HELP committee) (emphasis added). A central purpose of the Hatch-Waxman Act and the subsequent ANDA declaratory judgment amendment to that Act is "to enable competitors to bring cheaper, generic ... drugs to market as quickly as possible." Id. Novartis' actions frustrate this purpose and create a basis for finding a justiciable controversy.

[25] A fourth circumstance contributing to Teva's justiciable controversy is Novartis' pending infringement litigation. See Novartis Pharm. Corp., No. 05-1887, 2005 WL 3664014. As stated previously, Novartis' suit against Teva on Teva's submitted ANDA is an Article III controversy. A justiciable declaratory judgment controversy arises for an ANDA filer when a patentee lists patents in the Orange Book, the ANDA applicant files its ANDA certifying the listed patents under paragraph IV, and the patentee brings an action against the submitted ANDA on one or more of the patents. The combination of these three circumstances is dispositive in establishing an actual declaratory judgment controversy as to all the paragraph IV certified patents, whether the patentee has sued on all or only some of the paragraph IV certified patents. Our conclusion supports what we have already established in non-ANDA cases--that related litigation involving the same technology and the same parties is relevant in determining whether a justiciable declaratory judgment controversy exists on other related patents. See Vanguard Research, Inc. v. PEAT, Inc., 304 F.3d 1249, 1255 (Fed.Cir.2002) (following Goodyear and finding a justiciable declaratory judgment controversy where the defendant had sued the declaratory judgment plaintiff for misappropriation of trade secrets thereby demonstrating "a willingness to protect [its] technology."); Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed.Cir.1987) (finding a justiciable declaratory judgment controversy in a patent non-infringement and invalidity action where the defendant had sued the declaratory judgment plaintiff in state court for misappropriation of trade secrets involving the same technology, thereby engaging in "a course of conduct that shows a willingness to protect that technology.").

***10** [26] Novartis' selective '937 suit creates uncertainty as to Teva's legal rights under its ANDA. Ordinarily, a potential competitor in other fields is legally free to market its product in the face of an adversely-held patent. In contrast, under the Hatch-Waxman Act an ANDA filer in Teva's situation is not legally free to enter the market because federal statutes prohibit it. See 21 U.S.C § 355(j)(5)(B)(iii). Hence, Teva suffers a direct legal injury from the actions that Novartis has already taken--Novartis' listing of the five Famvir patents in the Orange Book and Novartis' suit against Teva challenging the validity of Teva's ANDA--which requires judicial relief. It is this exact type of uncertainty of legal rights that the ANDA declaratory judgment action was enacted to prevent. See id. § 355(j)(5)(C). Congress clearly has authority to give standing and create justiciable injuries through legislation for parties that might otherwise have no recourse as long as Congress does not exceed the limitations of Article III. Gladstone, 441 U.S. at 100, 99 S.Ct. 1601 ("Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one 'who otherwise would be barred ....' " (internal citations omitted)). Congress created the ANDA declaratory judgment action for generic drug companies specifically to avoid the type of legal uncertainty that Novartis has created. The legislative history of the ANDA declaratory judgment amendment explicitly states that the "uncertainty" caused by a brand-name company when it chooses to sue on only selective patents submitted in a single ANDA is an injury sufficient to support a justiciable controversy. See 149 Cong. Rec. S15885 (Nov. 25, 2003). The type of legal uncertainty as to the legal status of Teva's ANDA that Novartis has created by suing on only one of the five paragraph IV certified Famvir patents listed in the Orange Book is a present injury sufficient for a justiciable controversy.

Finally, the possibility of future litigation that Novartis created by electing to challenge Teva's ANDA on only one of the five Orange Book listed Famvir patents is a fifth circumstance contributing to finding that Teva has a justiciable declaratory judgment controversy. Novartis' suit on the ' 937 patent alone leaves open the possibility of future litigation regardless of whether Teva wins or loses the '937 infringement suit. The possibility that an ANDA filer will be subject to multiple infringement suits from the same patentee based on the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



submission of a single ANDA containing several paragraph IV certifications is an injury relevant to finding a justiciable controversy. If Teva is successful in defending the pending '937 infringement suit, it remains subject to four additional infringement actions by Novartis under 35 U.S.C. § 271(e)(2) on the remaining Famvir Orange Book patents certified in Teva's ANDA under paragraph IV. By its action, Novartis is insulating its Famvir Orange Book patents from any challenge of invalidity or non-infringement until all the patents expire. This threat of protracted litigation creates a present and real harm that is a relevant circumstance in finding whether a justiciable controversy exists.

