## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SOLAE, LLC,                                      )
A Delaware limited liability company,            )
                                                 )
    Plaintiff,                 )
                                                 )        C.A. No. 07-140-JJF
vs.                                              )
                                                 )
HERSHEY CANADA INC.                              )
an Ontario, Canada corporation,                  )
                                                 )
    Defendant                   )

## AFFIDAVIT OF LAURIE CRADICK
### Sworn June 25, 2007

1.      I have been employed by Solae, LLC. ("Solae") and one of its predecessor companies since December 1999. Since October 1, 2006, I have been in the position of Director of Sales—North America. Prior to that, I was an Account Manager—Lecithin Division, and I am employed at Solae's St. Louis, Missouri headquarters. As Account Manager—Lecithin Division, I was responsible for Solae's sales of soy lecithin products to, and customer relations with, The Hershey Company ("The Hershey Co.") and its subsidiaries, including Hershey Canada Inc. ("Hershey").

2.      I have knowledge of the matters to which I hereinafter attest, except for those matters which are stated in this affidavit to be based on information provided to me by others, all of which I believe to be true.

3.      For the entire time that I was responsible for this account, The Hershey Company's purchasing department in Hershey, Pennsylvania, negotiated the underlying

- 2 -

agreements for the purchase of Solae's soy lecithin products for itself and its subsidiary located in Canada. Typically, on an annual basis I would meet with The Hershey Co.'s representatives at The Hershey Co.'s offices in Pennsylvania to negotiate the projected aggregate volume of soy lecithin products that would be ordered by manufacturing plants for Hershey and The Hershey Co. over the course of the next year, and the price that would apply to those purchases.

4.        In or about late 2005, I had discussions with Kim McLucas of The Hershey Co.'s purchasing department regarding supplying Solae's soy lecithin products for Hershey and The Hershey Co. manufacturing plants in 2006. As far as I can recall, these discussions were conducted by telephone.

5.        Specifically with respect to SOLEC, the soy lecithin product that comprised the two shipments at issue before this Court, about mid-December 2005, Ms. McLucas and I agreed that for the period from January 1, 2006 to December 31, 2006, Hershey would order up to 250,00 pounds of SOLEC at a price of $1.2565 per pound. Consistent with past practice, and as far as I was aware, Solae's standard terms would apply to those sales and Hershey would send purchase orders to Solae to purchase shipments of SOLEC, and Solae would ship SOLEC to Hershey at the above-noted price to which The Hershey Co. had agreed on Hershey's behalf.

6.        Whenever Ms. McLucas, or any other The Hershey Co. purchasing representative, and I reached agreement on behalf of our respective companies about the projected volume of a Solae product which The Hershey Co. or Hershey plants would order in an upcoming year, and the price at which the product would be sold, I

- 3 -

understood that The Hershey Co.'s representative was making a good faith estimate of the projected volume of product that their company's plants would order from Solae. It was not my understanding that this agreement as to price created a binding contractual obligation upon The Hershey Co. or Hershey plants to purchase a given amount of product.

7.      Pursuant to Solae and Hershey's regular dealings, on or about June 21, 2006, Hershey sent, to Solae's St. Louis headquarters, a purchase order for 39,682.8 pounds of SOLEC at the price of $1.2565 per pound, in accordance with our prior understanding. What appears to be a true copy of Hershey's purchase order dated June 21, 2006 (the "Purchase Order") was attached to the June 6, 2007 Declaration of Kimberly McLucas as Exhibit E.

8.      The Purchase Order was faxed to Solae's Customer Service department at Solae's headquarters in St. Louis, Missouri. The fax transmission line at the top of the Purchase Order appears to indicate that this fax transmission included a second page. Solae's Customer Service file relating to Hershey does not contain a copy of any other page that accompanied the Purchase Order. I did not see the fax when it was received, and I do not know what other page may have been faxed to Solae. Laura Titus, who was the Solae customer service representative who received, processes and filed the Purchase Order, has told me that she cannot recall what other page came by fax with the Purchase Order.