III. CONCLUSION

***11** The Court re-affirmed in MedImmune the "all circumstances" analysis as the correct standard to use in determining whether a justiciable Article III controversy exists in a declaratory judgment action. Under this standard, we find that Teva has an injury-in-fact and a justiciable controversy that can be fully resolved by a declaratory judgment. Allowing Teva's declaratory judgment action is consistent with the "controversy" requirement in Article III and the Declaratory Judgment Act because the suit will achieve a final determination that resolves the entire dispute between Teva and Novartis. Teva has experienced real and actual injury. Consequently, Teva's injuries are traceable to Novartis' conduct and those injuries can be redressed by a favorable judicial decision. Therefore, Teva has established standing and an actual controversy sufficient to confer jurisdiction under the Declaratory Judgment Act.

For these reasons we reverse the district court's decision dismissing Teva's declaratory judgment action.

REVERSED

Concurring opinion filed by Senior Circuit Judge FRIEDMAN.

FRIEDMAN, Senior Circuit Judge, concurring in the judgment.

I agree with the court that the appellant Teva Pharmaceuticals USA, Inc. ("Teva") has shown an "actual controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and that the district court's judgment dismissing Teva's declaratory judgment action for lack of jurisdiction should be reversed. I write separately because I take a somewhat different, and shorter, path than the court does in reaching that conclusion.

In MedImmune, Inc., v. Genentech, Inc., --- U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), the Supreme Court rejected this court's settled view that a patent licensee must "terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed." Id., 127 S.Ct. at 767; see Gen-Probe Inc. v. Vysis, 359 F.3d 1376 (Fed.Cir.2004). The Supreme Court ruled that the jurisdiction of the district court did not turn on whether the declaratory judgment plaintiff had stopped paying royalties under or otherwise terminated the license, but on the general broader principles governing declaratory judgment jurisdiction, namely, whether the dispute between the parties is " 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.... Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " MedImmune, 127 S.Ct. at 771-72 (citation and footnote omitted).

***12** In a somewhat detailed footnote, the Supreme Court stated that this court's " 'reasonable apprehension of imminent suit' test" for determining declaratory judgment jurisdiction in patent cases (see Teva Pharms. USA, Inc. v. Pfizer, 395 F.3d 1324, 1333 (2005)) "would still contradict" a prior Supreme Court case and also "conflict[ ]" with another Supreme Court case, both of which that Court had relied on in its license breach ruling. Id., 127 S.Ct. at 775 n. 11. Although these footnote statements were dicta, the Court apparently was telling us that it rejected our "reasonable apprehension of imminent suit" test for determining declaratory judgment jurisdiction in patent cases,



and that the broader general rules governing declaratory judgment jurisdiction also govern patent cases.

In these unusual circumstances, where the Supreme Court went out of its way to state its disagreement with our "reasonable apprehension of imminent suit" test, which was not an issue in the case before it, it appears incumbent on us to stop using that test and hereafter to apply the general declaratory judgment standards that the Supreme Court applied in MedImmune.

I agree with the court that under these general standards there was an "actual controversy" between Teva and Novartis about the infringement and validity of the four patents relating to the Famvir technology. All five of Novartis' Famvir patents are closely related. As this court here recognizes, by listing those five patents in the Orange Book, "Novartis represent[ed] that a 'claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use or sale' of generic famciclovir covered by the claims of its listed Famvir patents." Maj. Op. at ----. In its Abbreviated New Drug Application filed with the Food and Drug Administration, Teva certified under paragraph IV of 21 U.S.C. § 355(j)(2)(A)(vii) that "its drug did not infringe" any of the five Novartis Famvir Orange Book patents or that the patents were invalid. There thus is an existing controversy between the parties over whether Teva's generic version of Famvir would infringe the four other Famvir patents listed in the Orange Book, and whether these patents are valid. Novartis' filing of the suit charging that Teva has infringed one of those five patents and Teva's filing a declaratory judgment suit relating to the other four patents confirms that the controversy between the parties is continuing.