9.      Ms. Titus told me that after she verified that the quantity of SOLEC state in the Purchase Order was available for the state delivery date, and confirmed that the

- 4 -

price corresponded to the price discussed between myself and Ms. McLucas, Ms. Titus then faxed to Hershey's Smith Falls plant a document entitled "Order Confirmation 234910" (the "Order Confirmation") on June 22, 2006. A true and correct copy of the Order Confirmation is attached here as **Exhibit 1.**

10.     After the SOLEC was manufactured pursuant to Hershey's Purchase Order, it was shipped from Solae's plant, located in Gibson City, Illinois, to Hershey's plant in Smith Falls, Canada.

11.     Upon shipping the SOLEC product to Smith Falls, Solae sent the invoice for this sale by mail. Lisa Affunti, who works in Solae's accounting department in St. Louis, has informed me that on or about September 27, 2006, she printed Solae Invoice No. 90308495 (the "Invoice"), inserted the Invoice into an envelope and posted that envelope for mailing to Hershey's Smith Falls plant. The Invoice is double-sided. The reverse side of the Invoice is headed "Attachment 1—Conditions of Sale", which listes 18 terms that applied to this sale of SOLEC. Ms. Affunti has told me that those "Conditions of Sale" were printed on the reverse side of the Invoice. Ms. Affunti said that her standard procedure is to check twice that the Conditions of Sale are printed on the reverse side of each invoice—once when she takes the invoices from the computer print tray, and again when she folds and inserts the invoices into the mailing envelopes. A copy of the Invoice, including the reverse side with the Conditions of Sale, is attached as **Exhibit 2.**

12.     I have been informed that Hershey accepted the shipment of SOLEC, and paid the price stated on the Invoice. Attached as **Exhibit 3** is a copy of a check dated

- 5 -

October 27, 2006 in the amount of $49,861.80 that was received from Hershey as payment in full of the Invoice.

13.        Neither Hershey nor The Hershey Co., nor any of their employees, ever expressed any objection to me about any of the Conditions of Sale set out on the reverse side of the Invoice. I understand from Lisa Affunti that the Conditions of Sale have been set out on Solae's invoices for the sale of SOLEC (or its predecessor product, CENTROL) and other soy-based products to The Hershey Co. and Hershey since about 2003. No one at The Hershey Co. or Hershey has ever previously expressed to me any objection to the applicability of any of those Conditions of Sale at any time in the past.

14.        Further, Laura Titus in Customer Service and Lisa Affunti in Accounting have told me that no one from The Hershey Co. or Hershey ever expressed any objection to either of them about any of those Conditions of Sale, in connection with either the Invoice dated September 27, 2006 or any prior sale transaction. Beyond that, I have never heard from anyone else at Solae of any instance where The Hershey Co. or Hershey objected to any of those Conditions of Sale.

15.        Jack Self, who is Global Director of Lecithin of Solae, has informed me that Solae denies all liability for the claims advanced by Hershey. John Hoffman, who is Associate Director of Quality Assurances of Solae, has informed me that most, if not all, of the evidence relevant to those issues is situated in the U.S. For example, Solae's physical facilities as well as all documents relating to those operations are in the U.S. Similarly, people who have information about those matters are employees of Solae who reside in the U.S. Mr. Hoffman has informed me that he estimates that from five to ten

- 6 -

Solae employees would likely be required to give evidence regarding the above-noted matters at a trial of this action.

16.      In addition to the above named people, I believe that the following individuals, who reside in the U.S., have information relating to the commercial sale transaction between the parties:

     a.  Jack Self, as Global Director of Lecithin Sales, has knowledge of the sales relationship with Hershey and Solae's standard sales practices. Mr. Self is employed at Solae's headquarters in St. Louis, and resides in the greater St. Louis area.

     b.  John Hoffman, as Associate Director of Quality Assurance, has knowledge of the production, shipment, and quality assurance processes related to the manufacture of SOLEC, all of which occurred in the United States. Mr. Hoffman is employed at Solae's headquarters in St. Louis, and resides in the greater St. Louis area.

     c.  Laura Titus was Solae's customer service representative for the Hershey account. The nature of Ms. Titus' involvement has been referred to above. Ms. Titus ceased being employed at Solae in August 2006; at that time she returned to her prior state of Indiana where she currently resides.

     d.  Lisa Affunti was employed in the accounting department of Solae. The nature of Ms. Affunti's involvement was referred to above. Ms. Affunti was employed at the Solae headquarters in St. Louis, Missouri until approximately the end of April 2007, and Ms. Affunti has informed me that she continues to reside in St. Louis County, Missouri.