FN1. Under this two prong test, the ANDA declaratory judgment plaintiff must show both: (1) a "reasonable apprehension" of "imminent" suit by the patentee; and (2) activity constituting infringement or the intent to infringe. See Pfizer, 395 F.3d at 1332.

FN2. The Declaratory Judgment Act and 35 U.S.C. § 271(e)(5) "serve [ ] the policies underlying the patent laws by enabling a test of the validity and infringement of patents that are ... being used only as ... 'scarecrows.' " Arrowhead Indus. Water, Inc. v. Ecolochem, 846 F.2d 731, 735 (1988) (quoting Judge Learned Hand in Bresnick v. U.S. Vitamin Corp., 139 F.2d 239 (2d Cir.1943)). Before the declaratory judgment provisions, competitors were "victimized" by patent owners who engaged in "extrajudicial patent enforcement with scare-the-customer-and-run tactics that infect[ed] the competitive environment of the business community with uncertainty and insecurity" and that rendered competitors "helpless and immobile so long as the patent owner refused to ... sue." Id. at 735 (quoting Japan Gas Lighter Ass'n v. Ronson Corp., 257 F.Supp. 219, 237 (D.N.J.1966)). After enactment of these provisions, competitors "were no longer restricted to [the hard] choice between incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a [declaratory] judgment." Id.

FN3. However, unlike non-declaratory judgment actions, even if there is an actual controversy, the district court is not required to exercise jurisdiction to address the merits of the action, as it retains discretion under the Act to decline declaratory judgment jurisdiction. Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952); Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed.Cir.1991) ("When there is no actual controversy, the court has no [jurisdiction and no] discretion to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary.").

FN4. See, e.g., Md. Cas. Co., 312 U.S. at 273, 61 S.Ct. 510 (finding a justiciable controversy even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured); Aetna Life Ins. Co., 300 U.S. at 239, 57 S.Ct. 461 (finding a justiciable controversy even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit); Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993) (holding that appellate affirmance of a judgment of non-infringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



of patent invalidity).

FN5. In analyzing Novartis' election not to sue on the four method patents, it appears from the greater part of the district court's analysis that the district court may have erred in explaining the purpose of the 45-day statutory "window" in 21 U.S.C. § 355(j)(5)(B)(iii). The provision provides an automatic 30-month stay of approval of an ANDA if an infringement action is brought by a patent holder within 45 days against the ANDA filer on a patent it has certified under paragraph IV; if no suit is brought the ANDA is immediately approved. Id. The district court seemed to incorrectly interpret this provision as a waiver, finding that Novartis had only a 45-day window in which to sue Teva on all the paragraph IV patents in Teva's ANDA, and because Novartis had allowed this window to expire, it could not bring suit on the four remaining method patents. Teva, slip op. at 7, 9-10, 2005 WL 3619389. This is not what the statute provides. Novartis' selective action against Teva is an attempt by Novartis to limit the impact of Teva's ANDA under the Hatch-Waxman Act, while at the same time using it to forestall a challenge on all the remaining four method patents. By suing solely on the '937 patent, Novartis has not only invoked the 30-month stay, preventing Teva's entire ANDA from immediate approval, but Novartis is also selectively suing on the patent with the earliest expiration date leaving the remaining four method patents overhanging Teva for future litigation. This conduct prevents Teva's generic from entering the market until the expiration of the last patent and is directly contrary to the purpose of the 30-month stay. The stay is explicitly offered to patent holders who "reasonably cooperate in expediting[ ] action[s]" challenging their patents. 21 U.S.C. § 355(j)(5)(B)(iii).

FN6. Teva filed its ANDA with the five paragraph IV certifications on December 28, 2004, resulting in the single act of infringement under 35 U.S.C. § 271(e)(2)(A).

FN7. "[I]n recent years both brand-name and generic drug companies have exploited certain aspects of the Hatch-Waxman Act to delay generic competition. The changes to the [ ] Act ... will stop these abuses." 149 Cong. Rec. S15882-03, S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy, ranking member of the Senate HELP committee).

FN8. A patent owner who brings an infringement claim against an ANDA filer within the 45-day period invokes an automatic 30-month stay preventing the otherwise immediate approval of the ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). The stay provides a safety net and an incentive to patentees who would otherwise not be inclined to bring a suit against the generic because at the time the ANDA is filed, the patentee has not suffered any economic loss. Where no commercial activity has yet taken place, a patentee becomes susceptible to having its patent found invalid or not infringed.