- 7 -

e. Cindy Wright is employed in Solae's customer service department, and was one of the representatives responsible for processing orders of various Solae soy products to Hershey and The Hershey Company. The nature of Ms. Wrights' involvement has been detailed in her affidavit, which also accompanies Solae's Opposition Brief. Ms. Wright is employed at the headquarters of Solae in St. Louis, and Ms. Wright has informed me that she resides in the greater St. Louis area.

f. Carmen Compas is employed in Solae's Protein Division, and is responsible for Solae's sales of soy protein products to The Hershey Co. since 2004. The nature of Ms. Compas' involvement has been detailed in her affidavit, which also accompanies Solae's Opposition Brief. Ms. Compas is employed at the headquarters of Solae in St. Louis, and Ms. Compas has informed me that she resides in the greater St. Louis area.

g. Kim McLucas was employed as a purchasing agent in the purchasing department of The Hershey Co. in Hershey, Pennsylvania. As mentioned above, Ms. McLucas was The Hershey Co. and Hershey's contact with whom I negotiated the SOLEC Supply Agreement for the supply of SOLEC to The Hershey Co. or Hershey facilities in 2006. As far as I know, Ms. McLucas is still employed at The Hershey Co. headquarters in Hershey, Pennsylvania, and as far as I can recall, Ms. McLucas also resides in Hershey, Pennsylvania.

h. I was involved as described above. I am employed at the headquarters of Solae in St. Louis and I reside in St. Louis.

- 8 -

17.     A declaration by Kimberly McLucas of The Hershey Co., dated June 6, 2007, was attached to the Motion to Dismiss filed by Hershey filed on June 8, 2007. I have read Ms. McLucas' declaration.

18.     In paragraph 7 of her affidavit, Ms. McLucas states that on January 10, 2006 she sent to me a copy of the document attached as Exhibit B to her affidavit, which she refers to as a "Quantity Contract". I believe I did not receive that document. To the best of my recollection, I have not received such a "Quantity Contract" document from Ms. McLucas, or from others, in connection with Solae products which I sold to The Hershey Co. or Hershey. To the best of my recollection, I learned of this document when I recently was shown Exhibit B of Ms. McLucas' affidavit.

19.     Ms. McLucas did not state in her affidavit how she sent that Quantity Contract document to me, and she did not include with Exhibit B any communication document, such as a fax transmission sheet. I do not know how Ms. McLucas sent it. However, I note that both the address and the fax number which are listed for Solae on the Quantity Contract at Exhibit B were not accurate in January 2006.

20.     The mailing address listed for Solae in the box opposite the word "Vendor" in Exhibit B is "3008099, THE SOLAE CO LLC, 23091 Network Place, Chicago, IL 60673-1217, USA". That address is an address of BankOne which was used by one of Solae's predecessors, Central Soya, for customers to pay their Central Soya accounts. To the best of my recollection, Central Soya changed that address in or around mid-2003, and at that time Central Soya notified customers of this change by inserting notices of the change in the envelopes containing invoices that were sent to customers.

- 9 -

21.         Similarly, the telephone number (800-348-0960) and the fax number (219-425-5301), which are listed for Solae in Exhibit B were not current in January 2006. Those numbers were the phone number and fax number, respectively, of a former Central Soya office in Fort Wayne, Indiana.  To the best of my recollection, that office was formally closed around December 2004, and those numbers had not been operational since around early 2005.

22.         Ms. McLucas had my correct contact information in January, 2006. Attached as **Exhibit 4** is a copy of an email dated December 14, 2005 that I sent to Ms. McLucas which listed the mailing address of my home office in Wisconsin at that time. Ms. McLucas and I often communicated with each other by e-mail and my office phone and fax numbers typically appeared under my name at the end of my emails.  For example, my phone number and fax number are listed under my name in the December 14, 2005 emails from me to Ms. McLucas which are attached as Exhibit A to Ms. McLucas' affidavit.

23.         Attached as Exhibit C to Ms. McLucas' affidavit is a sheet headed "Terms and Conditions".  In paragraphs 9 and 10 of her affidavit, Ms. McLucas said that Exhibit C is a copy of the reverse side of The Hershey Co.'s standard form Quantity Contract document.  Ms. McLucas said that she cannot remember whether she sent Exhibit C to me.  I confirm that I did not receive a copy of that document.  Moreover, to the best of my recollection, I did not receive or see a copy of a document like Exhibit C, or other documents setting forth other terms from Hershey, prior to this legal proceeding.