2007 WL 942201 (Fed.Cir.(N.J.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# TAB 8

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

**TRILEGIANT LOYALTY SOLUTIONS, INC. Plaintiff,**
**v.**
**MARITZ, INC., Defendant.**

**No. Civ.A. 04-360 JJF.**

Feb. 15, 2005.

Jack B. Blumenfeld, and Rodger D. Smith II, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Steven Lieberman, Sharon L. Davis, and R. Elizabeth Brenner, of Rothwell, Figg, Ernst & Manbeck, P.C., Washington, D.C., for Plaintiff, of counsel.

Rudolf E. Hutz, and Patricia Smink Rogowski, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, J. Bennett Clark, Jennifer E. Hoekel, and Marc W. Vander Tuig, of Senniger Powers, St. Louis, Missouri, for Defendant, of counsel.

MEMORANDUM OPINION

FARNAN, J.

***1** Presently before the Court is the Motion To Transfer Under 28 U.S .C. § 1404(a) (D.I.13) filed by Defendant Maritz, Inc. ("Maritz"). For the reasons discussed, Maritz's Motion To Transfer will be denied.

BACKGROUND

Plaintiff Trilegiant Loyalty Solutions, Inc. ("Trilegiant") initiated this lawsuit in this Court alleging patent infringement arising from Defendant Maritz's development and operation of online incentive programs. Trilegiant is incorporated in Delaware, and has its principal place of business in Richmond, Virginia. Maritz is a Missouri corporation with its principal place of business in Fenton, Missouri.

PARTIES' CONTENTIONS

By its motion, Maritz contends that a transfer to the Eastern District of Missouri is appropriate in this case pursuant to the factors identified in Jumara v. State Farm Insurance Co., 55 F.3d 873 (3d Cir.1995). Maritz contends that both the private and public interests favor a transfer to Missouri. With regard to the private interests, Maritz contends that none of the parties has a presence in Delaware, and that transfer to the Eastern District of Missouri would not significantly change the burden Trilegiant already bears by virtue of choosing Delaware. Maritz further contends that party witnesses and potential non-party witnesses appear to be located far from Delaware. Maritz also contends that accused activities likely took place in Missouri and that relevant documents are not likely to be located in Delaware. With regard to the public interests, Maritz contends that none of the interests involved in this lawsuit are unique to Delaware and that Missouri is the more practical venue for this lawsuit. Maritz did not address the following factors: 1) likelihood of an enforcement problem; 2) administrative difficulty in the two fora resulting from court congestion, and 3) familiarity with applicable state law.

In response, Trilegiant claims that its choice to bring suit in Delaware is entitled to substantial deference because Trilegiant chose to litigate in Delaware for several rational and legitimate reasons. Trilegiant contends that it sought the benefits of Delaware law by incorporation in this state. Trilegiant further contends that Magistrate Thyne mediated a previous case that involved two of the three patents in this suit. With regard to the convenience of the parties and witnesses, Trilegiant contends that Delaware is more convenient than Missouri for it and the inventor, Mr. Storey. Trilegiant stresses the Delaware Court has subpoena power over potential third-party Delaware corporations that would make access to documents easier in Delaware than in Missouri.

DISCUSSION

I. Legal Standard

Maritz moves for a transfer to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). Section 1404(a) is the general transfer statute that provides, "For the convenience of the parties and the witnesses, in the interest of justice, a district court may transfer any civil action to any other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



district or division where it may have been brought." Courts in the Third Circuit apply the public and private interest factors outlined in Jumara v. State Farm Insurance Co., 55 F.3d 873 (3d Cir.1995), to decide if they should order a transfer. The private interests outlined in Jumara include: (1) Plaintiff's forum preference; (2) Defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties; (5) the convenience of the witnesses--but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records--but only to the extent that the documents may be unavailable for trial in one of the fora. Id. at 879 (citations omitted).

***2** The public interests include "the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest ..., [and] the public policies of the fora." Id.

Maritz bears the burden of establishing the need for transfer. Id.