24.        With respect to paragraph 13 of Ms. McLucas' affidavit, I do not agree with Ms. McLucas' description of the nature of our agreement respecting price and projected supply of SOLEC for 2006 (which Ms. McLucas referred to as the "Quantity Contract"). It was never my understanding that The Hershey Co. or Hershey was contractually obligated to purchase the precise amount of SOLEC which Ms. McLucas had projected as Hershey's anticipated volume of orders for 2006.

25.        I think regular dealings between Solae and The Hershey Co. show that neither The Hershey Co. nor Hershey believed that the projected volumes and related pricing agreement created binding contracts. As I understood it, if in a given year the volume of orders from The Hershey Co., or subsidiary, plants turned out to be materially lower than the quantity projected by The Hershey Co.'s purchasing representative, that situation would raise a business relations issue, not a contractual legal issue. My understanding and expectation was that if such an event were to occur, I would contact The Hershey Co.'s purchasing representative to inquire about the reason for the unexpectedly low volume of orders and seek to work with her or him to try to effect a subsequent increase in the volume of the orders.

26.        Such a situation actually occurred in 2006 in connection with another Solae product for which Ms. McLucas and I were responsible — SOLEC 3F-UB-TN — which Solae sold to The Hershey Co.'s plant in Hershey, Pennsylvania. Ms. McLucas had estimated projected orders by The Hershey Co.'s plant of 544 metric tonnes. Based on the pattern of orders received from The Hershey Co.'s plant in the first quarter of 2006, it was evident that the total sales of that product in 2006 would fall well short of the projected volume. In March 2006 I contacted Ms. McLucas to inquire about whether

- 11 -

there were any concerns affecting The Hershey Co.'s orders of this product. Attached as **Exhibit 5** is a copy of an exchange of emails between Ms. McLucas and me about this issue on March 13, 2006. The content and phrasing of those e-mails reflects the business nature of our price and supply agreements for this product.

27.        Those communications in March 2006 were followed by a meeting in July 2006 between me and Douglas Solliday of The Hershey Co., whom I understood had succeeded Ms. McLucas as The Hershey Co. representative responsible for procurement of this product. My discussions with Mr. Solliday about the volume of The Hershey Co.'s orders of that product were similar in nature to my March, 2006 communications with Ms. McLucas. There was no suggestion by either Mr. Solliday or me that the difference between the actual orders and Ms. McLucas' prior projection was a breach of a contractual obligation by The Hershey Co. or Hershey.

I declare under penalty of perjury that the foregoing is true and correct.

**SWORN BEFORE ME** in St. Louis,                    )
MO, this day on June 25, 2007.                         )
                                                                              )
                                                                              )
                                                                              )
                                                                              )
**Notary:**                                                         )          _____
                                                                              )          LAURIE CRADICK

"NOTARY SEAL"
Pamela R. Harper, Notary Public
St. Louis County, State of Missouri
My Commission Expires 8/3/2008

# Exhibit 1

**The Solae Company.**

# Order Confirmation 234910

| **Shipping Address** | **Information** | |
|---|---|---|
| HERSHEY CANADA, INC.<br>C/O WILLS WAREHOUSE<br>HWY 15 SOUTH<br>SMITH FALLS ON  K7A 4T6<br>CANADA | Document Date | 21 Jun 2006 |
| | Purchase Order No. | 4500257993 |
| | Purchase Order Date | |
| | Incoterms | FOB Shippoint; Frt. PPD/Dlvd |
| **Bill-to Party Address** | Payment Terms | 30 days from invoice date |
| HERSHEY CANADA SMITH FALLS PLT<br>1 HERSHEY DRIVE<br>SMITH FALLS ON  K7A 4T6<br>CANADA | Freight Terms | Freight Included in the Price |
| | 22 Jun 2006  01:04:24 | Page 2 of   2 |