II. Analysis

A. Whether Plaintiffs' Choice Of Forum Is Entitled To "Paramount Consideration"

Ordinarily, a court will give "paramount consideration" to a plaintiff's choice of forum. See Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970). However, absent a legitimate, rational reason, if the plaintiff chooses to litigate away from his or her "home turf," the defendant's burden is lessened. Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F.Supp. 759, 764 (D.Del.1991). Under Section 1404(a), "home turf" refers to a corporation's principal place of business. Id. A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. Stratos Lightwave, Inc. v. E20 Communications, Inc., C.A. No. 01-309 JJF, 2002 WL 500920 at *2 (D.Del. March 26, 2002).

Applying these principles to the circumstances in this case, the Court will give "paramount consideration" to Trilegiant's decision to file the instant action in Delaware. Trilegiant is a Delaware corporation. As the Court observed in Stratos, a corporation's decision to incorporate in a state is a rational and legitimate reason to file an action in that forum. 2002 WL 500920 at *2. Therefore, to prevail on its Motion, Maritz must demonstrate that the Jumara factors strongly favor a transfer to Missouri.

B. Whether The Private Interests Strongly Favor Transfer

Although the claim arose and Maritz has its principal place of business in Missouri, I conclude that these factors, along with the remaining Jumara private interest considerations, do not strongly favor a transfer to Missouri.

First, I conclude that the convenience of the parties does not favor venue in Missouri over Delaware. Neither party would be unduly burdened by litigating this action in Delaware. See Pennwalt Corp. v. Purex Inds., Inc., 659 F.Supp. 287, 290 (D.Del.1986) (taking into account the burden a small company would encounter in litigating an action in a jurisdiction where it did not reside). Maritz's annual sales approximate $1.4 billion (D.I. 16 App. D) and Trilgiant chose to litigate in Delaware. Therefore, I conclude that litigating this action in Delaware will not "place a significant and onerous burden" on either party. Pennwalt, 659 F.Supp. at 290.

Next, although Maritz contends that the books and records necessary to litigate this action are in Missouri, Maritz does not contend that they could not be produced or would be unavailable in Delaware. Therefore, I do not consider the location of the books and records as weighing in favor of a transfer to Missouri. See Jumara, 55 F.3d at 879 (indicating that a court should consider the location of books and records only to the extent that the files "could not be produced in the alternative forum").

***3** Further, party witnesses or witnesses who are employed by Maritz or Trilegiant carry no weight in the "balance of convenience" analysis since each party is able to procure the attendance of its own employees. See Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 203 (D.Del.1998). With respect to Mr. Storey, the inventor of the patents-in-suit and a non-party witness, Maritz does not contend that he would be unavailable for trial in Delaware, and Maritz has provided the Court with no evidence that

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Mr. Storey, would be unwilling to testify on its behalf. Accordingly, I give little weight to Mr. Storey's status as a non-party witness and residence outside of Delaware.

Finally, although I appreciate the additional expense that Maritz may incur as a result of litigating in Delaware, I find that this hardship is substantially outweighed by the private interest considerations.

C. Whether The Public Interests Strongly Favor Transfer

I also conclude that the public interests do not weigh strongly in favor of a transfer to Missouri. Maritz did not argue that the congestion of the Delaware courts strongly favors a transfer. Further, there is no strong local interest in litigating this action in Missouri. The instant action is a patent infringement case, and, as the Court held in Stratos, rights relating to patents are not local or state matters. Stratos, 2002 WL 500920 at *2. Therefore, patent rights do not alone give rise to a local controversy or implicate local interests. Id. Accordingly, I conclude that the fact that the alleged infringement occurred in Missouri does not weigh strongly in favor of transferring the instant action.

In addition, I find that the Jumara factor that requires examining the difficulty in enforcing a judgment, were Trilegiant to prevail in the Delaware litigation, does not weigh in favor or against a transfer because there has been no dispute in either state over in personam jurisdiction.

CONCLUSION

Based upon Trilegiant's decision to file the instant lawsuit in Delaware and the absence of strong private or public interests favoring transfer to Missouri, I conclude that the Jumara factors do not strongly favor a transfer of the instant action under 28 U.S.C. § 1404(a). Accordingly, I will deny Maritz's Motion.

An appropriate Order will be entered.

ORDER

At Wilmington, this 15th day of February 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that the Motion To Transfer (D.I.13) filed by Defendant is DENIED.

2005 WL 441077 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