## Sales Order Details

| Item | Material Description | Conf. Date | Quantity | Net Weight | Gross Weight | Unit Price | Amount |
|---|---|---|---|---|---|---|---|
| 0010 | 10005325 | 06/29/2006 | 18 IBC | 18,000.000 KG | 19,242 KG | 2.7701 /KG | 49,861.80 |
| | SOLEC 3F-UB-IP<br>Standard Soy Lecithin Fluid<br>1,000 KG ST CAGE<br>Cust. Material No.: 1-00768-000 | | | | | | |
| | | | | | Total Amount   USD | | 49,861.80 |
| | Please fax order confirmation James Kuehl at (613) 283-4844. | | | | | | |

**Created By: Laura Titus**
**Shipping Plant: VX07 Gibson City Plant**
Price shall be the price in effect on the date of shipment
Prices reflected in the order confirmation are subject to change.
Please see Attachment 1 - Conditions of Sale on reverse side.
If you have any questions regarding this invoice please contact Financial Services at 1-800-325-7108 extension 3468.

Solae, LLC
P.O. Box 68940
St. Louis, Missouri 63168
(314) 982-1953 Tel  (800) 325-7108 Toll Free

Solae, LLC
1034 Danforth Drive
St. Louis, Missouri 63102

REASON FOR ERROR    E-1) HAND UP OR LINE FAIL    E-3) NO ANSWER    E-2) BUSY    E-4) NO FACSIMILE CONNECTION

COMMUNICATION RESULT REPORT ( JUN. 23, 2006  9:41AM )    P. 1

TTI SOLAE LLC-CS

FILE MODE          OPTION                 ADDRESS            RESULT    PAGE
6137 MEMORY TX     TRANSMITTED/STORED JUN. 23, 2006  9:34AM
                                        9161328834844        OK        1/1

**Exhibit 2**

# The Solae Company.

# Invoice
# 90308495

**Shipping Address**

HERSHEY CANADA, INC.
C/O WILLS WAREHOUSE
HWY 15 SOUTH
SMITH FALLS ON K7A 4T6
CANADA

**Billing Address**

HERSHEY CANADA SMITH FALLS PLT
1 HERSHEY DRIVE
SMITH FALLS ON K7A 4T8
CANADA

**Information**

| | |
|---|---|
| Document Date | 27 Sep 2006 |
| Billing Date | 27 Sep 2006 |
| Purchase Order No. | 4500257993 |
| Purchase Order Date | |
| Sales Order Number | 234910 |
| Incoterms | FOB Shippoint; Frt. PPD/Dlvd |
| Payment Terms | 30 days from invoice date |
| Payment Due Date | 27 Oct 2006 |

PLEASE REMIT TO:
   SOLAE, LLC
   C/O BANK OF AMERICA
   P O BOX 169
   ST LOUIS, MO 63150-0169          Page 1

**Invoice Details**

| Item | Material Description | Date Shipped | Quantity | Net Weight | Gross Weight | Unit Price | Amount |
|---|---|---|---|---|---|---|---|
| 0010 | 10005325<br><br>SOLEC 3F-UB-IP<br>Standard Soy Lecithin Fluid<br>1,000 KG ST CAGE<br>Cust. Material No.: 1-00768-000<br>Country of Origin: US | 09/27/2006 | 18 IBC | 18,000.000 KG | | 2.7701 /KG | 49,861.80 |
| | | | | | **Total Amount** | USD | 49,861.80 |
| | | **Total Gross Weight** | | 18,242 KG | | | |

Price shall be the price in effect on the date of shipment.
Please see Attachment 1 - Conditions of Sale on reverse side.



Solae, LLC
P.O. Box 88940
St. Louis, Missouri 63188
(314) 982-1983 Tel  (800) 325-7108 Toll Free

Solae, LLC
1034 Danforth Drive
St. Louis, Missouri 63102

ATTACHMENT 1 - CONDITIONS OF SALE
1. Unless otherwise indicated on the face of this Agreement, title, liability for and risk of loss to Product sold hereunder (the "Product") pass to Buyer upon loading for shipment at Seller's producing location.

2. Seller warrants only to Buyer that the Product delivered hereunder meets Seller's standard specifications for the Product as in effect on the date of shipment or such other specifications as may have been expressly agreed to herein. EXCEPT AS EXPRESSLY PROVIDED IN SECTION 6 HEREOF, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY (INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM ANY COURSE OF DEALING OR TRADE USAGE) REGARDING THE PRODUCT. Buyer, having the expertise and knowledge in the intended use of the Product and any articles made therefrom, assumes all risk and liability for results obtained by the use of the Product, whether used alone or in combination with other materials.

3. Failure to give notice of claim within ninety (90) days from date of delivery, or the date fixed for delivery (in case of non-delivery), shall constitute a waiver by Buyer of all claims in respect of the Product so delivered or not delivered, as the case may be. No Product shall be returned to Seller without Seller's prior written permission, and then only in the manner prescribed by Seller. No claim shall be allowed for Product that has been processed in any manner. n Any claims of Buyer may be setoff by seller in any amounts due and payable to Seller. Claims include claims of any kind, including without limitation those (a) for loss, damage, expense or injury, (b) with respect to the Product delivered or for non-delivery of the Product, or (c) based upon Seller's (i) breach of warranty, contract, statute, or regulation or (ii) negligence, strict liability or any other tort.

4. BUYER'S EXCLUSIVE AND SOLE REMEDY FOR ANY CLAIM SHALL BE A REFUND OF THE AMOUNT OF THE PURCHASE PRICE PAID FOR THE PRODUCT IN RESPECT OF WHICH DAMAGES ARE CLAIMED, AND IN NO EVENT SHALL SELLER'S LIABILITY FOR ANY CLAIM BE GREATER THAN THAT AMOUNT.

5. NEITHER PARTY SHALL BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION OR ANY OTHER LOSS), WHETHER OR NOT CAUSED BY OR RESULTING FROM THE BREACH OF CONTRACT, NEGLIGENCE OR OTHER WRONGFUL ACT OR OMISSION OF SUCH PARTY EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

6. Seller warrants that the use or sale of the Product delivered hereunder will not infringe the claims of any validly issued UnitedStates patent covering the Product itself, but does not warrant against infringement due to: (a) the use of Products in combination with other products or materials or in the operation of any process, or (b) the compliance by Seller with any specifications provided to the Seller by Buyer.

7. No liability shall result from delay in performance or non-performance, directly or indirectly caused by circumstances beyond thecontrol of the Party affected ("Force Majeure"), including, but not limited to Act of God, fire, explosion, flood, war, act of or authorized by any government, accident, labor trouble or shortage, equipment failure, inability to obtain from its usual sources of supply fuel, power, material, equipment or transportation or commercial impracticability. Quantities so affected may be eliminated from this Agreement without liability, but this Agreement shall remain otherwise unaffected. Seller shall have no obligation to purchase supplies of the Products specified herein to enable Seller to perform this Agreement.

8. It is understood and agreed between Buyer and Seller that if this Agreement covers Products that must be manufactured especially for Buyer and is suspended or terminated for any reason, Buyer will take delivery of and make payment for such Products as have beencompleted and such Products as are in process on the date notice of suspension or termination is received by Seller. If Buyer for any reason cannot accept delivery of such Products, Buyer will make payment therefor as though delivery has been made and Seller will store such Products for Buyer's account and at Buyer's expense.

9. If for any reason, including without limitation, Force Majeure, Seller is unable to supply the total demand for Products specified herein, Seller may distribute its available supply among any or all purchasers as well as business units, including affiliates and subsidiaries, of Seller on such basis as Seller may deem fair and practical without liability for any failure of performance that may result therefrom. Seller shall have no obligation to purchase Product to enable Seller to supply Buyer under this Agreement.

10. At Buyer's request, Seller may, at its option, furnish such technical information as Seller has available with respect to the use of the Products covered by this Agreement. Unless otherwise agreed in writing, all such technical assistance and information will be provided gratis, and Buyer assumes sole responsibility for results obtained in reliance thereon.

11. Buyer acknowledges that it has received and is familiar with Seller's labeling and literature concerning the Products and their properties. Buyer will forward such information to Buyer's employees and any others, including Buyer's customers, who may handle, process or sell such Products and advise such parties to familiarize themselves with such information.

12. Buyer shall reimburse Seller for all taxes, licenses, or other charges, by whatever name, (other than taxes based upon Seller's income) which Seller may be required to pay to any Government (National, Foreign, State or Local) upon the sale, production, or transportation of the Products sold hereunder.

13. In the event Buyer fails to fulfill Seller's terms of payment completely, or in case Seller shall have any doubt at any time as to Buyer's financial responsibility, Seller, without advance notice and at Seller's sole option, may decline to make further deliveries, except upon payment of all arrearages and receipt of cash in advance or delivery of security satisfactory to Seller.

14. This Agreement is not assignable or transferable by Buyer, in whole or in part, except with the prior written consent of Seller. This Agreement shall be binding upon the Parties, their successors and permitted assigns.

15. Failure by either Party to require performance by the other Party or to claim a breach of any provision of this Agreement shall not be construed as a waiver of any right arising under this Agreement, including the right to require subsequent performance or contest any subsequent breach.

16. If any term or provision of this Agreement shall be found to be invalid, illegal or unenforceable, this Agreement shall remain in full force and effect and such term or provision shall be deemed stricken. Seller and Buyer shall promptly agree upon a substitute for any such term or provision.

17. This Agreement is to be construed and the respective rights of Buyer and Seller are to be determined according to the laws of the State of Delaware, U.S.A., without regard to choice of law or conflicts principles of Delaware or any other jurisdiction, and the courts of Delaware shall have exclusive jurisdiction over any disputes or issues arising under this Agreement. The United Nations Convention on Contracts for the International Sale of Goods shall not govern this Agreement or the performance thereof or any aspect of any dispute arising therefrom.

18. This Agreement contains all of the terms and conditions with respect to the purchase and sale of the Products sold hereunder. These terms and conditions supersede any of previous date and no modification thereof shall be binding on Seller unless separately contracted in writing and agreed to by a duly authorized representative of Seller. No modification shall be effected by the acknowledgment or acceptance of purchase order forms stipulating different conditions. Unless Buyer shall notify Seller in writing to the contrary as soon as practicable after receipt of this Agreement by Buyer, Buyer shall be deemed to have accepted the terms and conditions hereof and, in the absence of such notification, Buyer's acceptance of the Products shall be equivalent to Buyer's assent to the terms and conditions hereof.

**Exhibit 3**



Hershey Canada Inc.                          3008099
2350 Matheson Blvd. East
Mississauga, Ontario L4W 5E9        Tel: (717) 534-5657                    NO.  01015428

| REFERENCE NUMBER | INVOICE NUMBER | INVOICE DATE | PURCHASE ORDER | COMMENTS | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| 5100258272 | 90308495 | 09/27/2006 | 4500257993 | | 49,861.80 | 0.00 | 49,861.80 |

| PAYMENT DOCUMENT   2000301938 | | | AMOUNT PAID | 49,861.80 |

# Exhibit 4

| | | |
|---|---|---|
| **Laurie Cradick/PROTEIN** | To | kmclucas@hersheys.com |
| 12/14/2005 03:32 PM | cc | |
| | bcc | |
| | Subject | address |

Kim - My current address is:

S96 W13206 Linksway Court
Muskego, WI 53150

Have a great evening and I'll talk to you tomorrow morning - Laurie

_____
Laurie Cradick
Account Manager - Lecithin Division
Solae, LLC
Office phone:  414-427-5067
Office fax:  414-427-5092

**Exhibit 5**

| | |
|---|---|
| Laurie Cradick/PROTEIN | To "McLucas, Kimberly" <kmclucas@hersheys.com> |
| 03/13/2006 02:22 PM | cc |
| | bcc |
| | Subject Re: |

Hi Kim - Thank you so much for looking into this for me and I am glad to hear that there we not "concerns" impacting the current order pattern.

Also, are you available on the afternoon of April 24 for a meeting? I'll plan on flying in to Harrisburg on Monday. Please let me know a time that would work well for you.

Best regards,

Laurie Cradick
Account Manager - Lecithin Division
Solae, LLC
Office phone: 414-427-5067
Office fax: 414-427-5092

"McLucas, Kimberly" <kmclucas@hersheys.com>



| | |
|---|---|
| "McLucas, Kimberly" <kmclucas@hersheys.com> | To <LCradick@solae.com> |
| 03/13/2006 01:03 PM | cc |
| | Subject |

Hi Laurie,
Checked into the Hershey plant lecithin usage and just as we thought....no issues, the plant is simply pulling from one supplier and not both. We have addressed the situation, so you should be seeing orders shortly.

Apologize for the mix-up. kim